# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
JOHNNY DUANE MILES,
Defendant and Appellant.

S086234

San Bernardino County Superior Court
FSB09438

May 28, 2020

Justice Groban authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, and Kruger concurred.

Justice Liu filed a dissenting opinion.

PEOPLE v. MILES

S086234

Opinion of the Court by Groban, J.

On March 17, 1999, a jury in San Bernardino County convicted defendant Johnny Duane Miles of burglary and first degree murder, first degree forcible rape, second degree robbery, and false imprisonment by violence of Nancy Willem. The jury found true the special circumstances that Willem was killed during the commission of the burglary, rape, and robbery (Pen. Code, § 190.2, subd. (a)(17))[1] and that the murder was intentional and involved the infliction of torture (§ 190.2, subd. (a)(18)). The jury also convicted defendant of 10 additional counts related to two separate incidents and found true the enhancement allegations relating to those counts. Following the penalty phase, the jury reached a verdict of death. After denying defendant's motion to modify the verdicts (§ 190.4, subd. (e)), the trial court sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Case

This case arises from three separate incidents occurring in February 1992: (1) the murder, rape, robbery, and false

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

imprisonment by violence of Nancy Willem and the burglary preceding her death; (2) the rape, robbery, false imprisonment by violence, and penetration by a foreign object of Christine C.; and (3) the robbery and false imprisonment by violence of Melvin Osburn and the rape, robbery, false imprisonment by violence, and penetration by a foreign object of Carole D.

### a. Nancy Willem

On February 4, 1992, Nancy Willem did not come home from work at the Behavioral Health Services Clinic in Rialto. That evening, her roommate, Kristen Schutz, started calling the clinic, but the clinic's phone lines were busy. When Schutz was not able to reach Willem, Schutz drove to the clinic. After entering the building through an unlocked back door, she found the door to the clinic ajar.

As she entered the clinic, she saw the reception area had been ransacked. She followed the blood on the floor from the reception area into one of the offices. There, she found Willem's naked body between a couch and a coffee table. There was a telephone cord tied to her wrist and a sweater wrapped around her neck. There was also a handwritten note found on top of her abdomen that read: "Feed the poor. Down with the goverement [*sic*]."

Schutz tried to call the police but realized that the telephone cords were missing. Once she reconnected one of the cords, she called 911. The police arrived and pronounced Willem dead on the scene. After securing the area and obtaining consent to search the clinic, the police collected blood and other bodily fluids from the reception area and office where Willem's body was found. The police also recorded a video depicting the crime scene, which was played for the jury.

2

Dr. Nenita Duazo subsequently performed the autopsy on Willem's body. Willem's injuries were extensive. She had multiple lacerations of her scalp and forehead, a fractured jaw, a missing tooth, redness in her vagina, and a circular area that appeared to be a cigarette burn on her chest. She had bruising of her face, chest, back, arms, and legs, which, according to Dr. Duazo, indicated that Willem was alive when her injuries were inflicted. Internally, Willem had eight broken ribs, a tear in her left lung, two lacerations of her liver, and hemorrhage in her brain. These injuries were likely caused by the application of substantial and multiple instances of force while Willem was still alive. Willem also had hemorrhage in her eyes and neck, as well as a broken bone and broken cartilage in her neck, all of which indicated that she was manually strangled before her death. Dr. Duazo testified that Willem was killed by a combination of blunt force injuries and manual strangulation.

### i. Physical evidence

Several witnesses testified regarding the collection and analysis of blood and other bodily fluids found at the crime scene. In particular, two criminalists from the San Bernardino County Sheriff's Crime Laboratory, David Stockwell and Donald Jones, testified concerning their analysis.

Stockwell testified that he conducted a serological analysis on items recovered from the crime scene. He concluded that the nonvictim blood and semen from the crime scene came from an individual who was likely African-American and a type AB secretor, which he defined as someone whose blood type is secreted into other bodily fluids. He testified that the genetic markers found in the nonvictim blood and semen would be expected in approximately one in 333 million African-American

men.  Following this analysis, he received a blood sample from defendant, who is African-American.  Stockwell testified that defendant is a secretor and his genetic markers matched the genetic markers found in the nonvictim blood and semen recovered from the crime scene.

Next, Jones testified that he conducted a DNA analysis on the samples recovered from the crime scene.  He concluded that defendant's DNA profile matched the DNA profile from the crime scene.  He testified that the DNA profile from the crime scene would be expected in approximately one in 180 million African-Americans (or one in 280 million African-Americans using his lab's updated match criteria from around the time of the trial).

### ii.  Other evidence

On the night of Willem's death, her ATM card was used to withdraw $1,160 from an ATM in Pomona and another $300 from an ATM in Glendora.  An employee from the bank's investigations unit testified that ATM surveillance photographs showed an individual wearing glasses and a "Red Dragon" hat at the time of the transaction in Glendora.  The individual's features could not be discerned from the photographs.

A couple of months after Willem's death, the police briefly stopped an individual who identified himself as defendant and was walking no more than half of a mile from Willem's office.  During the stop, the police documented that defendant was an African-American man who was 25 years old, six feet, six inches tall, and 210 pounds.

As to the handwritten note found at the crime scene, the prosecution offered testimony by expert Glen Owens.  He examined the note found on Willem's body and certain inmate

forms written by defendant. He concluded that there were some indications that the writer of the inmate forms may have written the crime scene note but it was not definitive. An investigator testified that when defendant was served with a court order requiring him to provide a handwriting exemplar, he refused to comply.

An officer at the Rialto Police Department testified that during a search of defendant's car, the police found a note in it. That note read in part: "We'll be wiped out by the governement [*sic*]." The note contained a misspelling of the word government, which was similar to the misspelling in the note found on Willem's body.

### b. *Christine C.*

Christine C. was working alone at the Desert Communities United Way office in Victorville on the evening of February 25, 1992 when a man forced his way into the office. Christine C. described the man as African-American, over six feet tall, in his twenties, and of "slim build."[2]

The man was wearing a ski-type mask and holding a silver handgun. Pointing the gun at her, he demanded money. She gave him cash from her purse and said that the office had no other money. He then ordered her to lie down on the floor while he searched the office. Once he returned, he directed her into a conference room, tied her arms behind her back with a telephone cord, and took her jewelry. When she looked at him, he told her, "Don't look at me." He also took an ATM card from her purse and asked her for the PIN, to which she said she did not know it.

---

[2] Christine C. did not identify defendant in her testimony.

After rummaging through the office, he returned to the conference room. He proceeded to pull up Christine C.'s skirt and pull down her pantyhose, while she was lying on her stomach with her hands tied behind her back. He penetrated her vagina from behind, initially with his fingers and then with his penis. He ejaculated on her thighs and wiped her off with a tissue. He then tied her feet and hands together and tied her to the conference table with telephone cords, and he left the office. She untied herself and called 911. The police arrived on the scene, and she was taken to the hospital for a medical examination.

The San Bernardino County Sheriff's Crime Laboratory analyzed semen on tissues left at the crime scene. Criminalist Stockwell testified that based on his serological analysis, the semen profile from the Christine C. crime scene matched the profile from the Willem crime scene and additionally matched defendant's genetic markers. Criminalist Jones testified that the DNA found on the tissues also matched defendant's DNA profile and would be expected in approximately one in 180 million African-Americans.

### c.  *Melvin Osburn & Carole D.*

Therapist Melvin Osburn was in his office in San Bernardino on the evening of February 26, 1992 when a man later determined by the jury to be defendant entered the office wearing a ski mask and holding a silver handgun.[3] Defendant demanded Osburn's wallet, threatening, "Don't look at me or I'll kill you." After taking money from his wallet, defendant ordered

---

[3]    Osburn did not identify defendant in his testimony, but he described the perpetrator as a Black man who was at least six feet, one inch tall and in his twenties.

Osburn to lie down on the floor. Defendant then tied Osburn's hands and feet with telephone cords and proceeded to rummage around the office, repeatedly asking whether there was a safe. Defendant also forced Osburn's ring off his finger and asked Osburn about his ATM card, to which Osburn told him that there was no money on it. When it appeared defendant was getting ready to leave, Osburn's next client, Carole D., walked into the office.

She was met by defendant pointing a silver gun at her.[4] He directed her into Osburn's office, where he ordered her to lie down and not look at him. He asked whether she had any money or an ATM card, to which she replied that she did not. He took her wedding ring and tied her up with her purse strap and telephone cords. Next, he pulled her pants and underwear down and penetrated her vagina from behind, initially with his fingers and then with his penis.

Taking Osburn's keys, defendant left the office and drove away in Osburn's car, with his cellphone. Osburn freed himself and Carole D., and because the telephone cords were torn, he triggered the burglar alarm and eventually used his next client's phone to call the police. The police arrived, and Carole D. was taken to the hospital for a medical examination. The examining nurse testified that Carole D. showed signs of sexual assault. The police later found Osburn's car abandoned in a nearby parking lot. His cellphone bill showed calls that he had not made.

---

[4] She did not identify defendant in her testimony, but she described the perpetrator as a Black man over six feet tall and in his twenties.

The San Bernardino County Sheriff's Crime Laboratory analyzed semen found on Carole D.'s underwear. Criminalist Stockwell testified that this sample contained less serological information than the samples obtained from the other two crime scenes, but that the detectable genetic markers from the sample matched the semen profiles from the Willem and Christine C. crime scenes. He testified that the detectable genetic markers from the sample also matched defendant's genetic markers. As to the DNA, criminalist Jones was able to form only a partial DNA profile based on the sample, but he testified that the partial DNA profile matched defendant's DNA and would be expected in approximately one in 920 African-Americans.

### 2. *Defense Case*

The defense called three witnesses. First, the defense called Dr. Thomas Rogers, a pathology expert, who testified that it was not possible to determine whether Willem's injuries were inflicted when she was conscious or unconscious or to determine from any autopsy whether a deceased individual was tortured. Second, the defense called Dr. Jonathan Koehler, a research methodology expert, who testified regarding errors and probability statistics in DNA analysis. For the third witness, the defense called one of the investigating detectives, Detective Chester Lore. He testified that the police did not recover stolen property, bloody clothing, or a "Red Dragon" hat (which the individual who used Willem's ATM card in Glendora appeared to be wearing) when they searched defendant's residences and vehicle. Nor did the police recover any fingerprints from the crime scenes that matched defendant's fingerprints. Detective Lore also testified that the police previously investigated someone other than defendant in connection with a "Red

Dragon" hat, but that individual was eventually cleared as a suspect.

## B. Penalty Phase

After the jury returned its guilt phase verdicts, the trial court declared a doubt as to defendant's competency, suspended proceedings, and commenced a competency trial before a separate jury. (The evidence presented in the competency trial is described further below [see pt. IV., *post*].) Once defendant was found competent to stand trial, the trial proceeded to the penalty phase.

### 1. Prosecution Evidence

#### a. Defendant's criminal activity and prior convictions

The prosecution presented evidence in aggravation concerning defendant's unadjudicated criminal activity and prior criminal convictions.

##### i. January 6, 1992 incident

Paula Yenerall testified that she was working alone at an accounting firm in Rialto on the evening of January 6, 1992 when defendant broke the window and forced his way into the office. He was wearing a stocking cap, jacket, and gloves and appeared "very calm." He pointed a chrome, semi-automatic gun at her and demanded money. When she told him that she had some money in her purse at her desk, he held the gun to her head and pulled her to her desk to retrieve the money. He repeatedly said, "Don't look at me, bitch," and at one point said, "I'm a murderer and I'll kill you, too." After taking $1,200 from her, as well as two rings and a gold necklace, he tied her hands behind her back with a telephone cord. He then instructed her to stay put and left.

### ii. January 21, 1992 incident

Janet Heynen testified regarding a January 21, 1992 incident in a psychologist's office in Upland. While she was working that evening, defendant appeared at the reception window. She described him as calm and wearing a brown beanie, jacket, and gloves. He pointed a chrome handgun at her face and demanded money. He told her not to look at him and appeared to be "pulling the [telephone] cords out." After she gave him some cash, he briefly went into a back office for a couple of minutes and, once he returned, told her to not call the police and left.

### iii. February 19, 1992 incident

John Kendrick testified about a February 19, 1992 incident in Ontario. That evening, he was working in his accounting office with his clients Paul and Mary Crawford, when defendant entered the office. Defendant appeared "[v]ery calm" and was wearing a gray stocking cap on his head. Pointing a small chrome handgun at Kendrick, defendant demanded money. Kendrick and the Crawfords gave defendant several hundred dollars in cash, while defendant repeatedly said, "Don't look at me, man." Defendant then instructed them not to call the police for 30 minutes, and he left.

### iv. February 21, 1992 incident

Arnold and Sharyn Andersen testified that they were working together in their insurance and investment office in San Bernardino on the evening of February 21, 1992.[5] After they heard crashing and shattering sounds, defendant appeared

---

[5] For clarity, we will refer to Arnold and Sharyn Andersen by their first names.

in the office, pointing a small chrome, automatic gun at them. Defendant appeared calm and was wearing a beanie. He demanded money and told the Andersens to lie down on the floor, repeatedly telling them not to look at him. He then took some cash from Arnold's wallet and Sharyn's purse and, after Arnold went into his office to look for more money, defendant took a money clip with approximately $1,200 from him. As he was leaving the office, defendant grabbed a bunch of Kleenex and dabbed his hands where he had cut them from breaking one of the windows to enter the office.

### v. *June 16, 1992 crimes*

Bridget E. testified about defendant's June 16, 1992 crimes in Torrance. She was working at an appraisal office that evening with her boss, Steve H., when defendant entered the office and pointed a gun at them. Defendant was wearing a red bandana over his lower face. He demanded money, so Bridget E. gave him some money from her purse. He proceeded to search the office, asking for the location of a safe. He repeatedly said, "Don't look at me, man. Don't look at me, man."

Next, defendant tied Steve H. with telephone cords and computer cords, unzipped Bridget E.'s pants, and kicked Steve H. in the ribs a few times. Pointing the gun at Bridget E.'s head, defendant ordered Bridget E. to orally copulate Steve H. She told him that she was pregnant and asked him not to hurt her, so "[h]e said, just do what I say and you won't get hurt — if you don't want to get hurt." Bridget E. proceeded to orally copulate Steve H. She could not recall whether she was tied up at that time. Defendant then penetrated Bridget E.'s vagina, initially with his fingers and then with his penis. Once he stopped, he told her to continue copulating Steve H. She recounted that her

hands and feet were tied up with cords at that time. After defendant eventually left the office, Steve H. and Bridget E. untied themselves and called the police.

### vi. *Defendant's other criminal convictions*

At the prosecution's request, the trial court took judicial notice of 14 prior convictions, of which 13 were for first degree residential burglary and one was for second degree robbery.

### b. *Victim impact testimony*

The prosecution's penalty phase evidence also included victim impact testimony from Nancy Willem's father, mother, and younger sister. The family members described Nancy's personality and interests, including her interest in singing and playing guitar. During her mother's testimony, the prosecution played a videotape for the jury depicting Nancy singing at her youngest sister's wedding a couple of years before her death. The family members further described how Nancy's death affected them as a family and as individuals. The prosecution also offered a photograph of Nancy, which, according to her father, resembled how she looked around the time of her death.

The prosecution additionally offered victim impact testimony from Bridget E. She testified that after the June 16, 1992 crimes, she was tested "right away" for any diseases, and she was diagnosed with and treated for chlamydia. She also stopped working and by the time of the trial, had not had the opportunity to "get back into" the appraisal business. She suffered from nightmares for "a long time" and became "more suspicious of people" and a "more serious person."

## 2. Defense Evidence

### a. Defendant's testimony

Against the advice of counsel, defendant testified during the penalty phase, largely in a narrative form. He began by describing a time when he approached two people who had supposedly killed his cousin and his neighbor. He explained that the man who had killed his neighbor told him to testify about "Wilhelmena's murder." Defendant testified that by "Wilhelmena," he meant Nancy Willem, and that Wilhelmena was "able to reveal the things that happened at the time of the crime."

He then testified that ever since undergoing foot surgery when he was a teenager, he suffered from hallucinations and "ill angels," which controlled his actions. He said that he suffered from these "ill angels" at the time of Willem's death. As to her death, he said that "[t]here was one rape" and a beating of her head with an object, but there was no strangulation. He said that after he took her money and bank information, he raped her because the voices in his head told him that she wanted it. He described that the voices then grew louder and, in order to stop them, he beat, kicked, and stomped her. The voices next took over the left side of his body, causing him to write the note, saying, "Wake up goverenment [*sic*]." He testified that since that night, "Wilhelmena" helped him to control the "ill angels" and intervened to "save the lives of other females that were involved in this case."[6]

---

[6] On cross-examination, defendant testified that the voices told him to rape Christine C. and Carole D. as well. He said that the voices "were there continuously through the robberies," and

### b. *Evidence regarding defendant's mental health*

Much of the defense's penalty phase evidence concerned defendant's mental health. Clinical psychologist Dr. Joseph Lantz testified that defendant's intelligence fell within the borderline range, between mental deficiency and low-average, and in his opinion, defendant suffered from schizophrenia. Psychiatrist Dr. Richard Dudley testified that in his opinion, defendant suffered from schizo-affective disorder, which he defined as a combination of schizophrenia and a mood disorder. He further testified that defendant suffered from cognitive deficits and problems related to an invasive mass, which was near his brain and removed after his arrest. A social worker also testified about defendant visiting a psychiatric clinic in 1992.

In addition, Dr. Joseph Wu testified regarding a positron emission tomography (PET) scan of defendant's brain, of which photographs and a video were displayed to the jury. Dr. Wu testified that while a PET scan cannot alone lead to a diagnosis, defendant's brain exhibited abnormalities consistent with a schizophrenia diagnosis. Dr. Ernie Meth testified regarding a SPECT (single-photon emission computed tomography) scan of defendant's brain, of which photographs and a video were likewise displayed to the jury. Dr. Meth testified that based on this scan, defendant's brain exhibited abnormalities that were consistent with the results of Dr. Wu's PET scan.

---

when asked by the prosecutor about specific robberies, defendant recalled raping Bridget E., robbing Yenerall, and robbing the Andersens, although he denied robbing Heynen (and was not asked specifically about robbing Kendrick or the Crawfords).

### c. Other testimony

One of defendant's childhood friends, Dwayne Washington, described defendant as a "great kid" with a tough home life and a love for basketball. He testified that defendant became depressed during his teenage years after he underwent foot surgery and was no longer able to play basketball. He testified that on a few occasions around 1984 or 1985, defendant acted strangely and appeared to believe that people were trying to get him. Washington's mother, Sharon Mitchell, described defendant as a good kid with an "extremely negative" home life. She, too, recalled that defendant began suffering from headaches and memory lapses during his teenage years and recounted a few incidents in which defendant tried to hide under the table to prevent people from getting him. Washington's aunt, Serette Mitchell-Hughes, testified about one of those incidents as well. These witnesses also testified about defendant later getting married and having a daughter.

Defendant's former girlfriend, Terry Sylvester, testified that defendant lived with her and her three children around the late 1980's in Atlanta. She said that during that time, defendant worked and participated in family activities, but one day, he left for work and never returned. He later told her that he went back to California.

A retired correctional officer testified that should defendant be sentenced to life imprisonment, he could function within the constraints of the prison facilities and be safely imprisoned.

### 3. Prosecution's Rebuttal

In rebuttal, the prosecution offered testimony from two additional witnesses. First, Deputy Jonathan Billings testified

about a videotape that he said reflected defendant's "normal" behavior in jail.  The videotape, a portion of which was played for the jury, showed defendant watching television and playing chess with other inmates.  Second, psychiatrist Dr. Rajesh Patel testified that when defendant claimed to be suicidal in jail, Dr. Patel examined him and concluded that he was malingering mental illness.

## II.  PRETRIAL ISSUES

## A. Prosecutor's Use of Peremptory Challenges

Defendant contends that the prosecutor improperly exercised peremptory challenges to excuse two prospective jurors, who were African-American, in violation of *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).  The prosecutor's exercise of these peremptory challenges, defendant argues, warrants close scrutiny because there are heightened concerns about racial discrimination in this case given that he was charged with raping and murdering a White woman.  We will examine the prosecutor's exercise of the peremptory challenges in light of these and all other relevant circumstances.

### 1.  *Background*

Jury selection for defendant's trial began on November 18, 1998.  Following hardships and other dismissals, the remaining prospective jurors filled out a 31-page questionnaire.  Based on the completed questionnaires, the parties questioned some of the prospective jurors on their views regarding the death penalty pursuant to *People v. Hovey* (1988) 44 Cal.3d 543.  Once *Hovey* questioning concluded, and the trial court excused prospective jurors for cause or by stipulation, 72 prospective jurors remained.  The trial court called the first 12 prospective

jurors to the main panel. They included three African-American jurors, three Hispanic jurors, five White jurors, and one "American Indian / Caucasian" juror.

The parties then commenced general voir dire. After the defense challenged an African-American prospective juror for cause and that prospective juror was replaced, the prosecutor proceeded to exercise peremptory strikes against Malinda M. (a Hispanic woman), Kevin C. (an African-American man), Michelle G. (a White woman), Simeon G. (an African-American man), and Ronald W. (a White man). After the prosecutor twice passed on exercising any peremptory strikes and the defense exercised three peremptory strikes, the prosecutor next struck Isabella B. (an African-American woman).

At this time, the defense raised a *Batson/Wheeler* objection and moved to quash the panel. The defense noted that the prosecutor had used three of his six strikes up to that point on African-American prospective jurors. The trial court found that a prima facie case had been established. The court stated that it understood the basis for striking Isabella B. based on her answers during *Hovey* questioning, but asked the prosecutor to explain the basis for striking Kevin C. and Simeon G. After hearing the prosecutor's reasons, the court found, "As to [Kevin C.] and [Simeon G.], I think it's certainly not as obvious, but I cannot say it is not legitimate. [¶] So, at this point in time, I will make a finding that there have been valid reasons to justify excusing those three prospective jurors pursuant to a peremptory challenge."

After the court denied the motion, the 12 prospective jurors seated in the jury box included nine White jurors, two Hispanic jurors, and one "American Indian / Caucasian" juror.

The prosecutor twice passed on exercising any peremptory strikes, and the defense exercised four peremptory strikes. The prosecutor then exercised a peremptory strike against Mary B. (an African-American woman). At this time, the defense renewed its *Batson/Wheeler* objection and motion to quash the panel, arguing that, although Mary B. expressed reservations about the death penalty, the prosecutor had exercised his peremptory strikes to compose an all-White jury panel. The trial court denied the motion, finding that Mary B.'s reservations about the death penalty justified the strike.

After the prosecutor peremptorily struck Richard L. (a Hispanic man), and the defense exercised one more peremptory strike, the parties accepted the main jury panel. The panel included 10 White jurors, one Hispanic juror, and one "American Indian / Caucasian" juror. The trial court then proceeded to the selection of six alternate jurors. The prosecutor repeatedly declined to exercise any peremptory strikes, except to strike Lynia B. (a White woman). The sworn alternate jurors included one African-American and five White individuals. Before the penalty phase of the trial, the African-American alternate juror replaced an excused juror and served on the jury.

On appeal, defendant renews his challenge to the prosecutor's peremptory strikes of Kevin C. and Simeon G. from the main jury panel. Defendant states that he "is not challenging" the peremptory strikes of Isabella B. or Mary B. As we examine defendant's *Batson/Wheeler* arguments with regard to Kevin C. and Simeon G., we bear the above record in mind.

### a. *Prospective Juror Kevin C.*

Kevin C., who was African-American, was 32 years old at the time of jury selection. He was divorced with three children and worked as a coach operator. He had previously served in the military and had previously applied, but had not been selected, for other law enforcement positions. His former spouse was a correctional officer.

In his questionnaire, he revealed a degree of skepticism regarding the criminal justice system. He believed that people accused of crimes were treated "leniently if you rich harshly if poor." He previously served as an alternate juror in a criminal case involving murder charges, and when asked how his jury service experience affected his views on the court system, he said, "It let me know that no matter the crime or defendant the community selected [as jurors] is both white and blue collar workers." He believed the biggest problem with the system was "racial coded prison[s] keep racism alive and create even larger bias." And when asked whether he, any relative, or any close friend had ever been mistreated by a law enforcement officer, he checked "yes" and said, "pull[ed] over several times no good reason given no ticket given."

Asked whether he was upset by the O.J. Simpson verdict, he checked "no" and commented, "To [*sic*] hard to believe one man did it all, I believe biases created a lot of the circumstance [*sic*] evidence." Also regarding the Simpson case, he said, "watch[ed] several days of the O.J. Simpson trial taught me [a lot] about law" in response to whether he had read about, watched, or listened to any testimony regarding DNA evidence. Asked about his opinion on using DNA evidence in criminal

cases, he said, "I think it's like a polygraph not a for sure certain."

His questionnaire responses also suggested some hesitancy about the death penalty. Asked his opinion on it, he said, "there are members of society who do bad things and don['t] deserve to be here, can I kill them? unknown at this time." Asked whether he had a moral, philosophical, or religious objection to the death penalty, he checked "yes," commenting, "God should decide life or death, but some don't deserve[] life." He identified himself as Christian and described his religion's view as "thou should not kill." He said that he agreed with that view, although he added, "but if my child was being attack[ed] someone might die[]." As to whether he would vote to keep or abolish the death penalty, he said that he would not vote and remarked, "I like to decide who could stay in society but not decide who stays on earth (I'd like to sleep)." He believed that the death penalty was unfair but admitted, "mainly because I don't know it completely."

In spite of this, he said that his views on the death penalty had changed in the last 10 years, commenting, "at first against but now feel it is needed in special circumstances." He identified himself as belonging to Group 3, which was defined as "I neither favor nor oppose the death penalty." He said that his views on the death penalty were not such that he would never be able to personally vote for the death of the defendant under any circumstance. Nor would he be reluctant to vote for a sentence of death. But he said that he would be reluctant to sign the verdict form or state the verdict in court, commenting, "to look at someone not knowing why he did it would be hard."

During *Hovey* questioning, the prosecutor asked Kevin C. about his moral, philosophical, or religious objections to the death penalty. Kevin C. responded, "I feel where I live I should decide. Where I'm a Christian. I go to church, so I think, you know, I can't. I think God should decide. But, you know, I think I should decide if I live in the community." Following up on this response, the prosecutor asked, "Then you made a comment, though, on the next page. 'I'd like to decide who could stay in society, but not decide who stays on earth.' That means you feel comfortable [with] making a decision if somebody should be maybe incarcerated, but you feel less comfortable making a decision as far as life or death on an individual?" Kevin C. responded, "Well, of course I feel uncomfortable about life or death, but incarcerated for the rest of their life, if they don't believe, I would probably go that way, you know. Just an assumption. But, again, I don't think I'd have a big problem, depending on evidence of what is in front of me. If someone killed my daughter, then I could see it." The prosecutor clarified that "of course we have a victim that you weren't acquainted with" and "[y]ou don't know her at all." Kevin C. said, "Right, I'm just saying —"

The prosecutor then defined aggravating and mitigating evidence and asked, "But you're going to hear, like you may hear some bad evidence, and you may hear some good evidence. But basically, if the bad outweighs the good — " Kevin C. responded, "If the bad outweighs the good, then I don't have a problem doing my job." Asked "[w]hich means you could, you could vote for a death verdict," Kevin C. responded, "Yeah."

When the trial court subsequently called the first 12 prospective jurors, including Kevin C., to the jury box, the court and the parties asked a series of questions to the jurors as a

group. Neither the prosecutor nor the defense asked Kevin C. any individual questions during general voir dire.

Following defendant's *Batson/Wheeler* objection, the prosecutor stated his reasons for striking Kevin C.: "[Kevin C.] in his questionnaire compared DNA to a polygraph. That it wasn't a for sure thing. His answers on the questionnaire regarding the death penalty were much more tentative. He indicated questions like he wants to decide who is in society, but not [who's] on earth. He was very skeptical of the O.J. Simpson case. He stated biases created the circumstantial evidence in the O.J. Simpson case. This is a DNA case very much like that. It's a circumstantial case. It's a DNA case. Those, those are the main concerns that I had." The prosecutor added, "I think that in person his, his statements about the death penalty didn't rise to a level for cause; but, however, I think when you take the totality of his responses, I think, I mean those are essentially the reasons that I'm stating." The court found that the prosecutor's reasons for striking Kevin C. were legitimate and valid.

### b. *Prospective Juror Simeon G.*

Simeon G. was an unmarried, 24-year-old African-American man with no children at the time of jury selection for defendant's trial. He worked as a forklift driver. He had previously considered working in law enforcement to help others, and his father worked for the DEA.

In his questionnaire, he described himself as a leader rather than a follower and remarked, "I like my opinion over other peoples [*sic*]." He said that he had not previously worked with a group of people to make a decision, although he believed "it would be very interesting" to work with other jurors to reach

a verdict. He had not previously served on a jury. Asked whether he believed the jury system to be a fair method to judge a defendant charged with a crime, he replied affirmatively, commenting, "12 people have to come together to accuse someone. That[']s 12 different opinions. Pretty impressive."

He considered the biggest problems with the criminal justice system to be "A. The Court Backlog. B. Better ways of getting people through the judicial system." He believed he could be a fair and impartial juror, stating, "I'm open to objectively listening to evidence from both sides to decide a fair verdict." He did not believe that testimony by law enforcement officers would be more truthful or accurate than testimony by civilians; he would not automatically accept the opinion of a psychiatrist or psychologist; and he could follow an instruction that if a defendant does not testify, jurors are not supposed to draw any conclusions from that fact.

Asked whether he could follow an instruction "that a defendant is presumed innocent unless proven guilty beyond a reasonable doubt," he checked "yes" but commented, "If I have any feeling that he might not have done it, hes [*sic*] innocent." In that response, it appears that he crossed out the word "doubt" and replaced it with the word "feeling." Elsewhere, he indicated that he was not upset by the O.J. Simpson verdict (without providing any explanation); that people accused of crimes are treated fairly; and that he "really [didn't] know anything about" DNA evidence in criminal cases. He also favored the death penalty and said that he could vote for a death sentence.

During general voir dire, Simeon G. and two other prospective jurors did not arrive at the courthouse that morning, possibly due to a miscommunication. The defense insisted on

trying to locate these missing prospective jurors. The prosecutor objected to doing so, arguing that other prospective jurors in their group were present in court and thus inferring that the missing prospective jurors "voluntarily absented themselves." It appears that the trial judge, seeing from Simeon G.'s questionnaire that he worked for Kmart Corporation, "called information and got the numbers of two Kmart stores in the Ontario area and [called] to try to locate Simeon [G.]." Simeon G. then called and spoke to the bailiff, and at the bailiff's request, Simeon G. came to court that afternoon.

That afternoon, the prosecutor explained to the prospective jurors who were seated in the jury box, including Simeon G.: "[O]ne of the instructions you're going to get in the case has to do with, essentially, reasonable doubt. There will be a definition that you're going to get at the end of the case. It's basically a doubt based on reason. And the duty is that if the case has been proved by the prosecution beyond a reasonable doubt, your duty is to return a guilty verdict. There's [*sic*] also other principles that are, I don't know how deeply we touched on them in the questionnaire, but the presumption of innocence. Of course, everybody who is charged with a crime is entitled to the presumption of innocence, and that is in existence right now. [¶] The question is, is if it [*sic*] at the conclusion of the case if the case has been proved beyond a reasonable doubt whether we can expect everybody to come back with a guilty verdict."

Immediately following this explanation, the prosecutor asked Simeon G., "[I]n your questionnaire you mentioned something — and keep in mind I'm not intending to, you know, embarrass anybody or anything like that. It's just, like I said, this is the only way we can get information quickly is to kind of be in a group at this point. [¶] You mentioned that if — [Simeon

G.], you mention in your questionnaire that if you had any feeling that maybe the defendant was [not] involved, then he'd be not guilty."[7]  Simeon G. replied, "I'm sorry?"  The prosecutor explained, "In your questionnaire, you used the phrase that if you have a feeling that the defendant was [not] involved, that you'd find him not guilty.  And you used the word 'feeling' instead of the word 'doubt.'  You'd written 'doubt' and crossed out and written the word 'feeling.'  Do you remember that?"  Simeon G. replied, "I don't quite remember it, but I'm trying to understand your question.  You're saying if I had a reasonable doubt?"

The prosecutor responded, "Well, I'm not sure.  I'm trying to understand what you meant by that.  You indicated that if you had a feeling that he might not be involved, then he would be not guilty?"  Simeon G. replied, "Well, I think what I was trying to say, if I'm correct, is that if the evidence showed that there wasn't — that there was some reasonable doubt, then I probably would not accuse him, because of the fact that, myself being in the same situation or anybody, I think that if the evidence didn't totally prove that I did it, then there is some doubt.  You know what I'm saying?"  The prosecutor said, "Okay."  Simeon G. added, "So it wasn't so much a feeling as it was if the evidence didn't show."  When the prosecutor sought to clarify the answer, asking, "Okay.  So you would base it on evidence?"  Simeon G. replied, "Basically, yes.  I'm sorry."  The prosecutor commented, "I wanted to make sure," and Simeon G.

---

[7]  It appears that the prosecutor initially misspoke and meant to say "if you had any feeling that maybe the defendant was [not] involved, then he'd be not guilty."  The prosecutor subsequently clarified his question.

added, "I couldn't tell you, tell you what I said, because I don't have the paper to look at what I actually meant totally."   The prosecutor concluded, "Okay.  Thank you."

Following defendant's *Batson/Wheeler* objection, the prosecutor stated his reasons for striking Simeon G.:  "[Simeon G.] made statements on his questionnaire how he likes his opinions over others.  He did make a statement, although he explained it differently in court, he made a statement on his questionnaire basically saying if I have a feeling he didn't do it, he's not guilty.  And he had crossed out the word doubt, which led me to believe that he certainly wasn't going to base it on evidence.  [¶] And I, also, would note that this is an individual who the Court personally tracked down this morning.  He didn't have — he, unlike others in his group, didn't show up for court this morning.  I would be concerned about his responses in light of the fact that he was, he was single-handedly hunted down to be here this afternoon.  So, I'm not sure that his responses in court should prevail over the answers he gave on his questionnaire.    But  certainly  those  statements  on  his questionnaire cause me some significant concerns."

Seeking clarification, the court asked, "His answer being that if he had a feeling the defendant was not guilty, that was the answer that bothered you?"  The prosecutor responded, "Yes, based on — and he had crossed out the word doubt.  And to me that made it sound like he was going to be basically basing it on a hunch, or a feeling, which was, as the presenter of evidence, I'm powerless to overcome.  And that was the main concern on that."  The prosecutor then added, "Also, he was not upset by the O.J. Simpson verdict.  If you'll notice across the board, I've excused jurors I believe of Hispanic origin and Caucasian origin, and the common denominator, essentially, is that they were not,

were not upset by the O.J. Simpson verdict, which was a DNA, circumstantial case. And I think those, those raise significant concerns in my mind as a guilt phase juror and the type of case that I'm dealing with."

Following the prosecutor's reasons, defense counsel stated that Simeon G. misunderstood whether "he was supposed to be here today or tomorrow" and, once it was clarified, he appeared. Defense counsel continued, "[Simeon G.] checked on his questionnaire with regard to the death penalty that he's a Group 2, that he favors the death penalty, but would weigh and consider aggravating circumstances. [¶] He really doesn't give any answers that suggest that he couldn't be fair and impartial. He indicates that his father was a D.E.A. agent. [¶] With regard to DNA, he said he didn't know anything about it."

The court responded, "Well, I understand that there's certainly not enough there to excuse him for cause, but that's not the test that I have to utilize in this situation. I have to determine whether or not there are valid, legitimate reasons for the District Attorney dismissing three of the four Blacks that were called to the box. [¶] As I indicated, as to [Isabella B.], I understand his concern there. As to [Kevin C.] and [Simeon G.], I think it's certainly not as obvious, but I cannot say it is not legitimate. [¶] So, at this point in time, I will make a finding that there have been valid reasons to justify excusing those three prospective jurors pursuant to a peremptory challenge. But I don't need to remind counsel that we're treading on thin ice in this area, and the consequences of falling through means we start all over again."

## 2. Discussion

### a. Applicable law

The United States and California Constitutions prohibit the discriminatory use of peremptory challenges. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) A three-step inquiry governs the analysis of *Batson/Wheeler* claims. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.)

" 'The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. . . . All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 975 (*O'Malley*).) " 'At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has

some basis in accepted trial strategy." ' " (*People v. Jones* (2011) 51 Cal.4th 346, 360 (*Jones*).)

" ' " "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' " ' " (*People v. Vines* (2011) 51 Cal.4th 830, 848 (*Vines*).) However, " '[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171 (*Gutierrez*).)

Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges. "Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613–614 (*Lenix*); accord, *People v. Winbush* (2017) 2 Cal.5th 402, 435 (*Winbush*).)

Defendant, however, argues that the trial court's findings are not entitled to deference here because the prosecutor's reasons were "suspicious" and, after hearing them, the court credited them without much discussion on the record. We disagree. The trial court found that a prima facie case had been established and asked the prosecutor to explain the basis for striking Kevin C. and Simeon G. The prosecutor's stated reasons were largely self-evident: It requires "little additional explication" (*Gutierrez, supra,* 2 Cal.5th at p. 1171) to understand why an advocate would harbor a concern about a prospective juror's stated preference for his own opinion over others' or a prospective juror's opinion on DNA evidence, the death penalty, or the O.J. Simpson verdict. Moreover, the prosecutor articulated why, specifically, some of the prospective jurors' responses concerned him. The court also asked the prosecutor a question about one of his stated reasons for striking Simeon G. (See *ante,* at p. 26 ["His answer being that if he had a feeling the defendant was not guilty, that was the answer that bothered you?"].) And the court listened to defense counsel's comments on the prosecutor's striking of Simeon G.[8] The trial

---

[8] Disagreeing, the dissent argues that the prosecutor's reasons were not self-evident and, in turn, that the trial court was required to do more than what it did here. The dissent relies on *Gutierrez, supra,* 2 Cal.5th 1150. (Dis. opn., *post,* at pp. 2–3.) In *Gutierrez,* we found that it was not self-evident why a prospective juror's mere unawareness of gang activity in a specific city would indicate a bias against a witness who was a gang member in the city. (*Gutierrez,* at p. 1169.)

The dissent asserts that the trial court here "expressly acknowledged that the prosecutor's proffered reasons for striking Kevin C. and Simeon G. were not self-evident." (Dis.

court acknowledged that "there's certainly not enough there to excuse [Simeon G.] for cause," but the trial court accurately explained that "that's not the test" and instead it must determine whether there were "valid, legitimate" reasons to justify the prosecutor's peremptory challenges.

The court then acknowledged that the prosecutor's stated reasons for striking Kevin C. and Simeon G. were not as "obvious" (as the reasons for striking another prospective juror, Isabella B.). The court, however, concluded that the prosecutor's reasons for striking Kevin C. and Simeon G. were legitimate and valid. The court added, "I don't need to remind counsel that we're treading on thin ice in this area, and the consequences of falling through means we start all over again." While the discussion was brief, and while the trial court could have done more to make a fuller record and itself acknowledged it was making a somewhat close call, the record shows that the court considered the prosecutor's reasons and, as discussed below, those reasons were plausible and supported by the record. In these circumstances, while a more detailed colloquy may well have been helpful, the prosecutor and the trial court adequately developed the record, and on this record, we conclude that the trial court's findings are entitled to deference. (See *People v.*

---

opn., *post*, at p. 2.) We disagree. The fact that the trial court did not "understand" the strikes as to Kevin C. and Simeon G. — *before the prosecutor provided his reasons for them* — and asked the prosecutor to explain those strikes does not mean that the prosecutor's reasons, once provided, were not self-evident. Nor do we require that the prosecutor's reasons be "obvious." Rather, the prosecutor's reasons, once provided, "were either self-explanatory or were explained at the hearing." (*People v. Smith* (2018) 4 Cal.5th 1134, 1162 (*Smith*).) For this reason, *Gutierrez*'s reasoning is "inapplicable here." (*Ibid.*)

*Hardy* (2018) 5 Cal.5th 56, 76 (*Hardy*) [" ' "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings" ' "].)

### i. *Comparative juror analysis*

"Also relevant here, in light of defendant's appellate arguments, are principles pertaining to comparative juror analysis, which, on a claim of race-based peremptory challenges, compares the voir dire responses of the challenged prospective jurors with those of similar jurors who were not members of the challenged jurors' racial group, whom the prosecutor did not challenge. [Citation.] '[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination.' " (*O'Malley, supra,* 62 Cal.4th at pp. 975–976.) Comparative juror analysis is appropriately confined to the jurors defendant has specifically discussed in his appellate briefing. (*Winbush, supra*, 2 Cal.5th at pp. 442–443.)

"Where, as here, the comparative analysis was not made at trial, 'the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges.' [Citation.] Therefore, 'an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.' [Citation.] When a defendant asks for comparative juror analysis for the first time on appeal, we have held that 'such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent.' " (*O'Malley, supra*, 62 Cal.4th at p. 976.) We have also held that under these circumstances, " 'a

reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.'" (*Id.* at p. 977.)

In supplemental briefing, defendant takes issue with our approach to conducting comparative juror analysis for the first time on appeal. He argues that we should ignore some of the Attorney General's efforts to distinguish challenged prospective jurors from those purportedly similar jurors whom the prosecutor did not challenge. Considering such distinctions, defendant argues, is inconsistent with recent decisions by the high court and "increases the risk that racial discrimination will persist in the criminal justice system."

Defendant's argument rests primarily on *Miller-El v. Dretke* (2005) 545 U.S. 231 (*Miller-El*). There, the high court made clear that "a prosecutor simply has got to state his reasons [for a peremptory challenge] as best he can and stand or fall on the plausibility of the reasons he gives." (*Id.* at p. 252.) The high court also cited this portion of its opinion in a footnote criticizing the dissent for "focus[ing] on reasons the prosecution itself did not offer" when the dissent explained why the nonchallenged jurors "were otherwise more acceptable to the prosecution than [the challenged prospective juror]." (*Id.* at p. 245, fn. 4.) Relying on these two excerpts, defendant observes that, in response to his comparative juror analysis, the Attorney General offers "new reasons for why the white jurors were *not* discharged" and argues that this "approach is barred by *Miller-El*'s stand or fall principle because it is simply the flip side of the same coin of offering new reasons for the discharge of the black jurors" and, moreover, is explicitly rejected by *Miller-El*'s footnote four. Defendant further argues that this approach is

inconsistent with *Snyder v. Louisiana* (2008) 552 U.S. 472 (*Snyder*) and *Foster v. Chatman* (2016) 578 U.S. ___ [136 S.Ct. 1737] (*Foster*) because the state in those cases offered new reasons for why the White jurors were not discharged and, without discussing those reasons, the high court concluded that, for a multitude of reasons, the peremptory strikes were motivated in substantial part by discriminatory intent.

We have recognized that "in judging why a prosecutor exercised a particular challenge, the trial court and reviewing court must examine only the reasons actually given. 'If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.' " (*Jones*, *supra*, 51 Cal.4th at p. 365, quoting *Miller-El, supra*, 545 U.S. at p. 252.) However, we have rejected the further argument that in conducting comparative juror analysis for the first time on appeal, "we may not consider reasons not stated on the record for accepting *other* jurors." (*Jones*, at p. 365.) In rejecting that argument, we have observed that "no authority has imposed the additional burden [on the prosecution] of anticipating all possible unmade claims of comparative juror analysis and explaining why *other* jurors were *not* challenged." (*Ibid.*)

Absent further explanation from the high court, we do not read *Miller-El* to require us when conducting comparative juror analysis for the first time on appeal, to turn a blind eye to reasons the record discloses for not challenging *other* jurors even if those jurors are similar in some respects to excused jurors. Reading *Miller-El* to restrict our review of the record in this manner would seem inconsistent with the high court's subsequent statement that the high court in *Miller-El* "made it clear that in considering a *Batson* objection, or in reviewing a

ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." (*Snyder, supra,* 552 U.S. at p. 478.) Nor do we read *Snyder* and *Foster, supra,* 578 U.S. ___ [136 S.Ct. 1737] to expressly prohibit us from considering such reasons the record discloses for not challenging *other* jurors in these circumstances.

That said, we take the opportunity to clarify and to emphasize the following two points about our approach to comparative juror analysis.

First, comparative juror analysis is a form of circumstantial evidence that is relevant on the issue of purposeful discrimination. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El, supra,* 545 U.S. at p. 241.) When a prosecutor states multiple reasons for challenging a juror, a comparison between the challenged juror and a similar nonchallenged juror in regard to *any one of* the prosecutor's stated reasons is relevant, but not necessarily dispositive, on the issue of purposeful discrimination. (See *id.* at p. 247, fn. 6 ["The dissent contends that there are no white panelists similarly situated to [the challenged jurors] because ' " '[s]imilarly situated' does not mean matching any one of several reasons the prosecution gave for striking a potential juror — it means matching *all* of them." ' [Citation.] None of our cases announces a rule that no comparison is probative unless the situation of the

individuals compared is identical in all respects, and there is no reason to accept one"].)[9]

Second, when conducting comparative juror analysis for the first time on appeal, we need not turn a blind eye to reasons the record discloses for not challenging other jurors. "This is so because a party legitimately may challenge one prospective juror but not another to whom the same particular concern applies. [Citation.] 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' " (*People v. Chism*

---

[9] The dissent emphasizes that recent decisions by the high court found "single-issue comparisons among jurors to be highly probative of discrimination." (Dis. opn., *post*, at p. 16.) As stated, we agree that a single-issue comparison among jurors is a form of circumstantial evidence that is relevant. However, such comparisons are not necessarily dispositive on the issue of purposeful discrimination but rather, must be considered within all of the relevant circumstances. (See *Flowers v. Mississippi* (2019) 588 U.S. __, __ [139 S.Ct. 2228, 2250] ["[i]n a different context, the [challenged juror's] strike might be deemed permissible," but "we must examine the whole picture" and the comparisons between the challenged and nonchallenged jurors "cannot be considered in isolation"].) The fact that the high court found single-issue comparisons to be highly probative of discrimination within the circumstances of a particular case is not inconsistent with our analysis here, which, as discussed below, recognizes that such comparisons are relevant but ultimately concludes, within all of the relevant circumstances, that substantial evidence supports the trial court's denial of defendant's *Batson/Wheeler* motion.

(2014) 58 Cal.4th 1266, 1319 (*Chism*); accord, *People v. Krebs* (2019) 8 Cal.5th 265, 293–294.)

However, "we bear in mind that comparative juror analysis is not simply an exercise in identifying any conceivable distinctions among prospective jurors. 'A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.' [Citation.] Rather, because the ultimate question before us concerns the prosecutor's motivations in exercising the challenge in question, we must ask whether there were any *material* differences among the jurors — that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges." (*O'Malley*, *supra*, 62 Cal.4th at p. 977.) In determining whether there were any *material* differences among the jurors, we note that differences among the jurors generally will be more probative if they closely relate to reasons the prosecutor has stated for a peremptory challenge. Because in this case we rely on differences among the jurors that closely relate to reasons the prosecutor has stated for a peremptory challenge, we need not opine on whether differences among the jurors can be material even if they are wholly unrelated to reasons the prosecutor has stated for a peremptory challenge.

### b. *Prospective Juror Kevin C.*

As a preliminary matter, defendant accurately points out that the prosecutor questioned Kevin C. regarding the death penalty but did not question Kevin C. regarding DNA evidence or the O.J. Simpson verdict. (See *Smith*, *supra*, 4 Cal.5th at p. 1152 ["an attorney's failure to meaningfully examine a prospective juror about a subject about which the attorney

claims to be concerned can constitute evidence of pretext"].) The prosecutor's failure to question Kevin C. about "each and every area of articulated concern," however, does not necessarily demonstrate that those concerns were pretextual. (*People v. Cowan* (2010) 50 Cal.4th 401, 451 (*Cowan*).) That the prosecutor failed to engage Kevin C. in voir dire is also less significant where, as here, the prosecutor received before voir dire, Kevin C.'s responses to the 31-page written questionnaire containing 130 questions. (See *People v. Melendez* (2016) 2 Cal.5th 1, 19 (*Melendez*) [" 'plac[ing] little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge' " where the prosecutor reviewed a "detailed" jury questionnaire and heard defense counsel question the prospective juror]; *Jones*, *supra*, 51 Cal.4th at p. 363.) Indeed, the prosecutor's concerns about Kevin C.'s views regarding DNA evidence and the O.J. Simpson verdict "arose from a pair of questionnaire responses that spoke for themselves; no additional clarification was needed to ascertain [Kevin C.'s] meaning." (*Smith, supra*, 4 Cal.5th at p. 1152; cf. *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1018, fn. 14 ["One inference that may be drawn from any such decision to ask few or no questions is that the prosecutor had already properly determined that a challenge was warranted based on the questionnaire or existing voir dire answers, and that further questioning was unnecessary"].)

Defendant also accurately points out that the prosecutor did not question other prospective jurors regarding DNA evidence or the O.J. Simpson verdict during voir dire. Defendant argues that this circumstance suggests that the prosecutor was not sincerely concerned about jurors' views regarding these topics. Our review of the record confirms that

both the prosecutor and the defense asked very few questions during voir dire.[10]

However, our review of the record also indicates that, contrary to defendant's argument, the prosecutor appeared interested in jurors' views regarding DNA evidence and the O.J. Simpson verdict. For the questionnaire, the prosecutor proposed various questions regarding scientific evidence, even leading defense counsel to request modifications to those

---

[10] This may have been in part due to the circumstances leading up to voir dire. Before jury selection, defense counsel proposed that the parties should ask any questions of the prospective jurors — even questions that did not pertain to the death penalty — during *Hovey* questioning. Defense counsel and the prosecutor had "some confusion or disagreement" in this regard because the prosecutor anticipated asking questions pertaining only to the death penalty or to confidential matters during *Hovey* questioning and thus was "only selecting [prospective jurors] for possible *Hovey* voir dire who have questionable answers that need further questioning as to [the] death penalty." The trial court ultimately agreed to follow the prosecutor's approach for *Hovey* questioning and to provide the opportunity for the parties to question the prospective jurors regarding other matters during voir dire. The court, however, expected that "there's not going to be a lot of questions" during voir dire since the parties had received "most of the information from the questionnaire." Then, during *Hovey* questioning, the parties primarily questioned the prospective jurors regarding the death penalty but, at times, questioned the prospective jurors regarding other matters. After *Hovey* questioning, the court said, "I'm gathering that there's not going to be a whole lot of individual questioning of these jurors, that you've pretty much covered those that you — the questions that you had from the questionnaires." Defense counsel responded that he did not "have a need to ask any further questions at all," but if the prosecutor planned to ask any further questions, defense counsel might "do a couple things."

questions because defense counsel "really [didn't] like having blood and semen, DNA, and all that stuff repeated over, and over again in the questions as though it's an important thing for [the prospective jurors] to be worried about in the case before they even hear what the evidence is." During voir dire, the prosecutor also asked the prospective jurors as a group whether they would "have a problem applying basically the law, and finding circumstantial evidence is every bit as important as direct evidence." The prosecutor later explained that he considered O.J. Simpson's case to be similar to defendant's case given that both relied on DNA evidence and circumstantial evidence. Keeping these and all relevant circumstances in mind, we proceed to examine each of the prosecutor's stated reasons for striking Kevin C.

Regarding the prosecutor's first reason, the prosecutor stated, "[Kevin C.] in his questionnaire compared DNA to a polygraph. That it wasn't a for sure thing." The prosecutor's case relied heavily on DNA evidence. The prosecutor's reason for striking Kevin C. is plausible, supported by the record, and race neutral. However, defendant argues that five other jurors (Jurors Nos. 10 and 11 and Alternate Jurors Nos. 1, 4, and 5) expressed similar reservations about DNA evidence yet were neither questioned nor excused by the prosecutor. Not so.

Unlike Kevin C., these other jurors did not express a negative opinion on DNA evidence. Rather, when asked about DNA evidence, Juror No. 10 replied, "should be admitted if can show + prove accuracy;" Alternate Juror No. 1 replied, "All evidence if more conclusive than not should be considered;" and Alternate Juror No. 4 replied, "No opinion." In addition, although Alternate Juror No. 5 replied, "It[']s ok but shouldn't be only evidence used" and stated elsewhere, "seems it could be

40

accurate," this response merely emphasized his preference to consider all evidence, a concept that he repeated elsewhere in his questionnaire. Lastly, Juror No. 11 responded, "OK if it[']s true evidence." This response might suggest that some DNA evidence may not be "true" evidence, but even if so, this response was less negative than Kevin C.'s response, which characterized all DNA evidence as "like a polygraph not a for sure certain." Thus, the prosecutor "could plausibly have distinguished" among these views regarding DNA evidence in deciding to strike only Kevin C. (*People v. Mills* (2010) 48 Cal.4th 158, 183 (*Mills*) [comparative juror analysis unpersuasive where prosecutor distinguished among prospective jurors' views on scientific evidence]; see also *People v. Wilkinson* (2004) 33 Cal.4th 821, 850 [discussing "the deep division in the scientific and legal communities regarding the reliability of polygraph evidence"].)

As to the second reason, the prosecutor accurately characterized Kevin C.'s questionnaire responses regarding the death penalty as "tentative." "A prospective juror's views about the death penalty are a permissible race- and group-neutral basis for exercising a peremptory challenge in a capital case." (*People v. McDermott* (2002) 28 Cal.4th 946, 970–971; see e.g., *Winbush, supra,* 2 Cal.5th at p. 436 [a juror's religious reservations about the death penalty can justify a peremptory challenge]; *People v. Garcia* (2011) 52 Cal.4th 706, 749 [a juror's "mixed and vague" views about the death penalty can justify a peremptory challenge]; *People v. Lomax* (2010) 49 Cal.4th 530, 572 (*Lomax*) [a juror's reluctance to impose the death penalty can justify a peremptory challenge].)

Kevin C.'s questionnaire responses indicated that he was uncertain whether he could vote for a death sentence and that he had religious reservations about the death penalty. He

wrote, "there are members of society who do bad things and don[']t deserve to be here, can I kill them?  unknown at this time."  He believed that the death penalty was unfair and said that he would be reluctant to sign a verdict form for a sentence of death or state the verdict in court.  He identified himself as a Christian who generally agreed with his religion's view that "thou should not kill."  Asked whether he had a moral, philosophical, or religious objection to the death penalty, he checked "yes," commenting, "God should decide life or death, but some don't deserve[] life."  He also wrote, "I like to decide who could stay in society but not decide who stays on earth (I'd like to sleep)."

It is true that Kevin C. said during *Hovey* questioning that he could vote for a death sentence, and when asked about his religious objection to the death penalty, he explained, "I feel where I live I should decide.  Where I'm a Christian.  I go to church, so I think, you know, I can't.  I think God should decide.  But, you know, I think I should decide if I live in the community."  But the prosecutor acknowledged this, stating, "I think that in person his, his statements about the death penalty didn't rise to a level for cause; but, however, I think when you take the totality of his responses, I think, I mean those are essentially the reasons that I'm stating."  Given "[t]he totality of" Kevin C.'s responses regarding the death penalty, the record amply supports the prosecutor's stated concern.  (See *Lomax, supra,* 49 Cal.4th at p. 572 ["[If] statements or attitudes of the juror suggest that the juror has 'reservations or scruples' about imposing the death penalty, this demonstrated reluctance is a race-neutral reason that can justify a peremptory challenge, even if it would not be sufficient to support a challenge for cause"].)

Defendant nevertheless contends that the prosecutor's reason was pretextual because Kevin C.'s reservations about the death penalty mirrored those of Jurors Nos. 2, 5, 6, 8, and 9 and Alternate Jurors Nos. 1 and 4, whom the prosecutor did not strike. Unlike Kevin C., none of the jurors identified by defendant expressed a religious objection to the death penalty. (Cf. *Winbush, supra*, 2 Cal.5th at p. 436 [upheld peremptory challenge where "[t]he trial court observed [the prospective juror's] statement that only God can take a life expressed a 'startling and dramatic' reservation about the death penalty based on what appeared to be the juror's strongly held religious beliefs [and] [t]he court observed that no other juror had expressed such a strongly held view"].)

Instead, most of these jurors merely expressed a degree of unfamiliarity or slight discomfort with the death penalty. For example, Alternate Juror No. 4 appeared unfamiliar with the death penalty, indicating that she did not know whether the death penalty was used too often or too seldom or whether it was fair or unfair, and stating, "I would have to decide based on the evidence + the judge[']s instructions regarding [the] death penalty." Juror No. 5 had "mixed emotions" about the death penalty, but she believed the death penalty was fair, she would vote to keep it "[j]ust in case," and she would not be reluctant to vote for a sentence of death, sign the verdict form, or state the verdict in court. Juror No. 9 stated, "I have mixed emotions. I must know that someone is actually guilty, I feel the death penalty is fair." She also would vote to keep the death penalty, believed it was used too seldom, and would not be reluctant to vote for a sentence of death, sign the verdict form, or state the verdict in court. And, while Alternate Juror No. 1 made clear that her opinion on the death penalty "depend[ed] on the crime,"

she also confirmed that she believed the death penalty was fair and would not be reluctant to vote for a death sentence, sign the verdict form, or state the verdict in court.

Some of the jurors identified by defendant, however, expressed more significant reservations about the death penalty. Juror No. 6 commented, "insecure about my feelings. I do believe in the death penalty but do not know how I feel about administering it." But, she, too, said that she would vote to keep the death penalty, that it was fair and used too seldom, and that she would not be reluctant to personally vote for a death sentence, sign the verdict form, or state the verdict in court. She also identified with Group 2, which was defined as "I favor the death penalty, but will not always vote for death in every case of murder with special circumstances." During *Hovey* questioning, she said that she might be reluctant to sentence somebody to death, but asked whether "feeling guilty" in her "heart" might "affect the way [she] act[s] on the way [she] feel[s] in [her] head," she confirmed, "No, I can truthfully say, no, I would not. No. It's just my own feelings, I should say." She confirmed that she could follow the law, she could sign a verdict form for a death sentence, and although she "wouldn't feel good about it," she could state the verdict for a death sentence in court.

In addition, Juror No. 8 identified with Group 4, which was defined as "I have doubts about the death penalty, but I would not vote against it in every case." He believed the death penalty was used too often and said that the death penalty "should be reserved for only the most heinous of crimes." But he characterized the death penalty as fair and would vote to keep it because it is a "necessary evil." He said that his views were not such that he could never vote for a death sentence,

explaining, "if the situation proved to warrant such a punishment, I would vote for it."  He also said that he would not be reluctant to personally vote for a death sentence, sign the verdict form, or state the verdict in court, although he "would not automatically seek the highest punishment."  During *Hovey* questioning, Juror No. 8 said, "I used to really be for the death penalty, but since then I've changed my views to I'm not totally against it, but I'm not totally for it either."  He acknowledged that he viewed life imprisonment as a more suitable punishment.  But, asked whether this view might cause him to favor that sentence regardless of the evidence, he replied, "Not necessarily.  That's my personal view, you know, depending on the evidence, you know.  I would choose what I thought was right."  He confirmed that he could follow the law and could vote for a death sentence.

We find that Juror No. 6's responses and Juror No. 8's responses were not so similar to Kevin C.'s responses regarding the death penalty as to cast doubt on the trial court's acceptance of the prosecutor's reason for striking Kevin C.  While Juror No. 6 expressed some discomfort and reluctance with voting for a death sentence, she made clear that she supported the death penalty and she ultimately confirmed that she could vote for a death sentence.  And while Juror No. 8 believed that the death penalty should be reserved for "only the most heinous of crimes," he made clear that he supported the death penalty and could vote for it in those circumstances.  By contrast, among Kevin C.'s tentative and vacillating responses about both his view on the death penalty and his ability to vote for a death sentence, Kevin C. indicated that he had a religious objection to the death penalty and agreed with his religion's view that "thou should not kill."  These responses called into question the fundamental

propriety of the death penalty and differed from Juror No. 6's belief in the death penalty and Juror No. 8's opinion that the death penalty was a "necessary evil" for the "most heinous of crimes."

Lastly, Juror No. 2 stated, "I am not in favor of the death penalty," and believed that it was not fair and was used too often. He believed the purpose of the death penalty was "supposedly to deter crime." Asked whether he had a moral, philosophical, or religious objection to the death penalty, he checked "yes" and elaborated, "I do not believe it deters crime." He did not refer to any religious beliefs, and he subsequently said that he did not have a religious preference or affiliation. Although he initially said that he "[w]ould not vote" to decide whether or not to keep the death penalty, he subsequently said that he probably would vote to keep the death penalty. In addition, he said that his views were not such that he could never vote for a death sentence, explaining, "I would and could follow the law." He said that he would not be reluctant to personally vote for a death sentence or personally sign a verdict form for a death sentence, although he would be reluctant to stand up in court, facing the defendant, and state the verdict for a death sentence. He identified himself as belonging to Group 4, which was defined as "I have doubts about the death penalty, but I would not vote against it in every case." During *Hovey* questioning, the prosecutor asked, "I think one of your concerns is you were kind of skeptical that maybe it doesn't deter crime, if that's the purpose of it . . . . [W]ould you be able to return, personally vote for a death verdict if you felt it was, if it felt [*sic*] the evidence supported, and the law supported it?" Juror No. 2 replied, "Yes."

We find that Juror No. 2 made clear that he did not support the death penalty, and that Juror No. 2's responses regarding the death penalty were similar in some respects to Kevin C.'s responses regarding the death penalty. We agree with defendant that the comparison between Juror No. 2 and Kevin C. has some probative value. That said, we also find that, unlike Kevin C., who gave tentative and vacillating responses about his view on the death penalty and his ability to impose it, Juror No. 2 was more clear and consistent in both respects: Juror No. 2 more clearly and consistently said that he did not support the death penalty, but Juror No. 2 also more clearly and consistently said that he could impose it. When the prosecutor asked Juror No. 2 whether he would be able to personally vote for a death verdict even though he was "kind of skeptical that maybe it doesn't deter crime," Juror No. 2 replied, "Yes." Juror No. 2's responses differed from Kevin C.'s more tentative and conflicted responses: "there are members of society who do bad things and don[']t deserve to be here, can I kill them? unknown at this time" and "I like to decide who could stay in society but not decide who stays on earth (I'd like to sleep)." In addition, unlike Kevin C., Juror No. 2 did not invoke a religious objection to the death penalty. Thus, comparing the totality of their respective responses regarding the death penalty, we find some similarities as well as some differences, and we conclude that the comparison has probative value within our inquiry as to whether the prosecutor's stated reason for striking Kevin C. was pretextual.

We additionally note that, in stark contrast to Kevin C., who believed DNA evidence was "like a polygraph not a for sure certain" and who was not upset by the O.J. Simpson verdict because he found it "hard to believe" Simpson was solely

responsible for the crimes and suggested "biases" created much of the evidence, Juror No. 2 believed that DNA evidence was "accurate" and was upset by the O.J. Simpson verdict because "[Juror No. 2] believe[d] it was proven beyond a reasonable doubt that [Simpson] was guilty." By noting these differences between Juror No. 2 and Kevin C., we do not intend to suggest that the similarities between Juror No. 2 and Kevin C. in regard to the death penalty are irrelevant within our analysis or that defendant must identify an exactly identical juror to prove purposeful discrimination. (See *ante*, at pp. 35–37.) Rather, "because the ultimate question before us concerns the prosecutor's motivations in [striking Kevin C.], we must ask whether there were any *material* differences [between Kevin C. and Juror No. 2] — that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges." (*O'Malley*, *supra*, 62 Cal.4th at p. 977.) Considering these and all relevant circumstances, we ultimately find no adequate basis to overturn the trial court's ruling.

As to the prosecutor's final reason, Kevin C. checked "no" when asked whether he was upset by the O.J. Simpson verdict and said, "To [*sic*] hard to believe one man did it all, I believe biases created a lot of the circumstance [*sic*] evidence." We have previously held that a prospective juror's opinion of the O.J. Simpson trial is a nonbiased ground for a peremptory strike. (See *Smith*, *supra*, 4 Cal.5th at p. 1153; *Vines*, *supra*, 51 Cal.4th at pp. 851–852; *Mills*, *supra*, 48 Cal.4th at p. 184.)

The NAACP Legal Defense & Educational Fund, Inc. (LDF), however, has filed an amicus curiae brief arguing that asking about a prospective juror's opinion of the O.J. Simpson verdict is a proxy for race because most Black people support the verdict and most White people do not. LDF refers to studies

finding, in 1995, that approximately 22 percent of Black people and 79 percent of White people believed Simpson was guilty. In response, the Attorney General argues, inter alia, that public opinion regarding the Simpson verdict is less clear than LDF suggests. The Attorney General refers to studies finding that "the number of Blacks who believe Simpson was guilty more than doubled to 45% by 2007 and became a majority view of 57% by 2015," and thus "selection of *Miles's* jury occurred at a time when the percentage of Whites who believed Simpson guilty was *decreasing* and the percentage of Blacks who believed him guilty was *increasing*."

LDF's argument that more Blacks than Whites support the Simpson verdict, "even if factually correct, does not establish that the criterion is not race neutral." (*Melendez*, *supra*, 2 Cal.5th at p. 18.) As we discussed in *Melendez*, the plurality opinion in *Hernandez v. New York* (1991) 500 U.S. 352 concluded that " '[w]hile the prosecutor's criterion might well result in the disproportionate removal of [prospective jurors of a specific ethnicity], that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause.' " (*Melendez*, at p. 17, quoting *Hernandez*, *supra*, 500 U.S. at p. 361.) But "the plurality [in *Hernandez*] did find that a disparate impact would be relevant to the overall inquiry." (*Melendez*, at p. 17.) Thus, if LDF's argument that more Blacks than Whites support the Simpson verdict is factually correct, "this circumstance is relevant to the inquiry as to whether the reasons were sincere and not merely pretextual." (*Id*. at p. 18.)

We assume that LDF's argument is factually correct, and we consider this circumstance to be relevant to our inquiry as to whether the prosecutor's reason was sincere and not merely

pretextual. However, the record here does not show that the prosecutor's reason was pretextual. The voir dire in this case began in Southern California approximately three years after the Simpson trial in Los Angeles, making it likely that the prospective jurors were familiar with and had formed opinions about that case. The prosecutor specifically expressed concern about the prospective jurors' opinions of the Simpson verdict because the prosecutor considered Simpson's case to be similar to defendant's case given that both cases relied on DNA evidence and circumstantial evidence. And it appears that the prosecutor was not alone in considering Simpson's case to be similar in some respects to defendant's case. For example, while discussing the draft jury questionnaire regarding scientific evidence, the court commented, "I'm assuming part of [the prosecutor's] concern is whether there's a juror that just says, I absolutely would not believe anything that involved DNA evidence based on my daily watching of the O.J. Simpson trial or something of that nature." For another example, while questioning the prospective jurors about DNA evidence during voir dire, defense counsel twice referred to the O.J. Simpson case, including to comment that "there's been a lot of publicity about [DNA] [and] most people are familiar, to some degree or another, with the O.J. Simpson case."

In addition, the prosecutor struck several non-African-American prospective jurors who were not upset by the verdict, suggesting that the prosecutor's concern was sincere and not merely a pretext for excusing African-American prospective

jurors. (Cf. *People v. Woodruff* (2018) 5 Cal.5th 697, 755.)[11] The prosecutor struck, in total, five non-African-American prospective jurors. Four of these five prospective jurors were not upset by the O.J. Simpson verdict: Malinda M. (a Hispanic woman) was not upset with the O.J. Simpson verdict because "I think there was doubt in the case and some things were done improper that [led] to the not guilty verdict;" Ronald W. (a White man) was not upset with the O.J. Simpson verdict because "evidently they had weighed all the evidence and come to agreement;" Richard L. (a Hispanic man) was not upset with the O.J. Simpson verdict because "the D.A. did not prove beyond a reasonable doubt;" and Lynia B. (a White woman) was not upset with the O.J. Simpson verdict because "to[o] many unanswered questions was neither convinced of guilt nor innocence." After striking Malinda M. (a Hispanic woman) and Ronald W. (a White man), the prosecutor specifically said that he had excused jurors "of Hispanic origin and Caucasian origin, and the common denominator, essentially, is that they were not, were not upset by the O.J. Simpson verdict."

---

[11] Also, the prosecutor did not strike Alternate Juror No. 2, who was African-American and was not upset by the O.J. Simpson verdict. The Attorney General argues that this fact tends to show that "the prosecutor was motivated by the jurors' individual views instead of their race." Alternate Juror No. 2 indeed checked "no" when asked whether she was upset by the Simpson verdict, but she explained, "The evidence was there which told me he was guilty." In light of Alternate Juror No. 2's explanation, it appears possible that she simply checked the wrong box when asked whether she was upset by the Simpson verdict. Because Alternate Juror No. 2's answer could be interpreted in any number of ways on the cold appellate record, we find that it is of little help in analyzing the sincerity of the prosecutor's reason.

Finally, contrary to defendant's argument, comparing Kevin C.'s response to other jurors' responses does not undermine the credibility of this reason. Unlike Kevin C., who was not upset by the O.J. Simpson verdict because he found it "hard to believe" that Simpson was solely responsible for the crimes, and suggested that "biases" created much of the circumstantial evidence, Alternate Juror No. 5 simply checked "no" when asked whether he was upset by the verdict and expressed no further thoughts regarding it. Similarly, while Juror No. 6 checked "no" to the same question but commented, "evidence not clear," Juror No. 6's response was more measured than and dissimilar to Kevin C.'s response. (See *Vines, supra*, 51 Cal.4th at p. 851 [responses by two prospective jurors "dissimilar" where one said, "the Simpson trial 'restored' his 'faith' " and the other said, " 'It raised my concerns on jury selection and impact of televising a trial' "].) Neither Alternate Juror No. 5's response nor Juror No. 6's response resembled Kevin C.'s harsh rebuke of the prosecution's evidence in the O.J. Simpson case, nor did they inject the concept of "biases" into the result.

In short, each of the prosecutor's reasons is supported by the record, and considered together, they provide ample, nonbiased grounds for striking Kevin C. Substantial evidence therefore supports the trial court's conclusion that the prosecutor struck Kevin C. for reasons other than his race.

### c. *Prospective Juror Simeon G.*

The first reason offered by the prosecutor was that Simeon G. liked his own opinion over other people's opinions. In his questionnaire, Simeon G. described himself as a leader, rather than a follower, because he liked his opinion over other people's

opinions. Although Simeon G. did not assert in this or other questionnaire responses that he would be unwilling or unable to deliberate with fellow jurors, the prosecutor reasonably could be concerned that Simeon G. might have difficulty considering other opinions and deliberating with fellow jurors — particularly given that Simeon G. had not worked with a group of people to make a decision before. (Cf. *Lenix, supra*, 44 Cal.4th at p. 623 ["[a]n advocate is entitled to consider a panelist's willingness to consider competing views [and] openness to different opinions"]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1125 [a prosecutor could feel concerned about a prospective juror's comment that "he would not be influenced by anyone's opinion but his own"].)

The dissent does not attach any import to Simeon G.'s response, positing that "[e]veryone likes his or her opinion over other people's." (Dis. opn., *post*, at p. 5.) But the prosecutor was not required to interpret the response as the dissent does. It is not only that Simeon G. said he liked his opinion over other people's; it is also that he made this statement in order to explain why he would describe himself as a "leader" rather than a "follower." The prosecutor could reasonably have understood this response, in context, to suggest that if another person had a different opinion, Simeon G.'s view of leadership would cause him to prefer his own opinion "over" the opinion of the other person. It was not unreasonable for the prosecutor to ascribe some significance to Simeon G.'s response.

That said, we recognize that the prosecutor did not ask Simeon G. during voir dire about his stated preference for his own opinion over other people's opinions. The prosecutor's failure to engage Simeon G. on each concern, however, is not conclusive in determining whether the prosecutor's reasons

were pretextual. (See, e.g., *Cowan*, *supra*, 50 Cal.4th at p. 451 [although a prosecutor's failure to engage in meaningful voir dire can suggest the prosecutor's stated reasons are pretextual, the prosecutor's failure to question the prospective jurors "about each and every area of articulated concern does not undermine the conclusion that her stated race-neutral reasons for excusing these prospective jurors were genuine and not pretextual"]; *Jones*, *supra*, 51 Cal.4th at p. 363.) We are mindful that lawyers may refrain from asking questions for a variety of reasons. (Cf. *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1018, fn. 14 [recognizing that "lawyers must use their voir dire time judiciously"].) Here, asking Simeon G. during voir dire — in front of the other prospective jurors — to elaborate on his questionnaire response would have forced him to explain why he believes that his opinion is preferable to the opinions of other people, such as those seated around him. Considering these and all relevant circumstances, we find that the prosecutor's first reason for striking Simeon G. is race neutral, plausible, and supported by the record.

Despite this, defendant contends that a comparative juror analysis between Simeon G. and Juror No. 1 discredits the prosecutor's reason. It does not. Juror No. 1 identified herself as a leader, rather than a follower, and elaborated, "I like to make my own decisions." Although Juror No. 1's response was similar in some respects to Simeon G.'s response, the prosecutor could reasonably have found Juror No. 1's response to be less concerning in context than Simeon G.'s response. Jurors are expected to make their own decisions after deliberating with fellow jurors — which Juror No. 1 previously had done to reach a verdict in a separate case. The prosecutor thus could have concluded that Juror No. 1's statement that she liked to make

her "own decisions" did not call into question her openness to considering other opinions before returning a verdict. Simeon G.'s response, by contrast, could reasonably cause concern about his openness to considering other opinions, and unlike Juror No. 1, he had not previously served on a jury or worked with a group of people to make a decision. (See *Chism*, *supra*, 58 Cal.4th at p. 1321 [where a juror, similar to two challenged prospective jurors, lacked supervisory work experience, the fact that the juror had previously served on a separate jury in a capital case "substantially distinguishe[d] him from [the two challenged prospective jurors]"]; *Vines*, *supra*, 51 Cal.4th at pp. 851, 852 [comparative juror analysis rejected where answers were "dissimilar" and "significant differences in life experiences" existed between jurors].)[12]

Thus, we find some similarities as well as some differences between Simeon G. and Juror No. 1 in regard to the prosecutor's first reason for striking Simeon G., but we ultimately conclude that their respective responses were not so similar as to cast doubt on the trial court's acceptance of the prosecutor's reason for striking Simeon G. We additionally note that Juror No. 1 did not raise any of the other concerns the prosecutor raised in explaining his reasons for the strike. Unlike Simeon G., Juror

---

[12] In his reply brief, defendant engages in an attenuated analysis concerning Juror No. 3 and Juror No. 4's respective responses to the related question, "Have you ever worked with a group of people to make a decision?" But defendant's attempt to parse that question from the related question concerning whether a prospective juror is a leader, *and why*, misses the point. Juror No. 3 and Juror No. 4 did not declare a preference for their opinion over other people's opinions, making their responses fundamentally distinguishable from Simeon G.'s response.

No. 1 expressed that she was upset with the O.J. Simpson verdict because she "believe[d] he was guilty," and she did not suggest that she might rely on her feelings in reaching a verdict in the guilt phase.

As to the second reason for striking Simeon G., the prosecutor expressed concern that Simeon G. might rely on hunches or feelings, rather than evidence, in reaching a verdict in the guilt phase since he replaced the word "doubt" with the word "feeling" and said in his questionnaire that if he had a feeling the defendant did not do it, the defendant was not guilty. The record shows that when asked whether he could follow an instruction that a defendant is presumed innocent unless proven guilty beyond a reasonable doubt, Simeon G. checked "yes;" commented, "If I have any feeling that he might not have done it, hes [*sic*] innocent;" and in this comment, replaced the word "doubt" with the word "feeling."

When asked about this response, Simeon G. did not "quite remember" replacing the word "doubt" with the word "feeling." The dissent posits that Simeon G. "most likely" recognized a double negative in his original comment and replaced the word "doubt" with the word "feeling" in an effort to correct it. (Dis. opn., *post*, at p. 8.) This is a possible explanation. But Simeon G. did not provide this explanation. And had he intended to correct the double negative, he could have revised his comment in multiple ways, including, for example, by crossing out the word "not" or by replacing the word "doubt" with the word "belief."

But Simeon G. replaced the word "doubt" with the word "feeling," and as revised, his statement read that if he had "any feeling" that the defendant "might" not have done it, the

defendant was innocent. The word "feeling" is ordinarily used to mean "[a]n idea, belief, or sense (especially a vague or irrational one) that a particular thing is true; an impression *that* something is about to happen or is the case; an intuition *about* something" or "[t]hat which a person feels in regard to something; attitude, esp. emotional attitude, sentiment; opinion or belief based on emotion or intuition and not solely on reason." (Oxford English Dict. Online (3d ed. 2015) <https://oed.com/view/Entry/68981?rskey=QkM9MC&result=2 &isAdvanced=false#eid> [as of May 22, 2020].)[13] To the prosecutor, Simeon G.'s response that if he had "any feeling" that the defendant "might" not have done it, the defendant was innocent "made it sound like [Simeon G.] was going to be basically basing it on a hunch, or a feeling, which was, as the presenter of evidence, [the prosecutor was] powerless to overcome."

The prosecutor's concern was plausible and supported by the record. We acknowledge that Simeon G.'s questionnaire response may be interpreted in multiple ways and that his other questionnaire responses did not indicate that he would rely on his feelings in reaching a verdict in the guilt phase. However, the prosecutor was not obliged to accept the most innocuous interpretation of Simeon G.'s questionnaire response and could be legitimately concerned about his response for the reasons the prosecutor specifically articulated. (See *People v. Mai* (2013) 57 Cal.4th 986, 1050, 1051 [where the prospective juror's remarks "might be taken more than one way," the prosecutor

---

[13] All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

"was not obliged to accept [the defendant's] precise interpretation of [the juror's] ambiguous remarks, and [the prosecutor] could reasonably be concerned about [these remarks]"].)

It is true, however, that Simeon G. explained his questionnaire response differently during voir dire. During voir dire, the prosecutor explained to the prospective jurors, including Simeon G., that "if the case has been proved by the prosecution beyond a reasonable doubt, your duty is to return a guilty verdict" and the question is if "at the conclusion of the case if the case has been proved beyond a reasonable doubt whether we can expect everybody to come back with a guilty verdict." Immediately after this, the prosecutor asked Simeon G. about his questionnaire response. Simeon G. did not "quite remember" his questionnaire response, but when asked what he meant by it, Simeon G. explained, "Well, I think what I was trying to say, if I'm correct, is that if the evidence showed that there wasn't — that there was some reasonable doubt, then I probably would not accuse him, because of the fact that, myself being in the same situation or anybody, I think that if the evidence didn't totally prove that I did it, then there is some doubt. You know what I'm saying?" Simeon G. added, "So it wasn't so much a feeling as it was if the evidence didn't show." Asked whether he "would base it on evidence," Simeon G. responded, "Basically, yes. I'm sorry." He added, "I couldn't tell you, tell you what I said, because I don't have the paper to look at what I actually meant totally."

Reviewing this colloquy in the appellate record, the dissent views Simeon G.'s responses to have "left no ambiguity about the issue." (Dis. opn., *post*, at p. 9.) To be sure, Simeon G. gave answers during voir dire that, from the prosecutor's

perspective, were less concerning than Simeon G.'s questionnaire response and helped to explain his questionnaire response. However, in this colloquy, Simeon G. also said that he did not "quite remember" his questionnaire response, and because he did not have a copy of the questionnaire, he could not tell the prosecutor "what [he] actually meant totally" by it. Simeon G. referenced that if the evidence "didn't totally prove" that the defendant did it, "then there is some doubt." And when asked whether he "would base [the verdict] on evidence," he responded, "[b]asically," yes. These portions of Simeon G.'s answers may not have been entirely reassuring to the prosecutor, who was concerned that Simeon G. would rely "on a hunch, or a feeling, which was, as the presenter of evidence, [the prosecutor] was powerless to overcome." Thus, reviewing this colloquy in the appellate record — unaided by Simeon G.'s tone or demeanor — we do not conclude that Simeon G.'s responses "left no ambiguity" and necessarily mollified any prosecutorial concern about his questionnaire response. (Dis. opn., *post*, at p. 9.)

Moreover, when providing his reasons for striking Simeon G., the prosecutor acknowledged that Simeon G. explained his questionnaire response "differently in court." Nevertheless, the prosecutor told the trial court that Simeon G.'s explanation during voir dire did not eliminate the prosecutor's concern about Simeon G.'s questionnaire response. The prosecutor explained that he was still concerned about Simeon G.'s responses "in light of the fact that he was, he was single-handedly hunted down to be here this afternoon. So [the prosecutor was] not sure that his responses in court should prevail over the answers he gave on his questionnaire." The dissent seems to contend that the prosecutor was obliged to abandon his concern about Simeon

G.'s written response because Simeon G. explained that response differently in court under oath and "left no ambiguity about the issue." (Dis. opn., *post*, at p. 9.) We disagree. Faced with seemingly different responses, the prosecutor was not obliged to abandon his concern about Simeon G.'s written response, which was signed under penalty of perjury, in light of Simeon G.'s oral response — and in fact, the prosecutor made clear to the trial court that he did not. (Cf. *Vines*, *supra*, 51 Cal.4th at p. 850 ["That [the prospective juror] stated on voir dire that he could consider both penalties, and thus demonstrated he was not subject to removal for cause [citation], did not preclude the prosecutor from exercising a peremptory challenge when [the juror's] questionnaire responses indicated a degree of reluctance to impose the death penalty with which the prosecutor was uncomfortable"].)

The trial court was " 'best situated' " to assess Simeon G.'s responses in court and the prosecutor's stated concern in light of those responses. (*People v. Armstrong* (2019) 6 Cal.5th 735, 770 (*Armstrong*) ["the 'trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes' "].) Having observed Simeon G. in court, the trial court could assess Simeon G.'s oral responses, and it was better positioned than our court to determine whether Simeon G.'s oral responses should have completely assuaged any potential concerns raised by his written response. The trial court also could assess the credibility of the prosecutor's stated concern about Simeon G.'s questionnaire response, as well as the prosecutor's assessment that he was "not sure that [Simeon G.'s] responses in court should prevail over the answers he gave

on his questionnaire."[14]  The trial court specifically asked a question to the prosecutor about this concern, and after listening to the prosecutor's explanation and defense counsel's comments, the trial court accepted the prosecutor's stated reasons for striking Simeon G.  (See *Lenix, supra,* 44 Cal.4th at p. 614 [we give " 'great deference to the trial court's ability to distinguish bona fide reasons from sham excuses' "].)

It is by no means clear from the record that if he had been selected, Simeon G. would have relied on his feelings in reaching a verdict in the guilt phase.  But "[o]ur task is not to determine whether we would have shared the prosecutor's concerns; the only question before us is whether substantial evidence supports the court's ruling that the prosecutor described legitimate reasons for the challenge and that he challenged [Simeon G.] for those reasons, not because of [his] race."  (*Smith, supra,* 4 Cal.5th at p. 1161.)

We find that the prosecutor's concern here is plausible, supported by the record, and race neutral.  Contrary to defendant's argument, his comparative juror analysis between Simeon G. and Juror No. 5 does not undermine the sincerity of the prosecutor's concern.  Asked whether she could follow a

---

[14]  The dissent states that "it is not clear why" the circumstances surrounding Simeon G.'s attendance in court would have caused the prosecutor to doubt Simeon G.'s responses in court.  (Dis. opn., *post,* at p. 11.)  The record shows that Simeon G. arrived in court only after the trial judge himself called his employer to try to locate him.  (See *ante,* at p. 24.)  By any measure, having a judge call your workplace to locate you and have you come to court is unusual.  Whether these unusual circumstances affected Simeon G.'s responses in court — as the prosecutor suggested they did — is an assessment that the trial court was best positioned to make.

presumption-of-innocence instruction, Juror No. 5 checked "yes" and wrote, "Try to follow instructions." Reading this statement to suggest that she could not or would not follow the instruction is strained, and we decline to do so. The record therefore provides no adequate basis to overturn the trial court's ruling.

For the final reason, the prosecutor said that Simeon G. (like Kevin C.) was not upset by the O.J. Simpson verdict. As discussed, a prospective juror's opinion regarding the Simpson case can be a nonbiased ground for a peremptory challenge. Defendant and LDF, however, argue that this reason was a proxy for race or, alternatively, pretextual. As discussed, we assume that LDF's argument that more Blacks than Whites support the Simpson verdict is factually correct, and we consider this circumstance to be relevant to our inquiry as to whether the prosecutor's reason was sincere and not merely pretextual. In this particular case, however, it is plausible that the prosecutor — tasked with securing a conviction in San Bernardino County approximately three years after the Simpson trial took place in the adjacent Los Angeles County — was sincerely concerned about the prospective jurors' opinions regarding the Simpson verdict because the prosecutor considered Simpson's case to be similar to defendant's case given that both cases relied on DNA evidence and circumstantial evidence. Also as discussed, it appears that the prosecutor was not alone in considering Simpson's case to be similar in some respects to defendant's case because both the trial court and defense counsel referred to Simpson's case at various points when discussing DNA evidence. (See *ante*, at p. 50.) In addition, four of the five non-African-American prospective jurors whom the prosecutor struck were not upset by the O.J. Simpson verdict, suggesting that the prosecutor's concern was sincere and not merely a

pretext for striking African-American prospective jurors. (See *ante*, at pp. 50–51.)

That said, we find that the credibility of the prosecutor's concern here is undermined to some degree by the prosecutor's failure to ask Simeon G. or other prospective jurors about the O.J. Simpson verdict during voir dire. In his questionnaire, Simeon G. indicated that he was not upset by the O.J. Simpson verdict but left blank the follow-up request to "[p]lease explain why or why not." To be sure, we recognize that one might infer from this response that Simeon G. was not upset by the O.J. Simpson verdict because he simply agreed with the verdict, requiring little explanation. But we also recognize that a prospective juror may not be upset by the O.J. Simpson verdict for a variety of reasons. While the prosecutor's failure to question Simeon G. or other prospective jurors about the O.J. Simpson verdict does not necessarily demonstrate that the prosecutor's concern was pretextual, we consider this circumstance to be relevant to our inquiry as to whether the prosecutor's concern was pretextual here. (See *Smith*, *supra*, 4 Cal.5th at p. 1152 ["an attorney's failure to meaningfully examine a prospective juror about a subject about which the attorney claims to be concerned can constitute evidence of pretext"].)

When the prosecutor gave this reason for striking Simeon G., the prosecutor stated, "If you'll notice across the board, I've excused jurors I believe of Hispanic origin and Caucasian origin, and the common denominator, essentially, is that they were not, were not upset by the O.J. Simpson verdict, which was a DNA, circumstantial case." Defendant argues that the prosecutor's statement meant that "he had struck all prospective jurors who were not upset with the O.J. Simpson verdict" and "this is not

what the record shows at all" because the prosecutor did not strike Juror No. 6 or Alternate Juror No. 5.[15]  Contrary to defendant's argument, the prosecutor's statement is fairly read to mean that the prosecutor had struck prospective jurors "across" different races, including a Hispanic prospective juror and a Caucasian prospective juror, who were not upset by the O.J. Simpson verdict.  And at the time of the statement, the prosecutor indeed had struck three non-African-American prospective jurors, two of whom — Malinda M. (a Hispanic woman) and Ronald W. (a White man) — were not upset by the Simpson verdict.

Nevertheless, defendant's comparative juror analysis between Simeon G. and Juror No. 6 and Alternate Juror No. 5 has some probative value and is more convincing than it was with respect to Kevin C.[16]  As noted, Simeon G. checked "no" as

_____

[15]    At the time of the prosecutor's statement, Juror No. 6 was seated in the jury box, but Alternate Juror No. 5 was not. Although defendant does not discuss this additional fact in his briefing, we note that at the time of the prosecutor's statement, others seated in the jury box had indicated that they were not upset by the Simpson verdict but had provided varying explanations that likely assuaged the prosecutor's concern.

[16]    Although defendant does not raise these comparisons, the dissent additionally compares Simeon G.'s response to the responses by Juror No. 4, Juror No. 7, and Alternate Juror No. 4. (Dis. opn., *post*, at p. 14.)  Juror No. 4 was not upset by the O.J. Simpson verdict because "su[r]prised, based on media-given facts, but did not follow trial closely."  Juror No. 7 was not upset by the verdict "since I can only judge from T.V. I cannot give an honest opinion."  And Alternate Juror No. 4 was not upset by the verdict because "I did not hear the evidence."  While a prospective juror's response that he or she was not upset by the O.J. Simpson verdict may suggest that the prospective juror

to whether he was upset by the Simpson verdict but did not explain why. His response was thus identical to Alternate Juror No. 5's response and less detailed than Juror No. 6's response, which noted, "evidence not clear." We find that the credibility of the prosecutor's concern regarding Simeon G.'s opinion on the O.J. Simpson verdict is undermined to some degree by defendant's comparative juror analysis. (See *Miller-El, supra,* 545 U.S. at p. 241 ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step"].)

We recognize that jurors need not be identical in all respects for a comparison among them to be probative, and we continue to consider defendant's comparisons to be relevant and probative on the issue of purposeful discrimination here. (See *ante*, at pp. 35–37.) However, we additionally consider as part of our inquiry into the prosecutor's motivations for striking Simeon G. that Juror No. 6 and Alternate Juror No. 5 were dissimilar from Simeon G. in regard to the prosecutor's other two stated reasons for striking Simeon G. (See *ibid*.)

Neither Juror No. 6 nor Alternate Juror No. 5 indicated that they might have difficulty considering the opinions of or deliberating with others when asked whether they considered themselves leaders or followers and why. Juror No. 6 considered herself "[b]oth" a leader and a follower "depend[ing] on what

---

agreed with that verdict, Juror No. 4, Juror No. 7, and Alternate Juror No. 4 explained that they were not upset by the verdict because they had limited information about the case. These explanations likely assuaged the prosecutor's concern.

interest" she had, and she had experience working with a group of people to make a decision. Alternate Juror No. 5 considered himself a leader because "like to learn, intelligent, people tend to follow my lead." While his response reflected some self-assuredness, he also said in his response that he "like[d] to learn," and he had "daily" experience working with a group of people to make a decision and "fe[lt] that there would be no problem working with others." Additionally, neither Juror No. 6 nor Alternate Juror No. 5 indicated that they might rely on their feelings in reaching a verdict in the guilt phase when asked whether they can follow an instruction that a defendant is presumed innocent unless proven guilty beyond a reasonable doubt. By contrast, Simeon G.'s opinion on the O.J. Simpson verdict may have raised more concern about him as a guilt phase juror in this case given that he liked his opinion over other people's opinions, had not previously worked with a group of people to make a decision, and said that if he had "any feeling" that the defendant "might" not have done it, the defendant was innocent.

Considering these and all other relevant circumstances, we view the issue to be close but ultimately find no adequate basis to overturn the trial court's ruling under the applicable standard of review. We find that each of the prosecutor's reasons for striking Simeon G. is plausible, supported by the record, and race neutral. Considering the prosecutor's reasons together and reviewing the trial court's determination regarding the sufficiency of those reasons with great restraint (see *Lenix, supra*, 44 Cal.4th at p. 613), we conclude that substantial evidence supports the trial court's conclusion that the prosecutor struck Simeon G. for reasons other than his race.

In sum, we find substantial evidence supports the trial court's denial of defendant's *Batson/Wheeler* motion. Although defendant argues that Kevin C. and Simeon G. were favorable prospective jurors for the prosecution, "the question is not whether a prosecutor should or should not have excused a prospective juror. It is whether this prosecutor excused [them] for an improper reason. The record provides no sufficient reason to so conclude or for this court to overturn the trial court's ruling" here. (*Hardy*, *supra*, 5 Cal.5th at p. 84.) Moreover, the prosecutor's acceptance of an alternate juror who was African-American further supports the prosecutor's good faith in exercising the peremptory strikes. (See, e.g., *Jones*, *supra*, 51 Cal.4th at pp. 362–363.)

## B. Excusal of Two Prospective Jurors for Cause

Defendant contends the trial court erroneously excused two prospective jurors based on their views about the death penalty. We disagree.

"Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), we consider whether the record fairly supports the trial court's determination that [a prospective juror's] views on the death penalty would have prevented or substantially impaired her performance as a juror." (*People v. Thomas* (2011) 52 Cal.4th 336, 357.) " ' "Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' " ' " (*Id.* at p. 358.)

" 'When the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1062 (*Wall*).)

As a preliminary matter, defendant contends that deferring to the trial court's findings on jury selection issues is improper for two reasons. First, he argues that such deference is inappropriate on direct appeal in light of the high court's holding in *Greene v. Georgia* (1996) 519 U.S. 145, 146–147. But *Greene* held that the Supreme Court of Georgia was mistaken when it believed itself bound by *Witt*'s standard of review: It was "free to adopt the rule laid down in *Witt* for review of trial court findings in jury-selection cases, but it need not do so." (*Greene*, at p. 147.) In contrast, we have previously adopted *Witt*'s standard of review and accordingly rejected this argument because "[t]he law in California . . . is settled on the point." (*People v. Farnam* (2002) 28 Cal.4th 107, 132, fn. 6.)

Second, defendant argues that deferring to the trial court's resolution of inconsistencies or ambiguities is contrary to the high court's holdings in *Adams v. Texas* (1980) 448 U.S. 38 (*Adams*) and *Gray v. Mississippi* (1987) 481 U.S. 648 (*Gray*). We have rejected the contention that *Adams* and *Gray* " 'made clear that when a prospective capital case juror gives equivocal responses, the state has not carried its burden of proving that the juror's views would "prevent or substantially impair the performance of his duties as a juror." ' " (*People v. Schmeck* (2005) 37 Cal.4th 240, 263 (*Schmeck*).) We also have rejected the contention that *Gray* "suggests the high court intended to cast aside its view that 'deference must be paid to the trial judge who sees and hears the juror.' " (*People v. Moon* (2005)

37 Cal.4th 1, 15 (*Moon*).) " 'Furthermore, the high court has more recently reiterated its view that "[c]ourts reviewing claims of *Witherspoon-Witt* error . . . owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 400.) These arguments therefore are meritless.

### 1. *Prospective Juror No. 44*

Prospective Juror No. 44's (Number 44) responses to the approximately 31-page jury questionnaire signaled a degree of uncertainty and discomfort regarding the death penalty. She said, "I don't feel one way or another" on whether the death penalty is fair or unfair, and "I don't have an opinion" on whether the death penalty is used too often or too seldom. Asked whether the sentence of death or life imprisonment without the possibility of parole was more severe, she responded, "Depends — for me Life w/o parole — for others — I don't know." But she also said that she did not like the death penalty, that it made her "uncomfortable," and that she would vote to abolish it. She identified herself as belonging to Group 4, which was defined as "I have doubts about the death penalty, but I would not vote against it in every case."

She said that her feelings about the death penalty were not such that she "would refuse to find the defendant guilty of first degree murder and/or would refuse to find the special circumstance true, solely to avoid having to make a decision on the death penalty," and that she was "willing to weigh and consider all the aggravating and mitigating factors that will be presented to [her] before deciding the penalty in this case." However, she indicated that she would be reluctant to vote for a

death sentence, to sign the verdict form for a death sentence, or to state that verdict in court before the defendant, commenting, "The day I am not reluctant to look a person in the face and sentence them to death will be the day I no longer belong to the human — or should I say humane — race." As to whether her feelings about the death penalty were such that she "would never be able to personally vote for the death of the defendant under any circumstances" and "would always vote for a sentence of life without [the] possibility of parole," she declined to check either the yes or no box. Instead, she commented, "I don't know — I've done a few things I thought I would never do."

During *Hovey* questioning, the prosecutor asked whether her identification as belonging to Group 4 (that she has doubts about the death penalty but would not vote against it in every case) was accurate "about the way [she] feel[s] on the death penalty." She responded, "You know, it's really hard to say exactly what you would do when you're not in the situation. I would have — I would never know exactly what I would do until I'm put in that situation. So, yeah, I would have doubts." The prosecutor then explained that in the penalty phase, the court will provide an instruction listing mitigating and aggravating factors to consider and "essentially if you find the aggravating factors outweigh the mitigating factors, then death is the appropriate verdict, if you find that." The prosecutor asked, "Do you think that — can you say for sure, I guess is my question, that if placed in that position with the aggravating factors weighing more heavily, could you personally make the vote?" She responded, "I know, I know what you're looking for, and I'm sorry. I can't help you with it, because I don't know, because there have been too many — I'm 39, and there have been too many times that I've said I'd never do this, or I'd always do that,

and then I've done the other.  So, I just cannot tell you, unless I'm placed in that situation, unless I've gone through it. . . . I just don't make judgments until I'm in that situation.  I just don't." Seeking to clarify her answer, the prosecutor asked if she found the aggravating factors weigh heavier than the mitigating factors, "you can't guarantee me that you could step up to the plate, so to speak, and make a vote for death?"  She repeated, "I can't guarantee anything.  I don't deal in hypotheticals, and I just — no, I cannot guarantee you what I would do until I am in that situation, no."

Defense counsel subsequently explained, "[T]he Court at the end always gives instructions to jurors about what the law is, and how they're supposed to carry out their duties. . . . And in a death penalty case, there are certain things that the law allows jurors to consider in deciding whether to select death or life, assuming you were in that position.  They're called aggravating factors, mitigating factors."  Defense counsel then asked, "if you're selected and sworn as a juror, could you commit yourself under oath to follow what the Judge told you the law was?  Or do you think there's something else that might interfere with your ability to do that?"  She responded, "I don't think there's anything that would interfere with my ability.  And I can't tell you, and I don't know if I could follow the law.  There's — I'm — there's just a good chance that I would or I wouldn't.  You're going to have to pick me and have me sit here and see, because I just don't know."

At the close of this questioning, the prosecutor challenged her for cause.  The trial court initially stated, "She technically comes within the *Wainwright [v.] Witt* standard.  She's not saying her views are such that it would substantially interfere with her ability to follow the instructions and her duty, she just

says she doesn't know, because it's such an emotional issue." Citing two cases, the prosecutor argued that jurors who insist they do not know or cannot say if they could impose a death sentence are properly excused. Defense counsel responded that Number 44 did not say that she could not or would never impose a death sentence; "[s]he just felt that she didn't know under what circumstances." The trial court commented, "She was probably an extremely honest juror who really couldn't give us a definite answer," and took the challenge under submission.

Later, after reviewing the record and the authority cited by the prosecutor, the trial court found, "[M]y memory is refreshed that her answers basically were that she could not say whether she would be able to impose the death penalty, and it was not just that she didn't know whether in this case she could impose the death penalty, because obviously she wouldn't know until she got — she heard the evidence and the law. But in any situation, basically, she didn't know until she was put in that situation whether she could do it, or whether she could follow the Court's instructions in this area. . . . I would agree with [the prosecutor] that that's sufficiently equivocal. Her 'I don't know' responses are sufficiently equivocal to warrant a challenge for cause, so I will order that she be excused."

The trial court did not err in excusing Number 44. Number 44 said in her questionnaire and during *Hovey* questioning that she did not know whether she could vote for a death sentence. Certainly, a juror's decision as to whether to vote for a death sentence can be weighty and difficult. "[E]ven a juror who 'might find it very difficult to vote to impose the death penalty' is not necessarily substantially impaired unless he or she was unwilling or unable to follow the court's instructions in determining the appropriate penalty." (*People v.*

*Merriman* (2014) 60 Cal.4th 1, 53 (*Merriman*).) Number 44, however, did not merely express uncertainty as to "her own views on the death penalty or the appropriateness of the death penalty in any particular case, but as to her ability to impose a death sentence." (*Wall, supra*, 3 Cal.5th at p. 1063.) When asked in her questionnaire whether her feelings about the death penalty were such that she would never be able to vote for a death sentence, she wrote, "I don't know — I've done a few things I thought I would never do." She repeated during *Hovey* questioning that she did not know whether she could vote for a death sentence. (See *Wall, supra*, 3 Cal.5th at p. 1062 [upholding the excusal of a prospective juror who "expressed hesitation about her ability to impose a death verdict" and "[i]n response to repeated questions by the trial court and the prosecutor as to whether she had the ability to impose the death penalty . . . said she did not know if she did"].)

Number 44 further expressed uncertainty as to her ability to follow the trial court's instructions regarding the consideration of aggravating and mitigating factors in deciding whether to impose a death sentence. Although she said in her questionnaire that she was willing to weigh and consider all the aggravating and mitigating factors before deciding the penalty in this case, she then responded to a similar question during *Hovey* questioning by saying, "I don't know if I could follow the law. There's — I'm — there's just a good chance that I would or I wouldn't. You're going to have to pick me and have me sit here and see, because I just don't know." "Given the juror's own recognition that [she] did not know whether [she] could follow the law or ever vote for the death sentence, the trial court did not commit *Witherspoon/Witt* error when it found the juror was

73

substantially impaired." (*People v. Spencer* (2018) 5 Cal.5th 642, 659.)

Nevertheless, defendant compares Number 44 to Juror White in the high court's *Adams* opinion and argues that Number 44's responses were insufficient to justify her excusal. "But using *Adams* as a reference point for evaluating the excusal of [Number 44] is inapt because *Adams* concerned the particular statutory scheme in Texas, whereby ' "[p]rospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life *will not affect his deliberations* on any issue of fact." ' [Citation.] As the *Adams* court explained, the statutory scheme is inconsistent with the standard demanded by the federal Constitution because 'neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty.' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1068.) Moreover, unlike Juror White and others who were improperly excluded under this statutory scheme "only because they were unable positively to state whether or not their deliberations would in any way be 'affected' " (*Adams*, *supra*, 448 U.S. at p. 50; *id.* at p. 50, fn. 8), Number 44 was not merely "unable positively to state whether or not [her] deliberations would in any way be 'affected,' " (*id.* at p. 50) but rather, she did not know whether she would be able to follow the court's instructions in a death penalty case or vote for a death sentence.

Defendant additionally compares Number 44 to Juror Bounds in the high court's *Gray* opinion. "Although the *voir dire* of member Bounds was somewhat confused, she ultimately stated that she could consider the death penalty in an appropriate case and the judge concluded that Bounds was capable of voting to impose it." (*Gray*, *supra*, 481 U.S. at p. 653.) After further discussion, the judge, however, excused Bounds for cause. (*Id*. at p. 655.) The state court agreed that Bounds was " 'clearly qualified to be seated as a juror' " but concluded that excusing Bounds was harmless error. (*Id*. at p. 657.) The issue subsequently addressed by the high court "was not the standard for excusing a juror for cause, but whether the erroneous excusal of a juror for cause was subject to a harmless error test." (*Moon*, *supra*, 37 Cal.4th at p. 14.) We find the comparison between Juror Bounds and Number 44 to be inapposite. Unlike Juror Bounds, Number 44 did not confirm "that she could consider the death penalty in an appropriate case," and the trial court did not conclude that she "was capable of voting to impose it;" rather, the trial court found that Number 44 "could not say whether she would be able to impose the death penalty."[17]

In short, we decline to find error in the trial court's decision to excuse Number 44 for cause.

### 2. *Prospective Juror No. 63*

Prospective Juror No. 63 (Number 63) did not reveal much hesitation regarding the death penalty in his questionnaire

---

[17] Defendant repeats these comparisons in arguing that Prospective Juror No. 63's responses were insufficient to justify his excusal. Those comparisons fare no better.

responses, but he neglected to answer several questions on the topic.[18] He said that he did not have any moral, philosophical, or religious objection to the death penalty and that he believed the death penalty was fair, noting in part, "If you kill you be killed." He said that his feelings about the death penalty were not "such that [he] would refuse to find the defendant guilty of first degree murder and/or would refuse to find the special circumstance true, solely to avoid having to make a decision on the death penalty;" that his feelings about the death penalty were not "such that [he] would never be able to personally vote for the death of the defendant under any circumstances" and "would always vote for a sentence of life without [the] possibility of parole;" and that he would not be reluctant to sign the verdict form for a death sentence or state that verdict in court. Inexplicably, however, he failed to respond to several other questions, including, among others, what his general feelings were about the death penalty, what he believed to be the purpose of the death penalty, whether the death penalty was used too often or too seldom, and whether he would vote to keep or abolish the death penalty. Nor did he identify which one of five defined groups most accurately described his opinion regarding the death penalty.

Separately, and without explanation, he checked "no" when asked whether he thought he could be a fair and impartial juror in this case and when asked whether he was "willing to

---

[18] Regarding the questionnaire's introductory paragraphs about the death penalty, he checked "no" when asked to acknowledge that he read and understood those paragraphs. It is not apparent from the record whether he indeed failed to read or understand those paragraphs or simply checked "no" due to inadvertence.

weigh and consider all the aggravating and mitigating factors that will be presented to [him] before deciding the penalty in this case."

During *Hovey* questioning, Number 63 said that he did not have strong feelings about the death penalty, but that he would not feel comfortable voting for a death sentence and that he would be reluctant to do so. The prosecutor asked, "Do you think your feelings about that might affect the way you judge the guilt or innocence of the defendant?" He said, "It might." The prosecutor then asked, "Do you think that your feelings might also affect the way you look at the Court's instructions about the death penalty?" He again said, "It might." He also confirmed that sitting on this type of case might be difficult for him based on his feelings.

The defense subsequently asked, "[D]o your feelings about the death penalty, are they based on a religious or ethical thing, or is it just your own personal feelings about it?" Number 63 responded, "You could say both." The defense then asked, "If you were to be asked to judge which penalty to impose, and the Court gave you what the rules are, here's how you decide. You look at all the aggravating factors, and they are 1, 2, 3, 4, 5. You look at all the mitigating factors, 5, 6, 7, 8, 9. Whatever they are. You decide whether the aggravating factors weigh more than the mitigating factors. If they do, then you vote for death. If they don't, you vote for life without possibility of parole. [¶] Would you be able to follow that instruction?" Number 63 responded, "I don't know." The defense asked, "What gives you — what is your concern about following that instruction?" Number 63 responded, "The way I feel." To clarify, the defense asked, "Which is that you wouldn't want to vote for death?" Number 63 responded, "Nope." Again seeking to clarify, the

defense asked, "No, you wouldn't want to vote for death?" Number 63 responded, "I don't think so. I'm saying, no, I'm not, but I don't think so."

The prosecutor challenged Number 63 for cause "based on his answers," and the defense said, "Submit it." The trial court excused Number 63 for cause.

"Jurors are not required to like the law, but they are required to follow it." (*Armstrong, supra,* 6 Cal.5th at p. 750.) "[S]o long as prospective jurors can obey the court's instructions and determine whether death is appropriate based on a sincere consideration of aggravating and mitigating circumstances, they are not ineligible to serve." (*Ibid.*) "A jury candidate who will not, or cannot, follow a statutory framework, is not qualified to serve." (*Ibid.*)

Here, Number 63 said in his questionnaire that he did not have any moral, philosophical, or religious objection to the death penalty, his feelings were not such that he "would never be able to personally vote for the death of the defendant under any circumstances," and he would not be reluctant to sign the verdict form for a death sentence or state that verdict in court. But he said during *Hovey* questioning that his feelings about the death penalty were based both on "a religious or ethical thing . . . and [his] own personal feelings," he "[didn't] think" he wanted to vote for a death sentence, and he would be reluctant and not feel comfortable doing so.

As with Number 44, a generalized recognition that it would be difficult to impose a death sentence does not mean that a juror is necessarily substantially impaired. (See *Merriman, supra,* 60 Cal.4th at p. 53.) But Number 63 said more. He indicated in his questionnaire that he was not "willing to weigh

and consider all the aggravating and mitigating factors that will be presented to [him] before deciding the penalty in this case." And when asked during *Hovey* questioning whether he would be able to follow the court's instruction regarding considering and weighing the aggravating and mitigating factors, he said that he "[didn't] know" due to "[t]he way [he] feel[s]."[19]

" '[A prospective] juror's inability to set aside his or her personal views and follow the law, need not be demonstrated with unmistakable clarity.' " (*People v. Jones*, *supra*, 3 Cal.5th at p. 615.) Here, Number 63's written and oral responses could have left the trial court with "the definite impression that [he] would be unable to faithfully and impartially apply the law." (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 426.) That defense counsel merely submitted the question to the trial court[20] further "suggest[s] counsel concurred in the assessment that the juror was excusable." (*People v. Cleveland*, *supra*, 32 Cal.4th at p. 735; cf. *Witt*, *supra*, 469 U.S. at p. 435 [where counsel did not question the juror or object to the trial court's excusing her for cause, "it seems that at the time [the juror] was excused no one

---

[19] Defendant notes that Number 63 was not directly "asked if he would be willing to set aside whatever personal views he had and follow the law given to him by the court." "We agree that the better practice is to ask such a question. But the focus of our review is whether there is substantial evidence to support a conclusion that the juror would not be able to set aside his or her personal feelings and follow the trial court's instructions concerning the imposition of the death penalty." (*People v. Jones* (2017) 3 Cal.5th 583, 616.)

[20] We have since held that similar statements do not suffice to preserve this objection on appeal. (*People v. McKinnon* (2011) 52 Cal.4th 610, 643.) But this rule does not apply retroactively here. (*People v. Cleveland* (2004) 32 Cal.4th 704, 734–735.)

in the courtroom questioned the fact that her beliefs prevented her from sitting.  The reasons for this, although not crystal clear from the printed record, may well have been readily apparent to those viewing [the juror] as she answered the questions"].)  After giving appropriate deference to the trial court's determination regarding Number 63's state of mind, we find substantial evidence supports the trial court's ruling and conclude that the court did not err in excusing Number 63.

## C.  Standard for Excusing Prospective Jurors for Cause

Defendant challenges the standard for excusing prospective jurors based on their views of the death penalty. " 'Under the applicable state and federal constitutional provisions, prospective jurors may be excused for cause if their views would prevent or substantially impair the performance of their duties.' "  (*People v. Gonzalez* (2012) 54 Cal.4th 1234, 1284–1285.)  We recently declined an invitation to revisit this standard and do so again here.  (See *People v. Rices* (2017) 4 Cal.5th 49, 79–80 (*Rices*).)

## III.  GUILT PHASE ISSUES

## A.  Denial of Defendant's Motion to Suppress

Pursuant to a search warrant, the police collected, among other items, a sample of defendant's blood and the note from his truck.  Before trial, defendant moved to suppress this evidence. The trial court denied his motion.  Defendant contends the court erred because the search warrant affidavit contained misrepresentations and omissions that were intentionally false or made in reckless disregard for the truth.  The trial court did not err.

### 1. *Background*

On June 16, 1992, the police received a report that a "black male wearing a white T-shirt armed with a small handgun" had just committed a robbery and rape at a nearby office building in Torrance. (See *ante*, pt. I.B.1.a.v.) Within minutes of the report, and in the general vicinity from which the suspect may have attempted to flee, two officers spotted defendant in his truck, appearing very nervous and matching the suspect's general description. The officers unsuccessfully attempted to stop defendant, a chase ensued, and the officers shot and arrested him. Once Detective Lore learned about the arrest, he sought a warrant to search defendant, his residences, and his vehicle.

#### a. *Detective Lore's affidavit in support of the search warrant*

Detective Lore's 11-page affidavit, dated June 18, 1992, began by describing Willem's death in Rialto and its apparent connection to other, similar rapes and robberies committed throughout San Bernardino and Riverside Counties. He described two such similar incidents: the Christine C. incident in Victorville and the Osburn and Carole D. incident in San Bernardino. In both incidents, the suspect bound the victims with telephone receiver cords. In the Christine C. incident, "a suspect was described as a tall Black male adult, late 20's to early 30's, armed with a small caliber handgun," and in the Osburn and Carole D. incident, the description of the suspect "matched the description of the suspect in the Victorville crime." Forensic specialist David Stockwell performed a chemical analysis for the three incidents and concluded that "the same suspect that committed the homicide/rape in the Rialto [*sic*], committed the rape in Victorville, [and] was also responsible for the robbery/rape in the City of San Bernardino." Based on

Stockwell's analysis, "the subject that was sought after in these series of crimes, is believed to be a Black male that is an ABO type, AB secretor."

Detective Lore next summarized a series of similar robberies. "The robberies included professional business suites in the late evening hours on Mondays, Tuesdays and Wednesdays, very similar to that of the time of the rapes mentioned previously. The robberies also included a male Black that matched the physical description of the one that was described in two of the rape incidents. The subject was armed with a small caliber semi-automatic handgun at the time of these robberies. During some of the robberies, the victims were bound with telephone receiver cords. During the follow-up interviews with the victims in these cases, it was revealed that in most of the cases the suspect had made some specific comments. The most prevalent being, 'Don't look at me.' "

Elaborating with respect to a related robbery, Detective Lore said that Arnold and Sharyn Andersen were working at their business when they were "confronted by a tall Black male adult, armed with a small caliber handgun." "The suspect made both victims lie on the floor. The subject robbed the victims of approximately $1,600.00 in cash and fled out the same door where he had forced entry." Detective Lore continued, "The investigation by San Bernardino Police Department revealed that the suspect smashed out a small window over the locking area of the door, which led into the rear portion of the business suite. When doing this, the suspect cut himself on the glass and had grabbed a box of Kleenex that was sitting on a counter near the back door to stop some of the bleeding. The Kleenex box was collected and linked to the suspect."

Detective Lore then noted that four robberies in Riverside "had similar suspect descriptions." The San Bernardino County Sheriff's Department also created a sketch of the suspect, which "seemed to be the consensus of most of the victims that saw the suspect during the robberies."

Next, Detective Lore explained that in June 1992, he learned that the Torrance Police Department had arrested defendant for committing a robbery and rape, during which "the suspect tied both victims with telephone receiver cords, had a chrome handgun, spoke very softly in a calm voice, and had made vaginal penetration with his finger and penis from behind. The suspect also said to the victims, 'Where is the money' and 'Don't look at me.'" According to Detective Lore, "All of the above M.O. traits are consistent with the crimes in the Inland Empire from January through March of 1992."

Detective Lore then proceeded to describe defendant. According to the Torrance Police Department, he has AB positive blood, which "is the same type of blood that the suspect in the Rialto homicide and the two other rapes in Victorville and San Bernardino [has]." He "is further described as being very clean with virtually no body fat. The physical description provided by his California Driver's License is 6'6", 210#, Black hair and brown eyes." "Mr. Miles criminal history from the State of California [citation] describes him also as being a Black male, 6'5", 200#." In addition, Detective Lore listed his residences, noting that he listed with the DMV an address in Compton as of March 23, 1992 and that the "crime spree stopped in the Inland Empire on 3/8/92, before the suspect moved to Compton, CA." Detective Lore concluded, "[b]ased on my experience as being a policeman for approximately 20 years, Mr.

Miles displays the physical characteristics as described by the majority of the victims in these cases."

Detective Lore added, "A photographic line-up with the suspect's photograph in position #2 was tentatively I.D.'d by victim Heynen, one of the victim's [*sic*] in the Upland robbery which occurred on 1/21/92. The victim pointed to position #2 (suspect Miles) and said, 'It could be him.' "

Near the end of the affidavit, Detective Lore summarized, "With the exception of the homicide, the suspect in each crime is described as articulate and soft spoken. Witnesses to the robberies described the suspect as being Black male adult, 25-35 years, 6'-6'4", thin build, large dark eyes, dark hair, wearing a dark blue or black watch cap, dark blue or black Levi type pants, an[d] at times was described as having a thin moustache. Information derived from his driver's license history, criminal history and booking information reveals his physical description of 6'6", 210#, black hair and brown eyes." Detective Lore believed evidence from these crimes would be located during searches of defendant, his residences, and his vehicle and listed the items sought and described the places and person to be searched. Judge Gunn issued the warrant.

On appeal, defendant contends that the affidavit contained misrepresentations and omissions regarding the Kleenex box, Heynen's identification, and the suspect descriptions. Before trial, Detective Lore testified regarding his affidavit, the search warrant, and the searches conducted pursuant to the warrant. As to the three purported misrepresentations or omissions challenged on appeal, he testified as follows.

First, Detective Lore testified twice about the Kleenex box statement. Initially, the defense elicited the following testimony: "Q. Then you state the Kleenex box was linked to the suspect; is that correct? A. Yes, sir. Q. In what way was the Kleenex box linked to Mr. Miles? A. It was sent to the San Bernardino Crime Lab, but unfortunately the box had been wiped off, and there was nothing of use taken from the box. Q. The purpose of that statement was to assert to the Magistrate, again as a basis for probable cause, that somehow or another there was a scientific link that had been made between the substance on that box and Mr. Miles; is that correct? A. Yes, sir. Q. And that wasn't true, was it? A. No, sir."

The prosecutor subsequently recalled Detective Lore to testify about this statement again. At this time, the prosecutor asked whether there were some things in his affidavit "which ultimately were found not to be correct" including "a Kleenex box alleged to have been analyzed and linked to the defendant through scientific evidence." Detective Lore replied, "Yes." Asked whether he was aware that this statement was not true at the time of his affidavit, Detective Lore replied, "No." Asked whether he intentionally made this statement with the intent to deceive the magistrate judge, Detective Lore again replied, "No." Asked to explain why he included this statement, he testified, "It was my belief at the time that [the] San Bernardino Police Department had collected the Kleenex box, along with the blood stained Kleenexes, that were placed into evidence and they were going to be shipped to the Crime Lab." He was not sure whether at the time of the affidavit, he anticipated that the items "were going to go [to the lab], or that they were already there." He acknowledged, though, that at the time of the affidavit, he did

not have information that the box had been analyzed or that any comparison had been made.

Second, Detective Lore testified that Heynen had identified another individual during an earlier photographic lineup, but he did not include this information in his affidavit. He said that he orally informed the magistrate judge that he had sought and obtained search warrants with regard to other suspects in this case and that the warrant sought here was "either the fourth or fifth search warrant" sought in this case.

Third, Detective Lore testified that the suspect descriptions in his affidavit were based on the ATM photographs captured after Willem's death, police reports, and victim interviews. Regarding the ATM photographs, he explained that he had visited the same ATM camera, and by comparing himself to the photographed suspect, he had estimated that the suspect was approximately six feet, five inches tall or six feet, six inches tall. As to the police reports, the defense pressed Detective Lore, asking him to confirm the height and weight descriptions reported by the victims.[21] When the defense asked whether any

---

[21]    During this line of questioning, Detective Lore confirmed the following: the Christine C. police report described the suspect as "Male — or black male. 25 to 27. 6 feet 1. 150 [pounds]"; the Osburn and Carole D. police report described the suspect as "6 feet. 150 to 160 pounds. I believe it's brown hair. Brown eyes. And skin was medium"; the Yenerall police report described the suspect as "Male black. 30's. 6 feet. Weight was medium"; the Heynen police report described the suspect as "Black male. Brown eyes. Height was 6 feet 1. Weight was 180 pounds"; the Kendrick and Crawfords police report described the suspect as "25 years. Black male. Hair was black. Eyes were black. Height was 6'4". Weight was 160"; and the Andersens police report described the suspect as "male black. 20's. 6 feet. 170 [pounds]."

of the victims described the suspect as six feet, six inches tall, Detective Lore testified that when he interviewed Arnold, he "said around 6'6"," explaining that "[Arnold] was 6'4", and that he actually had to look up to the suspect."

Asked by the defense whether he meant to imply "that basically all of these people had similar descriptions" by stating that the robberies "included a male black that matched the physical description" of the Christine C. and Osburn and Carole D. suspect, Detective Lore replied affirmatively. The defense then asked whether, in his opinion, someone who is six feet, 150 pounds "matches" defendant's height and weight. Detective Lore replied, "After 25 years of law enforcement, you begin to realize that people are not very good with heights and weights." When the prosecutor subsequently questioned Detective Lore, he confirmed that by the word "matched," he did not mean to suggest that each victim's suspect description exactly mirrored defendant's height and weight. Rather, he meant that "[t]he descriptions given by the different witnesses and victims in this case, [were] within a couple of pounds or a couple of inches. And when I say a couple of pounds, 10, 20, 30." He also confirmed that he included defendant's height and weight in the affidavit to make the magistrate aware that discrepancies existed.

### b. *Trial court's ruling*

The trial court evaluated defendant's contentions with respect to each of the three purported misrepresentations or omissions challenged on appeal.

First, regarding the Kleenex box statement, the trial court reasoned that it could be interpreted in one of two ways. The first possible interpretation was that the "blood on the box had been scientifically matched to the suspect's blood. In this case,

Mr. Miles." By this interpretation, the statement would be false because no testing had in fact been done. "Had the affiant known this at the time that he prepared the affidavit, there would be no question that he made a knowingly and intentionally false statement; and at the very least, he made a statement with a reckless disregard for the truth since he had no information that was the case." The second possible interpretation was "that the box being linked to the suspect merely meant that the authorities collected the evidence, [and] believed the blood on the box was that of the suspect when he forced entry into the building." Or put differently, the affiant at the time that he prepared the affidavit "believed there was a Kleenex box with blood on it, possibly the suspect's blood; and that box was taken into evidence to be analyzed. He did not mean to suggest that the analysis had been done and that the blood on the box was that of Mr. Miles."

The trial court found that this second interpretation was consistent with the surrounding facts in the affidavit and was consistent with Detective Lore's testimony, in which he explained that he had later learned the Kleenex box could not be analyzed because it had been wiped off. The trial court concluded, "[b]ased on the Court's reading of the affidavit, and having heard the affiant testify on both occasions as to his intentions in including that information, the Court cannot say that he knowingly and deliberately included false information for the purpose of deceiving the Magistrate, nor can the Court find a reckless disregard for the truth on [the] affiant's part. At most, the Court would find a negligent mistake in drafting the affidavit in such a way that a Magistrate could mistakenly assume there was a scientific link, or failing to include the information that the box was to be analyzed later."

Further, the trial court found that even if the Kleenex box statement were omitted from the affidavit, the affidavit would nevertheless establish probable cause. "The affidavit contained substantial information that the same person likely committed the Willem, [Christine C.], [Carole D.]/Osburn crimes, including serological evidence. There was also information presented that Miles has the same blood type as that found at the Willem crime scene. And finally, there was information that Miles was arrested as a suspect in a similar robbery/rape in Torrance."

Second, as to the purported omission of Heynen's earlier identification, the trial court found, "The identification by Miss Heynen is, at the very least, equivocal and falls short of a positive identification. I can assume that the Magistrate came to the same conclusion, and that the additional information would not have led to a different result or have added anything of substance to the affidavit."

Third, regarding the suspect descriptions, the trial court "[did] not find this information to be misleading or false, and [did] not find that defendant ha[d] met his initial burden of showing a knowing or intentionally false statement, or reckless disregard for the truth."

Finally, the trial court found that "the affiant and the executing officers had an objective good faith reliance on the warrant, and the good faith exception to the exclusionary rule would apply in this case."

### 2. *Discussion*

" 'In reviewing a search conducted pursuant to a warrant, an appellate court inquires "whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." [Citation.] "The task of the

issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." [Citation.] The magistrate's determination of probable cause is entitled to deferential review. [Citation.]' [Citation.] Probable cause sufficient for issuance of a warrant requires a showing in the supporting affidavit that makes it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought." (*People v. Scott* (2011) 52 Cal.4th 452, 483 (*Scott*).)

"A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse. [Citations.] A defendant who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.] In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*Scott, supra,* 52 Cal.4th at p. 484.)

On appeal, "[w]e defer to the trial court's express and implied factual findings if supported by substantial evidence, but we independently determine the legality of the search under the Fourth Amendment." (*People v. Eubanks* (2011) 53 Cal.4th 110, 133.) We consider each of defendant's contentions in turn.

First, the trial court's reading of the Kleenex box statement to mean "that the authorities collected the evidence, [and] believed the blood on the box was that of the suspect when he forced entry into the building" (but not to suggest "that the analysis had been done and that the blood on the box was that of Mr. Miles") is supported by the record. Indeed, the affidavit's first several pages detailed the series of robberies and rapes, referring throughout to the "suspect" or the "subject" of those crimes, and made no mention of defendant or his arrest. Reading this statement's reference to the "suspect" of the Andersens crime to mean defendant is thus strained, as the trial court found.

That said, Detective Lore's testimony about his own statement necessarily complicates the analysis. At one point, Detective Lore confirmed that the purpose of his statement was to assert that there was a "scientific link" between the Kleenex box and defendant. When later questioned by the prosecutor, however, Detective Lore said that he believed only that the "San Bernardino Police Department had collected the Kleenex box, along with the blood stained Kleenexes, that were placed into evidence and they were going to be shipped to the Crime Lab." He also confirmed that at the time of his statement, he was not aware that the statement was untrue, and he did not make it with the intent to deceive the magistrate judge. Faced with this inconsistent testimony, and with the opportunity to assess

Detective Lore's demeanor and credibility, the trial court found that his statement was not intentionally false or made with a reckless disregard for the truth. Though the testimony is less than clear, there was certainly substantial evidence to support the trial court's finding. (See *People v. Troyer* (2011) 51 Cal.4th 599, 613 ["on appeal from the denial of a motion to suppress, we are bound by the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility . . . where (as here) the findings are supported by substantial evidence"].) Simply put, the trial court was entitled to credit Detective Lore's clarification that he meant to convey in his affidavit that the Kleenex evidence was merely being shipped to the crime lab and that he in no way intended to deceive the magistrate.

In any event, even assuming that this statement was intentionally false or made with a reckless disregard for the truth, and accordingly was excised from the affidavit, the affidavit would nevertheless establish probable cause. The affidavit catalogued the similarities among the series of rapes and robberies, including that the crimes occurred on weekday evenings at professional offices, that several of the victims were bound with telephone cords, and that the suspect was described as a tall, Black man who was armed. In addition, the affidavit described the consistencies between these incidents and the rape and robbery for which defendant was arrested and described defendant as a tall, Black man with AB blood, which was consistent with the suspect descriptions and the forensic analysis.

Second, we turn to the affidavit's statement about Heynen's lineup identification. The affidavit stated that Heynen "tentatively" identified defendant in a photographic

lineup by saying " 'It could be him.' " Although the affidavit did not state that Heynen had identified another individual during an earlier photographic lineup, Detective Lore testified that he orally informed the magistrate judge about prior warrants obtained during the investigation for other suspects. It is conceivable that overstating the certainty of identifications made by victims or selectively including details about such identifications may be substantially misleading in some circumstances. But here, the affidavit described Heynen's identification of defendant as tentative and quoted her equivocal statement that " 'It could be him.' " The omitted fact of Heynen's earlier identification, when added to the affidavit, does not render the affidavit insufficient to support a finding of probable cause. As described above, the affidavit contained ample information to establish probable cause, including but not limited to the similarities among the series of rapes and robberies and the consistencies between these incidents and the rape and robbery for which defendant was arrested.[22]

Finally, substantial evidence supports the trial court's finding as to defendant's third contention regarding the suspect descriptions. The affidavit plainly stated the range of the suspect's height as described by the victims, and in the immediately following sentence, set forth defendant's actual height and weight. The affidavit therefore made clear the discrepancies between the suspect descriptions and defendant's

---

[22] To the extent that defendant challenges any related omission concerning earlier suspects in the investigation, "[t]he fact that law enforcement had investigated other leads had no bearing on whether probable cause existed to issue the warrant to search [the defendant's] home and car." (*People v. Sandoval* (2015) 62 Cal.4th 394, 408.)

characteristics, as Detective Lore testified he intended to do. Considering this, the fact that he elsewhere in his affidavit summarized the suspect descriptions as similar or matching does not show that he made a false statement, much less made a false statement with an intent to deceive or a reckless disregard for the truth. Similarly, his opinion that, based on his experience as a policeman, "Mr. Miles displays the physical characteristics as described by the majority of the victims in these cases" does not amount to an intentional or reckless falsehood, particularly since he testified that his experience as a policeman indeed taught him that victims were not always accurate in describing suspects. Nor do we find an intentional or reckless omission of material information regarding the suspect descriptions that, when added to the affidavit, renders the affidavit insufficient to establish probable cause.[23]

For these reasons, the trial court did not err.

## B. Instruction Regarding Motive

Pursuant to CALJIC No. 2.51, the jury was instructed as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may

---

[23] Defendant also claims that Detective Lore previously detailed these suspect descriptions in earlier affidavits for two other suspects in the investigation and that Detective Lore's inconsistent approach regarding the suspect descriptions within those affidavits and the affidavit here evidenced a lack of good faith in the affidavit here. But how Detective Lore presented the suspect descriptions in earlier affidavits for two other suspects does not alter our conclusion that the affidavit here contained no false statement and omitted no material information regarding the suspect descriptions.

tend to establish the defendant is guilty.  Absence of motive may tend to show the defendant is not guilty."  Defendant contends this instruction impermissibly lowered the prosecution's burden of proof for the murder by torture charge and the penetration by a foreign object charges in violation of his federal constitutional rights because, according to defendant, motive was "effectively" an element of those crimes.  We disagree.

### 1. *Murder by Torture*

The trial court instructed the jury that murder by torture requires in relevant part "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose."  Defendant argues that this "purpose" element was effectively negated by instructing the jury that motive was not an element of murder by torture.

We previously rejected that precise argument in *People v. Whisenhunt* (2008) 44 Cal.4th 174, 218.  In *Whisenhunt*, the defendant argued that CALJIC No. 2.51 "had the effect of negating the element of 'sadistic purpose' in the first degree murder by torture instruction, CALJIC No. 8.24."  (*Whisenhunt*, at p. 218*;* see also *id*. at p. 219, fn. 11 [CALJIC No. 8.24 stated in relevant part, "for the purpose of revenge, extortion, persuasion or for any sadistic purpose"].)  We observed that the Court of Appeal had previously rejected that argument in *People v. Lynn* (1984) 159 Cal.App.3d 715, and we concluded that *Lynn* "correctly decided this issue."  (*Whisenhunt,* at p. 218.)  We explained, " '[A]lthough malice and certain intents and purposes are elements of the crimes, . . . *motive* is not an element.' [Citation.]  'Motive describes the reason a person chooses to commit a crime.  The reason, however, is different from a

required mental state such as intent or malice.' " (*Ibid*.) We see no reason to depart from *Whisenhunt* here.

Nor does defendant's reliance on *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1125 compel a departure. In *Maurer*, the trial court instructed the jury that misdemeanor child annoyance required that " '[the] acts or conduct were *motivated by* an unnatural or abnormal sexual interest.' " (*Id*. at p. 1125, italics added.) The trial court additionally instructed the jury that motive was not an element of the crime charged and need not be shown. Reasoning that "the question whether 'motive' is somehow different from 'motivation' or 'motivated by' is a question of some academic interest but of little practical significance," the Court of Appeal held that the trial court erred by not excluding this misdemeanor child annoyance charge from the motive instruction of CALJIC No. 2.51. (*Maurer*, at p. 1127.) Unlike the charge in *Maurer*, however, the murder by torture charge here did not reference or require motive, or any derivation of that term. (Cf. *People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 (*Hillhouse*) [distinguishing *Maurer* where motive was not element of crime].) We find no error.

### 2. *Penetration by a Foreign Object*

The trial court instructed the jury that penetration by a foreign object under section 289, subdivision (a) requires in relevant part that "[t]he penetration was done with the purpose and specific intent to cause sexual arousal, gratification or abuse." The trial court further instructed the jury that "the 'specific intent to cause sexual abuse,' as used in this instruction, means a purpose to injure, hurt, cause pain or to cause discomfort. It does not mean that the perpetrator must be motivated by sexual gratification or arousal or have a lewd

intent." Here, again, defendant argues that this "purpose and specific intent" element was effectively negated by instructing the jury that motive was not an element of this offense.

We have made clear, however, that motive is not an element of an offense merely because the offense requires a particular purpose or intent. (See, e.g., *Hillhouse*, *supra*, 27 Cal.4th at pp. 503–504.) Accordingly, motive was not an element of the penetration by a foreign object charges simply by virtue of the charges requiring a particular "purpose and specific intent." (Cf. *People v. White* (1986) 179 Cal.App.3d 193, 198, 205–206 [regarding the "'purpose of sexual arousal, gratification, or abuse'" requirement of former section 289, subdivision (a), "it is the nature of the act that renders the abuse 'sexual' and not the motivations of the perpetrator"].) Defendant points to no authority suggesting otherwise. We find no error.

## C. Instruction Regarding Intent to Kill

Defendant contends that the jury was not properly instructed regarding the intent-to-kill requirement of the torture-murder special circumstance and therefore the jury's finding on this special circumstance violates state and federal law and must be reversed. The trial court instructed the jury pursuant to CALJIC No. 8.80.1 that if it found defendant guilty of first degree murder, the jury must determine if one or more of the following special circumstances are true: "the murder was committed by the defendant while in the commission of, or attempted commission of a robbery, rape or burglary; or the murder was intentional and involved the intent to inflict torture. . . . Unless an intent to kill is an element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not

find that the defendant intended to kill in order to find the special circumstance to be true."

Regarding the torture-murder special circumstance, the trial court instructed the jury pursuant to CALJIC No. 8.81.18, over the defense's objection: "To find that the special circumstance, referred to in these instructions as murder involving infliction of torture is true, each of the following facts must be proved: [¶] 1. The murder was intentional; and; [¶] 2. The defendant intended to inflict extreme cruel physical pain and suffering upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose. Awareness of pain by the deceased is not a necessary element of torture."

Defendant argues that CALJIC No. 8.81.18's directive that "[t]he murder was intentional" did not adequately instruct the jury as to the intent-to-kill requirement of the torture-murder special circumstance. He acknowledges that in some cases, CALJIC No. 8.81.18 may adequately instruct the jury as to this requirement. But he argues that where, as here, the jury was presented with multiple theories of first degree murder — specifically, premeditation and deliberation, torture, and felony murder — and two of those theories did not require an intent to kill, CALJIC No. 8.81.18's directive that "[t]he murder was intentional" did not necessarily require the jury to find that defendant intended to kill but rather required the jury simply to find that defendant intended to inflict torture or intended to commit the crime of rape, robbery, or burglary. In support of this argument, defendant relies on *People v. Pearson* (2012) 53 Cal.4th 306 (*Pearson*).

In *Pearson*, the trial court included torture in the list of felonies on which the jury could base a felony-murder special circumstance and as to which the jury needed to find only that defendant, if not the actual killer, acted as a major participant and with reckless indifference to human life. (*Pearson, supra*, 53 Cal.4th at p. 322.) This instruction "incorrectly described the mental state element of the torture-murder special circumstance [citation], which requires the intent to kill." (*Id.* at p. 323.) The trial court thus erred in its instructions on the intent-to-kill requirement of the torture-murder special circumstance.

We were unable to conclude beyond a reasonable doubt that "the court's instructional error, the omission of an intent-to-kill requirement for an accomplice's liability under the torture-murder special circumstance, was harmless." (*Pearson, supra*, 53 Cal.4th at p. 323.) The jury's verdict form showed "its reliance on an aiding and abetting theory," and the jury made no finding "as to whether defendant aided and abetted his accomplices' fatal acts with the intent to kill or merely with reckless indifference to the victim's life." (*Ibid.*) The "confusing" language provided on the verdict form for the torture-murder special circumstance also "[fell] short of a finding defendant personally intended to kill." (*Id.* at p. 323, fn. 7 [" 'that the defendant . . . committed the murder [of the victim] was intentional and involved the infliction of torture' "].) In those circumstances, we found that CALJIC No. 8.81.18 did not supply the missing intent-to-kill element because CALJIC No. 8.81.18 "required the jury to find '[t]he murder was intentional,' but not necessarily to find [the aider and abettor] personally harbored the intent to kill." (*Pearson*, at p. 323.)

Defendant's reliance on *Pearson*, however, is misplaced. Unlike in *Pearson*, the instructions here did not include torture in the list of felonies on which the jury could base a felony-murder special circumstance, or as to which the jury needed to find only that defendant acted with reckless indifference to human life. In addition, *Pearson* addressed CALJIC No. 8.81.18 as it applied to an aider and abettor, not the actual killer.

"In determining whether a legally inadequate theory was conveyed to the jury here, we must ask whether there is a ' "reasonable likelihood" ' that the jury understood the [relevant theory] in a legally impermissible manner. [Citation.] In doing so, we consider the instructions provided to the jury and counsel's argument to the jury." (*People v. Canizales* (2019) 7 Cal.5th 591, 613; see also *Hardy*, *supra*, 5 Cal.5th at p. 97.)

The instructions here informed the jury that it need not find that defendant intended to kill in order to find a special circumstance to be true *unless* an intent to kill is an element of the special circumstance, and that in order to find the torture-murder special circumstance to be true, it must find that "[t]he murder was intentional." Where, as here, defendant was the actual killer, CALJIC No. 8.81.18's requirement that "[t]he murder was intentional" adequately instructed the jury as to the intent-to-kill requirement of the torture-murder special circumstance. (Cf. *People v. Pensinger* (1991) 52 Cal.3d 1210, 1256 ["Further, defendant's intent to kill was established by the jury when it found the torture-murder special circumstance true, as that allegation was that '[t]he murder was intentional and involved the infliction of torture.' "]; accord, *People v. Leach* (1985) 41 Cal.3d 92, 108, 110.) In addition, the prosecutor correctly informed the jury that in order to find the torture-

murder special circumstance to be true, the jury must find "an intentional murder."[24] Accordingly, there was no error in these circumstances.

## D. Felony-Murder Special Circumstances

Defendant contends that the felony-murder special circumstances are unconstitutional because they do not require a finding of a culpable mental state when the defendant is the actual killer. "We have repeatedly held that when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance." (*People v. Jackson* (2016) 1 Cal.5th 269, 347; see *People v. Watkins* (2012) 55 Cal.4th 999, 1033–1034.) We decline to revisit this issue here, particularly since the jury found for purposes of another special circumstance that Willem's murder was indeed intentional.

---

[24] The prosecutor argued as follows: "Finally, we have a fourth special circumstance. The murder was intentional. Again, it has to be an, an intentional murder. Not an implied malice murder like with the first degree torture theory that we described earlier. Now we're into the torture special circumstance. Again, I know there's some overlapping words here, but to get to torture first degree murder, which is what I discussed a minute ago. [¶] Remember, the murder, it has to be murder, but there doesn't have to be an intent to kill. To get to the special circumstance first you have to find that there was an intentional murder, and again we've established, through the method of death, the method of attack, the repetitive nature, again the strangulation, we know the murder was intentional. There's no issue there."

## IV. COMPETENCY PHASE ISSUES

### Admission of Defense Counsel's Testimony Regarding Counsel's "Strategies and Tactics"

After the guilt phase, the trial court declared a doubt as to defendant's competency, suspended proceedings pursuant to section 1368, and commenced a competency trial before a separate jury. Defendant was appointed a different attorney from the public defender's office, David Negus, to represent him in the competency trial. At the competency trial, the defense argued that defendant was not able to rationally cooperate with his trial counsel, Joseph Canty, and thus was not competent to stand trial. Canty testified on behalf of the defense, and over the defense's objection, the prosecutor cross-examined him. Defendant contends that the trial court erred in allowing the prosecutor to cross-examine Canty about his "trial tactics and motive for seeking a competency hearing" because this testimony was irrelevant, prejudicial, and protected from disclosure by the attorney-client privilege and attorney work product doctrine. We examine each of defendant's contentions in turn.

### 1. Competency Trial

#### a. Defense evidence

Five doctors testified on behalf of the defense. Dr. Dudley testified that defendant suffered from schizo-affective disorder and cognitive deficits and was not able to rationally cooperate with his counsel. Dr. Wu testified that defendant's PET brain scan showed abnormalities that were consistent with schizophrenia, and Dr. Meth testified that defendant's SPECT brain scan showed abnormalities, which were consistent with those shown in the PET scan. Dr. Shoba Sreenivasan, a clinical

psychologist, testified that defendant was not able to rationally cooperate with his counsel. Dr. Lantz testified that he diagnosed defendant as schizophrenic undifferentiated, determined defendant's intelligence to be below average, and did not believe that defendant was able to rationally cooperate with his counsel as a result of his mental illness.

In addition to these doctors, Canty testified. Before he did, the trial court evaluated whether he could testify without obtaining an attorney-client privilege waiver from defendant and to what extent the prosecutor could cross-examine him. The trial court concluded that Canty could testify without obtaining a waiver since it was not clear that defendant was capable of waiving the privilege. The trial court refrained, however, from defining the scope of permissible cross-examination at the outset, suggesting instead that counsel request to approach the bench should the testimony near Canty's "strategy, motive, trial tactics."

Canty began his direct testimony by describing his experience with capital cases and his relationship with defendant. He proceeded to chronicle his concerns about defendant's decision-making in the case, detailing, among other things, defendant's refusal to consider a potential plea deal, his desire to testify in the guilt and penalty phases, and his wish to present no mitigating evidence during the penalty phase. Canty testified that he did not believe defendant could rationally cooperate with him.

On cross-examination, Canty acknowledged that his obligation in representing defendant was to exhaust every legal remedy that avoids the death penalty. The prosecutor then inquired into prior occasions on which Canty had voiced

concerns about defendant's competency in this case. With respect to one occasion, earlier in this case, Canty confirmed that defendant ultimately waived his right to a competency jury trial and that "a number of factors" went into that decision, including a "tactical" consideration in seeking to avoid pretrial publicity.

The prosecutor next asked whether the guilt phase jurors were "in limbo" pending the outcome of this competency trial, to which Canty confirmed that they were told to "potentially" come back later that month. The prosecutor asked, "And the effect of a finding of incompetency in this particular trial would mean that that jury would be discharged, would it not?" Canty responded, "That would be up to the Judge." When the prosecutor directed Canty's attention to a statutory provision (section 1368) — which, according to the prosecutor, provided that the jury would be discharged upon a finding of incompetency — Canty said he was not familiar with that provision.[25] The prosecutor then asked, "Well, if there is a finding of incompetency, I'm sure you would be arguing that the jury should be discharged, would you not?" Canty replied, "That's hard to know, because you have to know what the proposed treatment plan is going to be. And I don't know what the Judge will feel about keeping the jury." The prosecutor followed up, asking, "Frequently there's a, there's a tactical advantage in death penalty cases to have a second, separate jury

---

[25] Later in his testimony, Canty acknowledged that he subsequently reviewed the provision and that the prosecutor had accurately recited it. Canty testified that he did not recall the provision until the prosecutor had recited it, but acknowledged that he previously had discussed the impact of a finding of incompetency with his colleagues and the press.

impaneled for the penalty phase that did not hear the guilty phase; is that correct?"

The defense immediately asked to approach the bench. Outside the presence of the jury, the defense stated, "It sounds like we're getting into Mr. Canty's tactical decisions. I realize thus far it's been expressed just in the abstract, but [it would] appear that we're starting to focus in on it in this particular case." The defense objected to the line of questioning as irrelevant and prejudicial. In response, the prosecutor explained that he intended to show that Canty's motive for this competency trial was to obtain a new penalty phase jury. The trial court took the matter under submission. It ultimately ruled that the prosecutor could bring before the jury "this question of motivation" for the competency trial. The trial court instructed the prosecutor, however, that he otherwise should probably "stay away" from asking about "what's going on in [Canty's] mind."

Back in the presence of the jury, the prosecutor returned to his question as to whether "[f]requently it's a defense tactic in capital cases to seek a new jury for the penalty phase." Canty testified, "I can't answer that yes or no. I would think that depending upon the status of the case and a given case, I could conceive that counsel might wish to have another jury handle the penalty phase, and there would be a variety of reasons for that." Asked about another capital case where he had tried the penalty phase before a jury, Canty confirmed that he had moved for a new penalty phase jury in that case. The prosecutor's remaining, and relatively extensive, questioning regarded Canty's concerns about defendant's decision-making in the case.

On a brief recross-examination, Canty confirmed that in determining defendant's sentence, the penalty phase jury would consider evidence it had heard during the guilt phase. In the event of a new penalty phase jury, he explained that the witnesses who testified in the guilt phase would either be recalled, or counsel would stipulate as to their testimony. Finally, the prosecutor asked whether Canty had previously told the prosecution in this case that he may move for a new penalty phase jury. Canty responded, "I — if I — I don't remember making that statement. I wouldn't say that I didn't. I don't remember saying that." The prosecutor followed up, asking, "It's possible? And by that I mean, motion for a separate penalty phase jury?" Canty responded, "Yes. If that's — that's the question I'm answering, yes." The parties subsequently stipulated that Canty "has not made a motion for separate juries for guilt and penalty phase in this case."

### b. *Prosecution evidence*

A forensic psychologist, Dr. Lee Guerra, testified that defendant was competent to stand trial and that he suspected defendant was malingering mental illness. A psychiatrist, Dr. Jose Moral, likewise testified that defendant was competent to stand trial and that he, too, suspected defendant was malingering mental illness.[26]

An investigator testified that when he served defendant with a court order for a handwriting exemplar, defendant refused to comply. The investigator believed that defendant understood the request but considered it to not be in his best

---

[26] In rebuttal, the defense offered testimony from Dr. Ronald Roston to refute portions of Dr. Moral's testimony.

interest to comply with it. A videotape showing defendant watching and playing chess with other inmates in jail was also played for the jury, and Deputy Billings testified that defendant's behavior on the tape was generally consistent with his behavior in jail.[27]

###### 2. Discussion

####### a. Whether the testimony was irrelevant and unduly prejudicial

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue

---

[27] The prosecutor's closing argument discussed Canty's possible motivations for the competency trial, in approximately two transcript pages of the total 32-page closing argument. In relevant part, the prosecutor argued that Canty's "role is to use every legal means to insure [*sic*] that Miles escapes the death penalty," and reminded the jury that Canty previously moved for a new penalty phase jury in another capital case and that a finding of incompetence in this trial would guarantee the same result. The prosecutor urged the jury, "make no mistake that the competency issue is played as a tactic," that Canty used that tactic earlier in this case, and that "it is a tactic that gets played." The prosecutor later repeated, "[c]onsider that [defendant's] attorneys are doing the best they can and they're going to use every legal means so that he avoids the death penalty." The defense did not object during the prosecutor's closing argument.

prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Prejudice,' as used in Evidence Code section 352, is not synonymous with 'damaging.' [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)

"A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion." (*Merriman, supra*, 60 Cal.4th at p. 74.) " 'We will not disturb a trial court's exercise of discretion under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480.)

Here, defendant argues that the testimony about Canty's "strategy and tactics" was irrelevant and unduly prejudicial. Defendant "recognizes that in many cases, evidence of a testifying witness's motivation might be useful to assessing the credibility of the witness," but he argues, with little explanation, that Canty "was a sworn officer of the court [and] testifying under penalty of perjury." Defendant additionally argues that "the prosecutor's theory that Mr. Canty's state of mind would shed light on [defendant's] mental health required the exact type of speculative inference condemned by this court." In

response, the Attorney General argues that Canty's testimony was relevant both to Canty's credibility and to show "the potential benefits of faking incompetence" since the prosecutor argued that defendant was faking incompetence for an ulterior purpose.

We conclude that the trial court did not abuse its discretion under Evidence Code section 352 when it permitted the prosecutor to cross-examine Canty about his possible motive for seeking a competency trial. As noted, Canty was a witness during the competency trial and did not represent defendant for purposes of that trial. Whether the guilt phase jury would be discharged upon a finding of incompetence, whether there were advantages to impaneling a new penalty phase jury, and whether Canty previously considered seeking a new penalty phase jury in this case is evidence relevant to his credibility as a witness in this competency trial. (Cf. *People v. Turner* (2004) 34 Cal.4th 406, 430 [where "defendant's trial attorneys were percipient witnesses during the competency hearing," the prosecutor was "free to attack their credibility based on the evidence in the record" and did not commit misconduct by suggesting that defendant's trial attorneys raised the competency issue only due to "their emotional involvement in the case"].) To be sure, we recognize the suggestion that Canty harbored ulterior motives in testifying at the competency trial had possible prejudicial effects. In the circumstances here, however, we cannot say that on balance, the trial court abused its discretion in permitting this testimony. (See *People v. Dalton* (2019) 7 Cal.5th 166, 237 [" ' "Evidence is substantially more prejudicial than probative" ' under Evidence Code section 352 ' "if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' "].)

As to Canty's testimony that he previously sought a new penalty phase jury in another capital case, defendant did not raise a timely and specific objection to this particular testimony. Although we acknowledge that defendant objected to the prosecutor's overall efforts to show that Canty's motive for the competency trial was to obtain a new penalty phase jury in this case, we find that defendant forfeited any claim of error as to this particular testimony regarding the other capital case. Even if we assume for the sake of argument that this portion of his claim was preserved and admitting this testimony was error, however, we would find any such error harmless in light of Canty's other, properly admitted testimony, including his testimony that he "could conceive that counsel might wish to have another jury handle the penalty phase, and there would be a variety of reasons for that" and that it was "possible" that he told the prosecution that he may move for a new penalty phase jury in this case.

### b. *Whether the testimony was protected by the attorney-client privilege and attorney work product doctrines*

The attorney-client privilege protects from forced disclosure "a confidential communication between client and lawyer." (Evid. Code, § 954.) The Evidence Code defines "confidential communication between client and lawyer" as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the

lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Evid. Code, § 952.) The " 'fundamental purpose' " of the attorney-client privilege is " 'to safeguard the confidential relationship between clients and their attorneys so as to promote full and [frank] discussion of the facts and tactics surrounding individual legal matters.' " (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 292.)

Defendant contends that admitting Canty's testimony regarding his "tactical decisions" violated the attorney-client privilege. Canty's challenged testimony, however, did not violate the attorney-client privilege because it related primarily to general legal principles and publicly available facts. For example, his testimony about the procedural effects of an incompetence finding or the potential advantages in impaneling a new penalty phase jury spoke to legal concepts in nonspecific terms and did not disclose the content of any confidential communications between Canty and defendant. (Cf. *People v. Clark* (2016) 63 Cal.4th 522, 603 [privilege not violated where expert witness testified regarding general legal concepts and "did not disclose any actual communication between defendant and his attorney"].)[28] Similarly, his testimony about section 1368 or about moving for a new penalty phase jury in another case did not violate the attorney-client privilege since those facts were publicly available. (See *People v. Combs* (2004) 34 Cal.4th 821, 865–866 [privilege not violated by eliciting information contained in public record].)

---

[28] Nor did it disclose the content of any legal opinions formed in the course of representing defendant, as defendant contends.

Admittedly, a couple of the prosecutor's questions came closer to potentially eliciting privileged information. First, the prosecutor asked whether Canty would argue for a new penalty phase jury upon a finding of incompetency in this case (putting aside any applicable statutory provision). Although this question moved beyond the more general line of questioning, Canty's noncommittal response to this hypothetical question that it was "hard to know" and that he did not know "what the Judge [would] feel about keeping the jury" fell short of revealing any privileged information. Second, the prosecutor asked whether Canty previously told the prosecution that he was considering moving for a new penalty phase jury in this case, again going beyond the abstract and into the specifics of this case. However, information communicated to the prosecution would not have remained privileged. And in any event, Canty testified that, although it was possible, he did not recall whether he in fact told the prosecution that. Thus, despite these closer calls, none of his testimony ultimately disclosed any privileged information.

As to the attorney work product doctrine, section 1054.6 currently provides in relevant part that "[n]either the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (a) of Section 2018.030 of the Code of Civil Procedure, or which are privileged pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States."[29] Code of Civil Procedure

---

[29] When defendant committed his crimes and his trial took place, "Penal Code section 1054.6 referred to Code of Civil

section 2018.030, subdivision (a) in turn provides: "A writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories is not discoverable under any circumstances." Code of Civil Procedure section 2018.030, subdivision (b) separately provides that "[t]he work product of an attorney, other than a writing described in subdivision (a), is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." The policy behind the work product doctrine is to "[p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases [and to] [p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018.020.)

Defendant contends that admitting Canty's testimony regarding his "tactical decisions" not only violated the attorney-client privilege but also violated the absolute attorney work product doctrine. Defendant argues that admitting this testimony violated the attorney work product doctrine, regardless of whether the work product was reduced to writing or not, because "despite the arguably contrary language of California's absolute work product statute, the privilege also applies to non-written work product." Disagreeing, the Attorney General argues that "[t]he prosecutor's questions to Canty did

---

Procedure former section 2018, subdivision (c), which then stated the absolute work product protection now stated in Code of Civil Procedure section 2018.030, subdivision (a)." (*People v. Zamudio* (2008) 43 Cal.4th 327, 355, fn. 14.)

not relate to any *writing* reflecting his impressions, conclusions, opinions, legal research or theories and thus could not have impinged any valid work product privilege." The Attorney General further argues that "Canty was not asked to, and did not, divulge any otherwise privileged or confidential information;" instead, his testimony regarded matters disclosed to the prosecutor or in public records, and consisted of evasive responses that "did not disclose any unique impressions, conclusions, opinions, or theories."

We need not decide whether Canty's oral testimony qualified as attorney work product or whether admitting it violated the attorney work product doctrine. Even if we assume that error occurred, it was not reversible. The Attorney General and defendant disagree as to which standard of prejudice applies here. Regardless, we would find it harmless under either standard. (See *People v. Watson* (1956) 46 Cal.2d 818; *Chapman v. California* (1967) 386 U.S. 18.) As Canty acknowledged, section 1368 itself provided that the jury would be discharged if defendant were found mentally incompetent. In addition, Canty acknowledged that "depending upon the status of the case and a given case," he "could conceive that counsel might wish to have another jury handle the penalty phase, and there would be a variety of reasons for that." Canty also acknowledged that it was "possible" that he told the prosecution that he may move for a new penalty phase jury in this case. To the extent admitting other portions of Canty's challenged testimony may have violated the attorney work product doctrine, we find any such error harmless in light of Canty's properly admitted testimony. We therefore find no reversible error.

## V. PENALTY PHASE ISSUES

### A. Admission of Evidence of Crimes Committed as a Juvenile

Over the defense's objection, the trial court took judicial notice of 14 of defendant's prior convictions. Eight of these convictions were for crimes that defendant committed when he was 17 years old. Defendant contends that considering those convictions violated his rights under the Eighth Amendment to the United States Constitution. This contention fails.

If a defendant committed an offense while under the age of 18, but was tried and convicted as an adult, "the conviction would be admissible at the penalty phase under section 190.3, factor (c)." (*People v. Williams* (2010) 49 Cal.4th 405, 462; *People v. Pride* (1992) 3 Cal.4th 195, 256–257.) Defendant acknowledges this but urges us to reconsider the issue based on the high court's decisions in *Roper v. Simmons* (2005) 543 U.S. 551, *Graham v. Florida* (2010) 560 U.S. 48, *Miller v. Alabama* (2012) 567 U.S. 460, and *Hall v. Florida* (2014) 572 U.S. 701. We recently rejected a similar argument premised on those same four decisions and held that presenting evidence of a defendant's violent juvenile misconduct under section 190.3, factor (b) did not violate the Eighth Amendment.[30] (See *Rices*, *supra*, 4 Cal.5th at pp. 86–87.) We likewise reject

---

[30] Even where "[j]uvenile adjudications are inadmissible as evidence in aggravation . . . because they are not 'prior felony convictions' within the meaning of section 190.3, factor (c)," violent "conduct underlying the adjudication is relevant to the jury's penalty determination and admissible as violent criminal activity under [section 190.3] factor (b)." (*People v. Taylor* (2010) 48 Cal.4th 574, 653.)

defendant's argument here and find no error in admitting defendant's prior convictions under section 190.3, factor (c).

## B. Admission of Evidence of Unadjudicated Offenses

The prosecution devoted part of its case in aggravation to unadjudicated criminal activity and presented testimony concerning four incidents involving Yenerall, Heynen, Kendrick, and Arnold. Defendant, however, contends that permitting Yenerall, Heynen, Kendrick, and Arnold to testify violated his state and federal constitutional rights to a reliable penalty phase, due process, a fair trial, and confrontation, and to present a defense because the state lost or destroyed the following evidence relating to those four incidents: information as to which suspect sketches Yenerall and Heynen saw; a photo lineup in which Yenerall recalled identifying defendant; the Steven Dyer photo lineup shown to Heynen; the Randy Winters photo lineup shown to Kendrick; and the Roger Egans photo lineup shown to Arnold.[31] We disagree.

### 1. *Background*

#### a. *Yenerall*

Following the January 6, 1992 incident, Yenerall viewed a photo lineup in which she identified a man named Orlando Boone. That lineup was provided to the defense. She subsequently attended a live lineup that included Boone, but she did not identify him. After that, there is disagreement as to whether she viewed another photo lineup: She recalled viewing

---

[31] Although defendant initially contended that he also did not know whom Heynen identified in the Boone photo lineup, defendant conceded this point in his reply brief.

another one and identifying defendant in it, but the police had no record of any such lineup and believed she misremembered it.

In addition, she viewed a sketch of the suspect. The police composed several suspect sketches during the investigation, and it appears that those sketches were provided to the defense in this case. As to which sketch she personally saw, she did not recall, but Detective Lore testified that she saw one of two specific sketches. The defense argued, however, that "[a]lthough [Detective Lore] believed [Yenerall was shown] one of two composites in evidence, he did not know which one was shown to Yenerall and so that evidence is unavailable to the defendant." Later, she identified defendant during a live lineup and at the preliminary hearing.

During the penalty phase of the trial, she identified defendant in the courtroom, testifying, "I'm certain" as to that identification. She also testified about previously identifying defendant during the live lineup and during the preliminary hearing. Regarding the live lineup, she explained that she did not write a number on the lineup identification card but instead directly informed one of the detectives about her identification and was "very certain" about it. On cross-examination, she admitted that her hesitancy to write down a number on the card reflected "[s]ome" uncertainty but explained that she chose not to write down a number because she was not obligated to do so.

Also on cross-examination, she confirmed that she previously viewed a photo lineup in which she identified an individual other than defendant and expressed "some great degree of certainty" as to that identification. Asked whether she identified an individual named Orlando Boone, she testified that

she did not recall the name of the individual but that this individual subsequently attended a live lineup, where she did not identify him or anyone else.

### b. *Heynen*

Heynen testified that she saw at least four photo lineups after the January 21, 1992 incident. She recalled possibly pointing to someone as close in three lineups but did not recall identifying anyone. According to Detective Lore, Heynen later was not sure whether she actually saw that many lineups.

Detective Lore testified that Heynen viewed three photo lineups and one book containing parolee pictures. The first photo lineup, shown on March 12, 1992, included an individual named Steven Dyer. Detective Lore testified that Heynen did not identify Dyer in this lineup, but Detective Lore's notes indicated that Heynen said, "it could be him." This photo lineup was disassembled and not provided to the defense. The prosecution, however, provided the defense with a picture of Dyer, although it was not the picture used in the disassembled lineup. The same day as that lineup, she viewed a book of parolee pictures and said that an individual named Damon Cooper looked familiar. The book was provided to the defense. The second photo lineup included Boone. She identified another individual in that lineup, and the lineup was provided to the defense. The third photo lineup included defendant, and Heynen said, "it could be" him.

She also saw a suspect sketch and assisted the police in creating another sketch. As noted, it appears that the sketches were provided to the defense. The prosecutor declared that "all of the composites are available;" however, the defense argued that "like those shown to [Yenerall], the composites [shown to

Heynen] are unidentifiable." Later, she identified defendant during a live lineup and at the preliminary hearing.

During the penalty phase of the trial, Heynen identified defendant in the courtroom, testifying that she was "[v]ery certain" regarding her identification. She testified that she had previously identified defendant during a live lineup and during the preliminary hearing as well. On cross-examination, she said that she had previously viewed photo lineups on "[a]bout" four occasions. Asked whether on two of those occasions she selected anyone in the lineup, she responded, "That appeared to be close." She explained that in those two selections, the individuals could have been the perpetrator, but she was not sure. Asked whether she selected a picture of defendant and said it could be him, she testified that she was never told whether any of the pictures were of defendant.

### c. *Kendrick*

After the February 19, 1992 incident, Kendrick recalled viewing two photo lineups. He testified that he did not identify anyone in either of these lineups. However, Detective Lore testified that in one of these lineups, on March 26, 1992, Kendrick identified an individual named Randy Winters with a certainty of eight out of ten. This photo lineup was disassembled and not available to the defense. The prosecution, however, provided the defense with a copy of Winters's DMV picture, which was not the picture used in the disassembled lineup.

In addition, Kendrick saw a sketch of the suspect and assisted the police in creating another sketch of the suspect, both of which were provided to the defense. Later, Kendrick identified defendant during a live lineup and at the preliminary hearing.

During the penalty phase, Kendrick identified defendant in the courtroom and testified that he had previously identified defendant during the live lineup as well. He further testified that he had previously viewed two photo lineups but did not identify anyone in them. The defense did not cross-examine Kendrick.

### d. Arnold Andersen

Arnold Andersen testified that he viewed photo lineups on several occasions after the February 21, 1992 robbery, but he did not recall identifying anyone in them. Detective Lore testified that Arnold viewed two photo lineups. As to one of these lineups, Detective Lore testified that Arnold did not identify anyone but said that one individual was close. As to the other, Sergeant Howard Woods testified that Arnold said an individual named Roger Egans was the closest, with an 80 percent certainty, on May 21, 1992. Once Egans was eliminated as a suspect, this lineup was disassembled. The prosecution gave the defense a copy of Egans's DMV photo, but the photo was not the one used in the disassembled lineup.

Arnold also saw a sketch of the suspect that his wife, Sharyn, assisted in creating. He subsequently identified defendant during a live lineup and at the preliminary hearing as well.

During their penalty phase testimony, both Arnold and Sharyn identified defendant in the courtroom. They testified that they had previously identified defendant during a live lineup, too. Regarding the photo lineups, Arnold testified that he had previously viewed two or three photo lineups but did not identify anyone in them. The defense did not cross-examine either Arnold or Sharyn.

### e. Trial court's ruling

The prosecution originally filed an information that included charges relating to the January 6, January 21, February 19, and February 21, 1992 incidents.[32] Following the preliminary hearing, the defense moved to strike identification testimony by certain witnesses under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*). That motion was denied. The defense also moved to dismiss the information under section 995 on the ground, inter alia, that admitting the identification testimony violated defendant's constitutional rights. That motion, too, was denied. The trial court agreed that the missing evidence — which the court characterized "generally as the lost either photographs, composites or photo spreads" — was important but found that there was no willful or malicious conduct by the state.

Later, the defense moved to sever the counts involving eyewitness identifications from the Willem, Christine C., Osburn, and Carole D. counts on the ground, inter alia, that severance was an appropriate sanction under section 1054.5 due to the missing evidence related to the eyewitness counts. The defense simultaneously moved again under *Brady, supra,* 373 U.S. 83 and *Trombetta, supra,* 467 U.S. 479 to preclude any pretrial or in-court identification testimony by, among others, Yenerall, Heynen, Kendrick, and Arnold. The trial court

---

[32] Even earlier in the case, the defense successfully moved to quash an indictment on the ground that evidence regarding earlier identifications made by some witnesses had not been presented to the grand jury. At that time, the prosecutor acknowledged that certain exculpatory evidence indeed had not been presented.

granted defendant's motion for severance but denied his motion to exclude the identification testimony. When the defense moved to have the severed eyewitness counts tried before the other counts, the court denied the motion.

Before the penalty phase, the defense moved to exclude evidence of these severed, unadjudicated offenses or alternatively, to have them tried by another jury. The trial court found that the "confusion that underlies" the identifications could be brought before the jury without the missing evidence. The court also found that there was no "willful, purposeful, malicious intent on the part of the police in destroying evidence that could have been helpful to Mr. Miles," explaining that "these were line-ups that were put together early in the investigation, substantially prior to Mr. Miles being a suspect," and in those cases where the police followed up on photo lineups shown to the victims and "found that the person could not have been the perpetrator," the police "probably felt that there was no longer a need to keep those photo line-ups intact." The court denied the motion.

## 2. *Discussion*

The Attorney General frames defendant's contentions regarding the lost or destroyed evidence under *Trombetta*, *supra*, 467 U.S. 479. Defendant makes clear in his reply brief, however, that he does "not raise a *Trombetta/Youngblood* Due Process claim." Rather, he raises an Eighth Amendment claim based on the heightened reliability standard in capital cases and *Gardner v. Florida* (1977) 430 U.S. 349 (*Gardner*), and he additionally asserts violations of his state and federal constitutional rights to due process, a fair trial, confrontation and to present a defense. In light of defendant's express

clarification, we do not address his contentions under *Trombetta.*

Contrary to defendant's argument, the circumstances here are unlike those in *Gardner, supra,* 430 U.S. 349, on which defendant heavily relies. In *Gardner,* the high court vacated a death sentence where the trial court sentenced the defendant to death due in part to information in a presentence investigation report, portions of which were provided to the trial court but not disclosed to the defendant. (*Id.* at pp. 351, 353, 356, 362.) By contrast, no evidence in this case was provided to and relied on by the trial judge, but not disclosed to the defense.

Indeed, we have previously rejected an argument relying on *Gardner, supra,* 430 U.S. 349 in circumstances like those here. In *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1160–1161, the defendant claimed that he was deprived of his right to a reliable sentencing determination and a fair opportunity to confront and rebut evidence against him because certain evidence related to an unadjudicated charge had been lost, including photos shown to the victim. We held that despite this lost evidence, there was no unfairness in admitting evidence regarding the unadjudicated charge. (*Id.* at pp. 1162–1163.) Here, as in *Rodrigues,* we conclude that the loss of evidence did not deprive defendant of a fair trial or a reliable sentencing determination.

First, as to the suspect sketches viewed by Yenerall and Heynen, defendant argues on appeal that "although various composite sketches were available, since police could not recall which sketch had been shown to [Yenerall or Heynen], whatever value there was in the sketches was gone." The defense, however, implicitly acknowledged having received the suspect

sketches, and the defense could ask Yenerall and Heynen about them. Second, as to a photo lineup in which Yenerall recalled identifying defendant, the police did not believe any such lineup ever existed, and Yenerall recalled identifying *defendant*, not someone else, in it. Although defendant suggests that this missing lineup may explain how she initially identified Boone yet later identified defendant, this theory, too, is speculative. It also ignores that between her photo identification of Boone and her identification of defendant, she attended a live lineup where she did not identify Boone, making her later identification of defendant less sudden than defendant suggests. Moreover, the defense cross-examined Yenerall about her earlier identification in a photo lineup of an individual other than defendant, and about her hesitancy to write down a number on the card when she identified defendant in a live lineup.

As to the remaining missing evidence (the Dyer, Winters, and Egans photo lineups), defendant's contentions pose a closer call but ultimately, too, fall short. There is conflicting testimony as to whether Heynen, Kendrick, and Arnold made any identifications in the lineups, and the lineups took place before defendant was a suspect. In addition, the prosecutor provided the defense with pictures of Dyer, Winters, and Egans, and while those pictures were not comparable to the missing lineups, the defense could ask Heynen, Kendrick, and Arnold about those pictures and about their identifications. Indeed, the defense cross-examined Heynen about having viewed photo lineups on "[a]bout" four occasions and having selected persons who "appeared to be close" on two of those occasions; the defense had the opportunity but declined to cross-examine Kendrick or Arnold. In these circumstances, we find no error and conclude

that admitting the testimony of these four witnesses did not violate defendant's state or federal constitutional rights.

Even assuming for the sake of argument that admitting this testimony was error, it was not reversible. "[E]rror in the admission of evidence under section 190.3, factor (b) is reversible only if 'there is a reasonable possibility it affected the verdict,' a standard that is 'essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California*[, *supra,*] 386 U.S. 18, 24.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 527.) Certainly, there was no reasonable possibility that admitting Arnold's testimony affected the penalty verdict because his wife, Sharyn, testified about the same incident and identified defendant during her testimony. Defendant, too, acknowledged on cross-examination that he robbed the Andersens, as well as Yenerall. There was no reasonable possibility that admitting the testimony of Yenerall, Heynen, and Kendrick affected the penalty verdict either, in light of the volume of other evidence presented, including the details of Willem's brutal murder, the Christine C., Osburn, Carole D., Bridget E., and Steve H. crimes, defendant's 14 other convictions, and the victim impact evidence. There was no reversible error.

## C. Admission of Victim Impact Evidence Regarding Prior Crime

Over the defense's objection, Bridget E. testified about the effects of the June 16, 1992 incident on her health, career, and personality. Defendant contends that the trial court erred by admitting her testimony because, according to defendant, admitting victim impact evidence for prior crimes under section 190.3, factor (b) is improper and unconstitutional. Defendant's argument relies on five out-of-state decisions, a textual

distinction between section 190.3, factors (a) and (b), and *People v. Boyde* (1988) 46 Cal.3d 212 (*Boyde*).

We have previously found unpersuasive the five out-of-state decisions upon which defendant relies. (See *People v. Davis* (2009) 46 Cal.4th 539, 618.) We have also disagreed that "the textual distinction between section 190.3, factors (a) and (b) compels the conclusion that the electorate intended to preclude victim impact testimony and argument relating to violent criminal activity other than the capital crime." (*People v. Johnson* (2016) 62 Cal.4th 600, 647.) In addition, we have overruled *Boyde*, *supra*, 46 Cal.3d 212 "to the extent it concludes that victim impact evidence relating to factor (b) criminal activity is inadmissible, and reaffirm[ed] the unbroken line of authority beginning with *People v. Benson* [(1990)] 52 Cal.3d 754, which has approved evidence and prosecutorial argument regarding the impact of the defendant's factor (b) crimes on the victims of that criminal activity." (*Johnson*, at p. 648.) We find no error here.

### D. Admission of Victim Impact Evidence Related to Capital Crime

Over defendant's objection, the trial court admitted victim impact evidence related to Willem's murder consisting of testimony from her family members, a short videotape depicting her singing, and a photograph of her that resembled how she looked around the time of her death. We have previously permitted the admission of similar victim impact evidence (see, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 577–579 [admission of family member testimony and four-minute videotape depicting victim at family celebration]; *Vines*, *supra*, 51 Cal.4th at p. 888 [admission of videotape depicting victim singing and dancing]), and defendant does not argue that there

was anything improper about the amount or content of the specific victim impact evidence here. Defendant, however, argues that section 190.3, factor (a) has been improperly interpreted by this court to allow victim impact evidence in violation of state and federal law and accordingly calls for a wholesale reconsideration of existing precedent beginning with *People v. Edwards* (1991) 54 Cal.3d 787. We recently rejected the same statutory argument in *People v. Seumanu* (2015) 61 Cal.4th 1293, 1366–1368. We see no reason to reconsider it now and thus find no error here.

### E. Asserted Juror Misconduct

Defendant contends that the trial court erred when it declined to discharge Juror No. 12 after he saw newspaper headlines about defendant's competency trial. We disagree. We conclude that there was no substantial likelihood of juror bias and there was no violation of defendant's federal or state constitutional rights.

#### 1. Background

After the trial court declared a doubt as to defendant's competency and suspended proceedings, the trial court met individually with each of the guilt phase jurors and informed them that there was an issue — about which the court could not reveal the details — that would cause a significant delay before beginning the penalty phase. The court individually admonished each of the jurors to avoid discussing or reading about the case in the interim. When the court met individually with Juror No. 12, the court instructed Juror No. 12, "[P]lease don't discuss what we've talked about with any of the other jurors. And if there's anything in the newspaper about this case, please don't read that."

127

Several months later, the guilt phase jurors returned for the penalty phase. At the defense's request, the jurors filled out a supplemental questionnaire concerning whether they had read, heard, or discussed anything about the case since rendering the verdict. The first question asked, "Have you read anything in a newspaper about this case since rendering your verdict on March 18, 1999?" Juror No. 12 checked "yes" in response to this question and commented, "I have read the headlines, but not the article itself." Juror No. 12 checked "no" in response to the remaining two questions, indicating that he had not heard anything about the case from any other source or discussed the case with any of the other jurors since rendering the verdict.

The trial court and counsel inquired further into Juror No. 12's responses. Juror No. 12 explained that he had seen "[p]robably like two or three" newspaper headlines. Asked whether he "[j]ust saw the headlines, recognized it was about the case, and then didn't read anything further?" he replied, "That's right." He said that there was not anything about what he had read that caused him to come to any opinions or conclusions or that would affect or influence his ultimate decision in this case. He acknowledged, however, that from these headlines, he knew that a competency trial took place and knew its result. Asked about his reaction to this information, he responded, "All I knew is that I would be coming back. That's about all I thought about it." Asked to explain, he said that he had assumed he probably would not be returning if the competency trial had ended differently because the competency trial "was a part of the sentencing or whatever." He confirmed that he had not discussed any of this information with anybody else.

The defense moved to excuse and replace Juror No. 12. The trial court denied the motion, reasoning that Juror No. 12 had neither violated the court's order by seeing the newspaper headlines nor formed any opinions or conclusions based on them. The trial court found, "The impression I get was that in going through the newspaper, naturally in skimming the headlines you can see that this is something about the case, and at that point he stopped reading and did not read the content. . . . I didn't tell them not to read the papers. I just told them not to read anything about the case. I don't think he violated the Court's order." The trial court continued, "I didn't get the impression from anything that he said that he had formed any opinions or conclusions. In fact, he said he didn't, and that it wouldn't affect his decision in this case."

### 2. *Discussion*

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors." (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).) "Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias." (*Ibid.*) Even a juror's "inadvertent receipt of information that had not been presented in court falls within the general category of 'juror misconduct.' " (*Id.* at p. 579.)

"[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the

extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653.) "We emphasize that before a unanimous verdict is set aside, the likelihood of bias under either test must be *substantial*." (*Id.* at p. 654.) "Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*Id.* at pp. 654–655.)

In reviewing the trial court's ruling, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.] Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*Nesler*, *supra*, 16 Cal.4th at p. 582.)

We need not decide whether juror misconduct occurred here because, in any event, we find no substantial likelihood of juror bias. (See *People v. Thomas* (2012) 53 Cal.4th 771, 819.) The headlines were not so prejudicial in and of themselves that they were inherently and substantially likely to have influenced a juror during the penalty phase. Although the precise content of the headlines is not clear from the record, nothing suggests that they were inflammatory or biased in their presentation of the facts, or that they conveyed additional information about the

competency trial such as the issues involved, the evidence presented, or the testimony heard. The relevance of the competency verdict, or its potential for prejudice, was further diminished at the penalty phase since the task of jurors at the penalty phase was qualitatively different from that at the competency trial. Learning only that a competency trial took place and that defendant was found competent was therefore "not akin to a bell that could not be unrung." (*In re Boyette* (2013) 56 Cal.4th 866, 893; *id.* at p. 892 [contrasting extraneous information in case to "a suppressed confession or evidence of other crimes that the trial court had excluded as too prejudicial"]; cf. *People v. Ramos* (2004) 34 Cal.4th 494, 520–522 [newspaper accounts of trial were not inherently prejudicial and did not prejudice the verdict].)

Nor was it substantially likely that Juror No. 12 was "actually biased" against defendant. Defendant does not contend that Juror No. 12 was actually biased, and nothing in the record suggests such bias existed. Mindful of the trial court's admonitions to avoid news coverage of the case, Juror No. 12 did not read any newspaper articles about the case but promptly informed the trial court that he had seen a few headlines. He made clear that he did not form any opinions or conclusions based on the headlines, nor did he discuss them with anyone. His only reaction to the information was that he "would be coming back. That's about all [he] thought about it." The trial court found his representations credible, and substantial evidence supports this finding. (See *People v. Stanley* (2006) 39 Cal.4th 913, 951 [accepting credibility determinations regarding juror's recollection of newspaper article]; see also *In re Carpenter, supra,* 9 Cal.4th at p. 657 [juror not discussing

information with other jurors tends to negate inference of bias].)[33]

Having found no substantial likelihood of juror bias, we reject defendant's assertion that Juror No. 12's exposure to these headlines impeded his ability to fairly weigh defendant's mitigating evidence in violation of his federal constitutional rights. Defendant characterizes *Caldwell v. Mississippi* (1985) 472 U.S. 320 as instructive. In *Caldwell,* the high court vacated a death judgment where the prosecutor had "urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." (*Id.* at p. 323.) The high court has "since read *Caldwell* as 'relevant only to certain types of comment[s] — those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" (*Romano v. Oklahoma* (1994) 512 U.S. 1, 9; see also *In re Carpenter, supra,* 9 Cal.4th at p. 649 [discussing *Romano* as limiting *Caldwell*].)

Here, there was no evidence to suggest that Juror No. 12 was unable to consider defendant's mitigating evidence or felt any less responsible for making a penalty determination after seeing these headlines — much less that he was misled to believe himself to be so. (See *People v. Montes* (2014)

---

[33] Defendant asserts that the trial court did not admonish Juror No. 12 to disregard the headlines, but the Attorney General accurately points out that the court incorporated its guilt phase jury instructions into its penalty phase jury instructions, including, "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source."

58 Cal.4th 809, 896 [even assuming the juror committed misconduct by consulting religious passages, "those passages did not lessen the juror's personal sense of responsibility by shifting the decision to some other entity"].) We thus conclude that the trial court did not err.

### F. Instruction to Alternate Jurors

The trial court excused two of the seated guilt phase jurors and replaced them with two alternate jurors before the penalty phase began. The court then instructed the jury that "[f]or the purposes of this penalty phase of the trial, the alternate jurors must accept as having been proved beyond a reasonable doubt those guilty verdicts and true findings rendered by the jury in the guilt phase of this trial."[34] Defendant objected to having the two alternate jurors try the penalty phase but did not object to this specific instruction. He now contends that this instruction violated his federal and state constitutional rights to a fair

---

[34] In full, CALJIC No. 17.51.1 provided as follows: "Members of the Jury: [¶] Two jurors have been replaced by alternate jurors. [¶] The alternate jurors were present during the presentation of all of the evidence, arguments of counsel, and reading of instructions, during the guilt phase of the trial. However, the alternate jurors did not participate in the jury deliberations which resulted in the verdicts and findings returned by you to this point. For the purposes of this penalty phase of the trial, the alternate jurors must accept as having been proved beyond a reasonable doubt, those guilty verdicts and true findings rendered by the jury in the guilt phase of this trial. Your function now is to determine, along with the other jurors, in light of the prior verdict or verdicts, and findings, and the evidence and law, what penalty should be imposed. Each of you who now compose the jury must participate fully in the deliberations, including any review as may be necessary of the evidence presented in the guilt phase of the trial."

penalty trial, reliable sentencing decision, equal protection, due process, and effective assistance of trial counsel.

Assuming defendant's claim was not forfeited, it fails on the merits. (See § 1259 [preserving claims of instructional error affecting substantial rights despite lack of objection below].) We have made clear that "[a]s a matter of law, the penalty phase jury must conclusively accept [the guilt phase jury's] findings" as to the defendant's guilt and the truth of the special circumstance allegations beyond a reasonable doubt. (*People v. Harrison* (2005) 35 Cal.4th 208, 256 (*Harrison*).) We have also rejected the suggestion "that anytime a juror is replaced at the penalty phase, the jury should engage in guilt phase deliberations anew." (*People v. Maciel* (2013) 57 Cal.4th 482, 548.) And, most notably, in *People v. Cain* (1995) 10 Cal.4th 1 (*Cain*), we found no constitutional defect in the trial court instructing the jury, including a new juror who replaced an excused juror, that it must accept the guilt phase verdicts and findings at the penalty phase. (*Id.* at pp. 64, 66.)

Nor do we find *People v. Kaurish* (1990) 52 Cal.3d 648, 708 to be inconsistent, as defendant contends. In *Kaurish*, the defendant claimed that a replacement juror should have been instructed at the penalty phase that she "was not bound by the other jurors' earlier determination of guilt, but could vote against the death penalty if she doubted defendant's guilt." (*Ibid.*) We rejected this claim, finding that the replacement juror was instructed about considering lingering doubt as a mitigating factor, that instruction "made it clear that she could vote against the death penalty if she disagreed with the guilt phase verdict, and no further instruction was necessary." (*Ibid.*) This concept of lingering doubt, however, is distinct from and consistent with the jury's obligation to accept the guilt phase

verdicts and special circumstance findings as proved beyond a reasonable doubt at the penalty phase. (*Harrison, supra*, 35 Cal.4th at p. 256 [jurors may consider lingering doubt as mitigating circumstance but cannot relitigate or reconsider matters resolved at guilt phase]; *Cain, supra*, 10 Cal.4th at p. 67 [same].)[35]

In short, we discern no error in the trial court's instructions here.

## VI. OTHER ISSUES

### A. Challenge to California's Death Penalty Law as Not Adequately Narrowing the Class of Death-Penalty Eligible Defendants

Defendant urges that California's death penalty law violates the Eighth Amendment because it does not sufficiently narrow the class of death-eligible defendants, based on statistics drawn primarily from published decisions of this court and the Court of Appeal, as well as unpublished decisions of the Court of Appeal, First District, between 1988 and 1992. We have repeatedly rejected similar statistics-based arguments claiming that the multiplicity of the statute's special circumstances fails to sufficiently narrow the class of death-eligible defendants. (See, e.g., *People v. Beames* (2007) 40 Cal.4th 907, 934; *People v. Vieira* (2005) 35 Cal.4th 264, 303–304; *People v. Jones* (2003) 30 Cal.4th 1084, 1127–1128.) Defendant offers no persuasive reason to reconsider this issue.

---

[35] The trial court in this case gave CALJIC No. 8.85, which we have held to sufficiently cover the concept of lingering doubt. (See *People v. Enraca* (2012) 53 Cal.4th 735, 767–768.)

### B. Other Challenges to California's Death Penalty Law

Defendant raises numerous challenges to California's death penalty law that we have repeatedly rejected and continue to reject as follows.

Section 190.3, factor (i) (the age of the defendant) is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 977; *People v. Ray* (1996) 13 Cal.4th 313, 358.) The death penalty statute as construed by this court does not fail to perform the narrowing function required by the Eighth Amendment. (*Schmeck, supra,* 37 Cal.4th at p. 304.) "Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*People v. Sánchez* (2016) 63 Cal.4th 411, 487.) Other than the penalty verdict itself, the jury need not achieve unanimity. (*Ibid.*) The trial court did not "violate defendant's Fifth, Sixth, Eighth, or Fourteenth Amendment rights in failing to instruct the jury that it must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors." (*Schmeck*, at p. 304.) The trial court's instructions need not delete inapplicable sentencing factors, delineate between aggravating and mitigating circumstances, or specify a burden of proof either as to aggravation (except for section 190.3, factor (b) or (c) evidence) or the penalty decision. (*Schmeck*, at p. 305.) "Nor are potentially mitigating factors unconstitutionally limited by the adjectives 'extreme' and 'substantial' . . . ." (*Ibid.*) The sentencing factors are not vague and ill-defined. (*Ibid.*) "California's use of the death penalty does not violate international law." (*Sánchez*, at p. 488.) Allowing the jury that adjudicated the defendant's guilt to weigh

and consider his uncharged crimes in determining the penalty is constitutional. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 77.)

## C. Cumulative Prejudice

Defendant contends the combined errors require reversal of his convictions and death sentence even if the errors are not prejudicial when considered individually. We have assumed errors but found no prejudice. Considering these assumed errors altogether, we conclude that reversal is not warranted.

## VII. DISPOSITION

We affirm the judgment.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

PEOPLE v. MILES

S086234


Dissenting Opinion by Justice Liu


Defendant Johnny Duane Miles, a black man, was sentenced to death for raping and murdering Nancy Willem, a white woman. During jury selection, the prosecutor removed the first three black jurors available for peremptory challenge. Miles objected to the strikes as racially motivated under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258. The prosecutor gave reasons for each strike, and the trial court rejected Miles's *Batson* claim.

At the time of the ruling, the prosecutor had used three of his first six peremptory strikes to remove every black juror in the jury box who had not been excused for cause. At the end of jury selection, no black juror was seated on the main panel. Among the six alternate jurors, only one was black. As a result, the black defendant in this case, charged with raping and murdering a white woman, was tried and convicted by a jury that included no black member.

On appeal, Miles challenges the prosecutor's strikes of two black prospective jurors, Kevin C. and Simeon G. I agree that Miles has not shown purposeful discrimination with respect to the strike of Kevin C. in light of his ambivalent responses regarding the death penalty and the two other reasons given for his excusal. (Maj. opn., *ante*, at pp. 37–52.) But the record shows that each of the prosecutor's stated reasons for striking Simeon G. was implausible or unsupported by the facts. I would

thus conclude "it was more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170 (*Johnson*).) Because the "[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error," the judgment must be reversed. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)

## I.

Today's opinion accords deference to the trial court's ruling on the *Batson* motion, but it is unclear what this court is deferring to. "A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'" (*Gutierrez, supra*, 2 Cal.5th at p. 1159.) A "reasoned" attempt requires the trial court to "reject [the prosecutor's] reason or ask the prosecutor to explain further" when the reason is "not borne out by the record." (*Id.* at p. 1172.) Where "the prosecutor's reason[s] for [the contested] strike[s are] not self-evident and the record is void of any explication from the court, we cannot find . . . that the court made a *reasoned* attempt to determine whether the justification was a credible one." (*Ibid.*)

Here, the trial court expressly acknowledged that the prosecutor's proffered reasons for striking Kevin C. and Simeon G. were not self-evident. During discussion of the *Batson* motion, the trial judge told the prosecutor: "I don't understand [the strikes] as to [Kevin C.] and as to [Simeon G.]. You'll [have to] explain those." After hearing the prosecutor's reasons, the court concluded: "As I indicated, as to [another struck juror], I understand [the prosecutor's] concern there. As to [Kevin C.] and [Simeon G.], I think it's certainly not as obvious, but I

cannot say it is not legitimate." That was the extent of the trial court's explanation for upholding the strikes.

At one point, the court did ask the prosecutor to clarify his explanation for striking Simeon G. (Maj. opn., *ante*, at p. 26 [" 'His answer being that if he had a feeling the defendant was not guilty, that was the answer that bothered you?' "].) But the court did not probe any of the prosecutor's stated reasons for the strikes, even though they were difficult to reconcile with the record, as discussed below. Nor did the court explain why it credited the prosecutor's justifications. It merely made a global finding that the stated reasons were "valid" and "legitimate." (See maj. opn., *ante*, at p. 31 ["the trial court could have done more to make a fuller record and itself acknowledged it was making a somewhat close call"].)

Our requirement of a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " (*Gutierrez, supra*, 2 Cal.5th at p. 1159) demands more than what is apparent from the record here. I do not doubt that the trial court was sincere and listened to the parties' arguments. But because the record does not indicate whether it engaged in a reasoned evaluation of the prosecutor's explanations for the strikes, I see no basis for deference to the trial court's ruling.

## II.

In addressing Miles's *Batson* claim, our task is to determine whether "it was more likely than not" that the prosecutor's strikes were racially motivated. (*Johnson, supra*, 545 U.S. at p. 170.) It is important to keep in mind the applicable standard of proof. The "more likely than not" standard does not require a fact to be established beyond a reasonable doubt, nor does it call for "a finding of high

probability" as required by the clear and convincing evidence standard. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) It " 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence." ' " (*Id.* at p. 918.)

"The function of a standard of proof is to instruct the fact finder concerning the degree of confidence our society deems necessary in the correctness of factual conclusions for a particular type of adjudication, to allocate the risk of error between the litigants, and to indicate the relative importance attached to the ultimate decision." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546.) In the *Batson* context, the "more likely than not" standard reflects the "inherent uncertainty present in inquiries of discriminatory purpose." (*Johnson, supra,* 545 U.S. at p. 172.) The standard "is not designed to elicit a definitive finding of deceit or racism. Instead, it defines a level of risk that courts cannot tolerate in light of the serious harms that racial discrimination in jury selection causes to the defendant, to the excluded juror, and to 'public confidence in the fairness of our system of justice.' " (*Gutierrez, supra,* 2 Cal.5th at pp. 1182–1183 (conc. opn. of Liu, J.), quoting *Batson, supra,* 476 U.S. at p. 87.) Miles has met this standard with respect to the strike of Simeon G.

At the time of jury selection, Simeon G. was a 24-year-old forklift driver. He had studied business for three years in college and had plans to continue his education in the future. Simeon G. had characteristics that might be considered favorable to the prosecution. On the questionnaire, he wrote that his father was a Drug Enforcement Administration agent and that he had considered becoming a police officer. He indicated that he "favor[ed] the death penalty" and would have

been willing to personally impose it. He believed the purpose of the death penalty was "to match the seriousness of a crime with a life for a life" and thought it "should be an option" for serious crimes. He considered the death penalty law in California to be fair and wrote that he would vote to keep the death penalty because "it may be an appropriate punishment" in some cases. He also indicated that he had no moral, philosophical, or religious objections to the death penalty.

The prosecutor gave several reasons for striking Simeon G. The first was that Simeon G. "made statements on his questionnaire how he likes his opinions over others."

When asked on the questionnaire whether he would describe himself as a leader or a follower, Simeon G. wrote that he thought of himself as a "leader" because "I like my opinion over other people's." In *People v. Gutierrez* (2002) 28 Cal.4th 1083, we said that a juror's comment that "he would not be influenced by anyone's opinion but his own" gave rise to a reasonable concern that the juror "would not be able to consider the opinions of his fellow jurors." (*Id.* at p. 1125.) But Simeon G. said that he liked his opinion over other people's, not that he would not consider other people's views. His statement is actually somewhat of a tautology: Everyone likes his or her opinion over other people's; to have an "opinion" is to prefer that view to other views. Just because a person favors one view does not mean he or she "might have difficulty considering other opinions and deliberating with fellow jurors." (Maj. opn., *ante*, at p. 53.) Indeed, Simeon G.'s other responses on the questionnaire indicate that he was interested in working with other jurors to reach a verdict. When asked how he felt about working with 11 other jurors to make a decision, he wrote: "I believe it would be very interesting." When asked whether he

believed the jury system was a fair way to determine a defendant's guilt, he checked "yes" and explained: "12 people have to come together to accuse someone. That['s] 12 different opinions. Pretty impressive."

The prosecutor did not ask Simeon G. about these responses, nor did the prosecutor question him or any other jurors about their ability to work with others. As the high court has observed, " '[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.' " (*Miller-El v. Dretke* (2005) 545 U.S. 231, 246 (*Miller-El*).) Today's opinion speculates that the prosecutor might have refrained from questioning Simeon G. about this topic because "asking Simeon G. during voir dire — in front of the other prospective jurors — to elaborate on his questionnaire response would have forced him to explain why he believes that his opinion is preferable to the opinions of other people, such as those seated around him." (Maj. opn., *ante*, at p. 54.) But I see no reason why such inquiry would have been unproductive or more awkward than questioning on the death penalty, race relations, or other sensitive yet routine topics that call on jurors to explain their views and, at least implicitly, disapprove or cast doubt on the views of fellow jurors.

The prosecutor's explanation is even more suspicious in light of the fact that he accepted Juror No. 1, who also described herself as a "leader" and wrote, "I like to make my own decisions." Today's opinion attempts to distinguish "decisions" from "opinions" in parsing the responses of Juror No. 1 and Simeon G. (Maj. opn., *ante*, at pp. 54–55.) But the key point is that Juror No. 1's response gave no more indication than Simeon G.'s response that she would consider other people's

views in making a decision. Both "opinions" and "decisions" can be and often are informed by other people's points of view, and a juror who "likes my opinion over other people's" seems just as likely to consider other people's views as a juror who "like[s] to make my own decisions." It is true that Simeon G., unlike Juror No. 1, indicated that he had not previously served on a jury or worked with a group to make a decision. But that was not the prosecutor's stated reason, and in any event, Simeon G.'s other questionnaire responses suggested he was interested in and willing to do both.

The prosecutor's second reason for striking Simeon G. was that "he made a statement on his questionnaire basically saying if I have a feeling he didn't do it, he's not guilty. And he had crossed out the word doubt, which led me to believe that he certainly wasn't going to base it on evidence."

When asked on the questionnaire whether he could follow the reasonable doubt instruction, Simeon G. checked "yes" and wrote: "If I have any ~~doubt~~ feeling that [the defendant] might not have done it, he['s] innocent." During the *Batson* hearing, the prosecutor noted that Simeon G. originally wrote "doubt" on his questionnaire response, then crossed it out and replaced it with "feeling." According to the prosecutor, this suggested that Simeon G. would have relied "on a hunch, or a feeling" instead of evidence to decide Miles's guilt. While acknowledging that Simeon G. "explained [his questionnaire response] differently in court," the prosecutor said he was "not sure that [Simeon G.'s] responses in court should prevail over the answers he gave on his questionnaire." The prosecutor said he was especially concerned about those responses in light of the fact that Simeon G. "didn't show up for court" that morning and appeared in the

afternoon after being "single-handedly hunted down" by the trial judge.

Considering the record as a whole, I do not find the prosecutor's stated concern very plausible. Simeon G. first wrote on the questionnaire: "If I have any doubt that [the defendant] might not have done it, he['s] innocent." On a moment's reflection, it is clear that the double negative makes no sense: If a juror had *doubt* that the defendant might *not* have committed the crime, then the juror's inclination would be to find guilt, not innocence. It is unsurprising that Simeon G., most likely recognizing the error, crossed out "doubt" and replaced it with a different word, "feeling": "If I have any feeling that [the defendant] might not have done it, he['s] innocent." To draw an inference that Simeon G. intended this to convey that he would rely on his feelings *as opposed to evidence* to decide the defendant's guilt seems like a stretch.

But even assuming Simeon G.'s response was ambiguous, the prosecutor probed this issue during voir dire, and Simeon G.'s answers clarified any ambiguity. The prosecutor said: "In your questionnaire, you used the phrase that if you have a feeling that the defendant was [not] involved, that you'd find him not guilty. . . . You'd written 'doubt' and crossed out and written the word 'feeling.' . . . I'm trying to understand what you meant by that." Simeon G. responded: "Well, I think what I was trying to say, if I'm correct, is that if the evidence showed that there wasn't — that there was some reasonable doubt, then I probably would not accuse him, because of the fact that, myself being in the same situation or anybody, I think that if the evidence didn't totally prove that I did it, then there is some doubt. . . . So it wasn't so much a feeling as it was if the evidence didn't show." The prosecutor asked: "Okay. So you would base

it on evidence?" Simeon G. responded: "Basically, yes. I'm sorry." The prosecutor had no further questions on this topic.

Today's opinion says that when faced with inconsistent responses, the prosecutor is not obligated to accept the least objectionable one. (Maj. opn., *ante*, at pp. 57–58.) That is true, but it is not the situation here. At voir dire, the prosecutor expressly said that his questioning of Simeon G. was intended to clarify the "~~doubt~~ feeling" issue, and Simeon G. — in response to an open-ended, non-leading question posed by the prosecutor ("I'm trying to understand what you meant by that") — clarified that he would make decisions based on "the evidence," not a "feeling." His voir dire answers, given under oath, left no ambiguity about the issue. The court makes much of Simeon G.'s comments that he did not "quite remember" his questionnaire response and could not tell the prosecutor "what [he] actually meant totally" by it. (Maj. opn., *ante*, at p. 59.) But what those statements show is that he was attempting to be a scrupulous juror. When asked to explain the "~~doubt~~ feeling" issue, Simeon G. was careful to qualify that he did not recall his exact response on the questionnaire because he did not have a copy to review during voir dire. These comments in no way undermined Simeon G.'s clear and consistent assertions that he would rely on evidence rather than his feelings to reach a verdict.

Moreover, the rest of Simeon G.'s questionnaire indicated that he would have carefully considered the evidence presented in the case. When asked whether he could be a fair and impartial juror, he wrote: "I'm open to objectively listening to evidence from both sides to decide a fair verdict." When asked if he could follow the instruction that jurors should not draw any conclusions from the fact that a defendant does not testify, he

9

checked "yes" and explained that he would "[j]ust deal with the facts and other testimonies."  When asked whether he believed the testimony of law enforcement officers would be more truthful or accurate than civilian testimony, he checked "no" and wrote that "[n]obody's testimony should be more or less due to the fact that they are all under oath."  When asked whether he would automatically accept the opinion of a psychiatrist or psychologist, he checked "no" and explained that "[w]hat they say would have to make sense."  All of these responses, like Simeon G.'s answers during voir dire, show that he would have been a conscientious juror who makes decisions on the basis of facts and evidence, not hunches or feelings.  The prosecutor's fixation on one questionnaire answer, to the exclusion of all of Simeon G.'s other relevant and consistent answers, is suspicious.

Today's opinion says the prosecutor was not required to accept Simeon G.'s sworn voir dire responses at face value.  At the *Batson* hearing, the prosecutor said "this is an individual who the Court personally tracked down this morning. . . .  I would be concerned about his responses in light of the fact that he was single-handedly hunted down to be here this afternoon."  In evaluating this statement, today's opinion explains that "[t]he trial court was ' "best situated" ' to assess Simeon G.'s responses in court and the prosecutor's stated concern in light of those responses."  (Maj. opn., *ante*, at p. 60.)

But what exactly is the court deferring to?  The trial court made no specific findings regarding Simeon G.'s responses or demeanor when it denied the *Batson* motion.  Nor did it ask the prosecutor to explain why Simeon G.'s tardiness to court would cast doubt on the credibility of his voir dire answers.  The court only asked the prosecutor, "His answer being that if he had a

feeling the defendant was not guilty, that was the answer that bothered you?" I have no doubt that the trial court "listen[ed] to the prosecutor's explanation and defense counsel's comments" before "accept[ing] the prosecutor's stated reasons for striking Simeon G." (Maj. opn., *ante*, at p. 61.) But because its ruling is not accompanied by any reasons or analysis, there is nothing to defer to.

As to Simeon G.'s tardiness, a bit of context is important. The record shows there had been a miscommunication in the jury room, which may have caused several jurors not to appear in court that morning. After the court called Simeon G.'s workplace, he immediately called back and explained that he was confused and thought he was supposed to come the next day. Simeon G. then appeared in the afternoon for voir dire. The prosecutor was aware of this mix-up at the time of the *Batson* hearing, and there was no suggestion that the incident resulted from willful conduct by Simeon G. Nor was there anything in his background or questionnaire that suggested untrustworthiness. To be sure, "having a judge call your workplace to locate you and have you come to court is unusual." (Maj. opn., *ante*, at p. 61, fn. 14.) And it would be natural to infer that Simeon G. perhaps felt embarrassed when he appeared in court. But it is not clear why the incident would have cast doubt on the veracity of Simeon G.'s statement at voir dire that he would reach a verdict based on "the evidence" and not a "feeling," especially in light of the consistent responses on his juror questionnaire.

The prosecutor's third reason for striking Simeon G. was that "he was not upset by the O.J. Simpson verdict." Simeon G. indicated on the questionnaire that he was not upset by the O.J. Simpson verdict but did not explain why. He also wrote that he

"really [didn't] know anything about" DNA evidence. At the *Batson* hearing, the prosecutor said: "If you'll notice across the board, I've excused jurors I believe of Hispanic origin and Caucasian origin, and the common denominator, essentially, is that they were not, were not upset by the O.J. Simpson verdict, which was a DNA, circumstantial case. And I think those, those raise significant concerns in my mind as a guilt phase juror and the type of case that I'm dealing with."

In evaluating this reason, it must be said at the outset that exercising peremptory strikes based on jurors' attitudes toward the O.J. Simpson case — in the capital trial of a black man accused of murdering a white woman, occurring just three years after the Simpson verdict — seems like playing with fire. At the time of Miles's trial, it would have been hard to think of any recent case in the American justice system more sensational and racially polarizing than the Simpson trial. (See O.J.: Made in America (ESPN Films 2016); Toobin, The Run of His Life: The People v. O.J. Simpson (1996).) Amicus curiae NAACP Legal Defense & Educational Fund, Inc. (LDF) cites a poll taken in 1995, when the Simpson case was decided, finding that 22% of black Americans and 76% of white Americans believed Simpson was guilty of murder. (See De Pinto et al., *Poll: Only 27 Percent of Americans Think O.J. Simpson Will Regain Celebrity Status* (Sept. 29, 2017) CBS News.) The Attorney General argues that the racial disparity was not so significant by the time of Miles's trial and cites a different poll finding that 45% of black Americans in 2007 and 57% in 2015 believed Simpson was guilty. (See Ross, *Two decades later, black and white Americans finally agree on O.J. Simpson's guilt*, Wash. Post (Mar. 4, 2016).) But the figures cited by LDF are more relevant because jury selection in this case occurred in 1998. Those figures are

actually corroborated by the poll cited by the Attorney General, which shows that 31% of black Americans and 82% of white Americans in 1997 thought Simpson was guilty. (See *ibid.*)

Thus, at the time of Miles's trial, a practice of striking jurors who said they were not upset by the Simpson verdict would have resulted in disproportionate removal of black jurors. Although such disparate impact "does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause" (*Hernandez v. New York* (1991) 500 U.S. 352, 361), it can be considered "evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination" (*id.* at p. 363). There is nothing wrong with probing prospective jurors' views about DNA or circumstantial evidence in a murder trial. But surely there are less racially charged ways of doing so.

Also relevant is the fact that the prosecutor did not question Simeon G. or any other prospective juror about the Simpson verdict during voir dire. (Cf. maj. opn., *ante*, at p. 63 ["the credibility of the prosecutor's concern here is undermined to some degree by the prosecutor's failure to ask Simeon G. or other prospective jurors about the O.J. Simpson verdict during voir dire"].) The prosecutor's lack of questioning is especially suspicious as to Simeon G. When asked on the questionnaire whether he was upset by the Simpson verdict, Simeon G. simply checked "no" without explanation. At the *Batson* hearing, the prosecutor said his main concern with this response was that it indicated Simeon G. might be skeptical about DNA evidence. But the prosecutor never asked Simeon G. whether his response to the O.J. Simpson question was related to his views on DNA evidence. Nor did he ask Simeon G. or any other prospective juror about DNA evidence.

Comparative juror analysis also supports an inference of pretext. (Cf. maj. opn., *ante*, at p. 65 ["We find that the credibility of the prosecutor's concern regarding Simeon G.'s opinion on the O.J. Simpson verdict is undermined to some degree by defendant's comparative juror analysis."].) Like Simeon G., eight seated and alternate jurors indicated that they were not upset about the O.J. Simpson verdict. Some of those jurors provided explanations that might have been more acceptable to the prosecutor. But Alternate Juror No. 5, like Simeon G., did not explain why he was not upset about the verdict. Juror No. 4, Juror No. 7, and Alternate Juror No. 4 wrote that they were not upset because they did not know enough about the details of the case, which seems just as neutral as Simeon G.'s response. Juror No. 6 wrote that the "evidence [was] not clear" in the O.J. Simpson case, which if anything seems less favorable to the prosecution than Simeon G.'s response. In sum, the plausibility of the prosecutor's explanation "is severely undercut by [his] failure to object to other [jurors] who expressed views much like [Simeon G.'s]. . . . The fact that [the prosecutor's] reason also applied to these other [jurors], most of them white, none of them struck, is evidence of pretext." (*Miller-El*, *supra*, 545 U.S. at p. 248.)

Today's opinion finds these comparisons "relevant and probative" but ultimately downplays their importance by pointing out differences between the comparator jurors and Simeon G. (Maj. opn., *ante*, at p. 65.) The court notes that Juror No. 6 and Alternate Juror No. 5, while similar to Simeon G. on the O.J. Simpson question, did not indicate that they might have difficulty considering other people's opinions or that they might rely on their feelings to reach a verdict. (Maj. opn., *ante*, at pp. 65–66.)

This line of reasoning — undercutting the probative value of juror comparisons by identifying other traits on which the jurors differed — is a frequent maneuver in our *Batson* jurisprudence. (See, e.g., maj. opn., *ante*, at pp. 55–56; *People v. Hardy* (2018) 5 Cal.5th 56, 83 (*Hardy*); *People v. Winbush* (2017) 2 Cal.5th 402, 443–446; *People v. Chism* (2014) 58 Cal.4th 1266, 1318–1322.) To be sure, the issue of how similar two jurors must be to yield a probative comparison is not reducible to a simple formula. But this court's approach of changing the relevant point of comparison for each of the prosecutor's stated reasons cannot be the right one. The court's reasoning suggests that significant weight cannot be assigned to comparative juror analysis unless an accepted juror matches the struck juror with respect to *all* of the prosecutor's stated concerns. Indeed, despite statements to the contrary, that seems to be what the court actually holds in this case. (Maj. opn., *ante*, at pp. 55–56, 65–66.)

But the high court has expressly rejected this view. (See *Miller-El*, *supra*, 545 U.S. at p. 247, fn. 6 ["None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters."].) In several cases addressing *Batson* claims, "[t]he high court has repeatedly drawn inferences of discrimination from comparative juror analysis without regard to whether the comparator jurors matched the struck juror in every respect identified by the prosecutor." (*Hardy*, *supra*, 5 Cal.5th at p. 119 (dis. opn. of Liu, J.) [citing cases].)

In *Miller-El*, for example, the prosecution gave three reasons for striking a prospective black juror: he was ambivalent about the death penalty, his brother-in-law had a prior conviction, and the prosecution still had 10 peremptory challenges left and could be liberal in using them. (*Miller-El*, *supra*, 545 U.S. at pp. 247–250.) The high court first compared the death penalty views of the struck juror to those of three accepted jurors. (*Id.* at p. 248.) It found the similarities among the jurors' views to be probative (*ibid.*), even though the dissenting justices noted that the accepted jurors were not similarly situated to the struck juror with respect to the other reasons given by the prosecutor (*id.* at p. 290 (dis. opn. of Thomas, J.)). The high court then conducted comparative juror analysis with respect to the other two stated reasons, again considering each reason separately. (*Id.* at pp. 249–250.) In subsequent *Batson* decisions, the high court has consistently followed this approach to comparative juror analysis. (See *Flowers v. Mississippi* (2019) 588 U.S. __, __ [139 S.Ct. 2228, 2248–2249]; *Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1750–1754]; *Snyder v. Louisiana* (2008) 552 U.S. 472, 483–484.) All of these decisions found single-issue comparisons among jurors to be highly probative of discrimination; none used the pivoting frames of comparisons that this court employs to mitigate inferences of pretext.

Today's opinion says "[t]he fact that the high court found single-issue comparisons to be highly probative of discrimination within the circumstances of a particular case is not inconsistent with our analysis here, which . . . recognizes that such comparisons are relevant but ultimately concludes, within all of the relevant circumstances, that substantial evidence supports the trial court's denial of defendant's

*Batson/Wheeler* motion." (Maj. opn., *ante*, at p. 36, fn. 9.) But that assertion begs the crucial question: What is it about "the circumstances" of *Flowers*, *Foster*, *Snyder*, and *Miller-El* that makes single-issue comparisons highly probative in all of those cases, but not in the case before us? The court does not say — and thus leaves unexplained how its approach can be reconciled with high court precedent. (See *Hardy*, *supra*, 5 Cal.5th at p. 119 (dis. opn. of Liu, J.).)

## III.

With today's decision, this court extends its record of not having found *Batson* error involving the peremptory strike of a black juror in more than 30 years — despite the fact that "[t]he high court's opinion [in *Batson*] responded specifically to the pernicious history of African Americans being excluded from jury service, calling such exclusion 'a primary example of the evil the Fourteenth Amendment was designed to cure.' " (*Hardy*, *supra*, 5 Cal.5th at p. 124 (dis. opn. of Liu, J.), quoting *Batson*, *supra*, 476 U.S. at p. 85; see *People v. Johnson* (2019) 8 Cal.5th 475, 534–536 (dis. opn. of Liu, J.).)

Like this case, several of our recent cases had "definite racial overtones" that " 'raise[] heightened concerns about whether the prosecutor's challenge was racially motivated.' " (*Hardy*, *supra*, 5 Cal.5th at p. 78 [black man convicted of raping and murdering a white woman]; see *People v. Armstrong* (2019) 6 Cal.5th 735, 765 [same]; *People v. Harris* (2013) 57 Cal.4th 804, 863 (conc. opn. of Liu, J.) [same]; *People v. Johnson*, *supra*, 8 Cal.5th at p. 507 [black man convicted of murdering a white man and raping a white woman].) Like this case, some of our recent cases involved peremptory strikes that resulted in no black jurors serving on the main panel. (See *Hardy*, at p. 78;

*People v. Rhoades* (2019) 8 Cal.5th 393, 456 (dis. opn. of Liu, J.); see also *People v. Bryant* (2019) 40 Cal.App.5th 525, 535.) And like this case, our recent cases have upheld quite tenuous or implausible explanations for the removal of black jurors. It is past time to ask whether the *Batson* framework, as applied by this court, must be rethought in order to fulfill the constitutional mandate of eliminating racial discrimination in jury selection. (See *Bryant*, at p. 544 (conc. opn. of Humes, J.) [highlighting "the serious shortcomings with the *Batson* framework" as interpreted by this court and "calling for meaningful reform"].)

Here, the prosecutor's reasons for striking Simeon G. do not withstand scrutiny. Although I cannot be certain that the prosecutor struck Simeon G. because of his race, certainty is not the standard. Considering all relevant circumstances, I believe it was more likely than not that the strike was improperly motivated. Because the trial court erred in denying Miles's *Batson* claim, his convictions must be reversed.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Miles

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S086234
**Date Filed:** May 28, 2020

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** James A. Edwards

_____

**Counsel:**

Cliff Gardner and Catherine A. White, under appointments by the Supreme Court, for Defendant and Appellant.

Sherrilyn A. Ifill, Samuel Spital, Kristen A. Johnson, Christopher Kemmitt and Daniel S. Harawa for NAACP Legal Defense & Educational Fund, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens, Ronald A. Jakob and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Cliff Gardner
1448 San Pablo Avenue
Berkeley, CA 94702
(510) 524-1093

Christopher Kemmitt
NAACP Legal Defense & Educational Fund, Inc.
700 14th Street, NW, Suite 600
Washington, DC 20011
(202) 682-1300

Seth M. Friedman
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 645-3199